**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DEBORAH JONES-MACDONALD, | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:23-cv-2871 |
| | § | |
| ROLANDO DELGADO, JR., | § | JURY TRIAL DEMANDED |
| CHARLES RIBBE | § | |
| (in their individual capacities), | § | |
| HARRIS COUNTY, TEXAS, | § | |
| *Defendants.* | § | |

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT**
**SITTING IN THE SOUTHERN DISTRICT OF TEXAS:**

Plaintiff Deborah Jones-MacDonald ["Plaintiff"] respectfully comes before this Honorable Court complaining pursuant to 42 U.S.C. § 1983 that Defendants herein acted under color of state law and deprived her of her clearly established constitutional rights to remain free from unreasonable search and seizure, unreasonable use of excessive force, and wrongful arrest. In support thereof, Plaintiff specifically alleges the following:

## I.    <u>SUMMARY</u>

1. Harris County Sheriff Office's (hereinafter "HCSO") ***culture of violence*** creates a pattern, practice, custom, procedure, and policy of conduct that led to Plaintiff's serious injuries to her face, legs, knees, wrists, and ankles.

2. The specific culture of violence is evidenced by the actions, attitudes, statements, and decisions of Defendant Officers Delgado, Ribbe, and their supervisors, and supporting data and other incidents, as outlined in this complaint.

3. Both Delgado and Ribbe were previously employed inside the Harris County Jail, bringing that culture of violence into the streets wreaking harm against our communities and the Plaintiff in this case.

 = 

4. The above picture[1] accurately captures the culture of violence at HCSO that caused Plaintiff's injuries. It is a sticker found on the patrol car computer of Officer Delgado in this case - all property of HCSO - depicting "RoboCop" pointing a gun. "RoboCop" is a 1987 American science fiction film that emphasized extreme violence by an officer against citizens.[2]

5. This violent influence is permissibly revered and a part of the HCSO culture of violence promulgated by Delgado and Ribbe who initiated the physical assault and abuse of Ms. Jones-MacDonald in this case without provocation and without warning.

6. Delgado lied about this incident immediately after to a District Attorney intake representative; both Delgado and Ribbe lied in their offense reports and failed to complete required use of force reports in an attempt to shield themselves from accountability. Their supervisors and the policymaker, Sheriff Ed Gonzalez, have knowingly permitted and ratified these actions by failing to issue any corrective measures or change the culture of violence that led to Plaintiff's injuries.

7. The use of and permissibility of a Robocop sticker on official HCSO equipment clearly encourages and ratifies the use of violence, as evidenced by Delgado and Ribbe's actions in this case and the other culture of violence evidence included in this complaint.

8. Both Delgado and Ribbe have a history of abusive and dishonest behavior while employed

---

[1] Full image from Delgado's bodycam in this case is included as Exhibit D.
[2] Robocop is described and known as a film that "emphasized violence throughout the film" and used heightened and extreme scenes of violence. So much violence was in the film that it was threatened to not receive an acceptable theatrical rating at its release. https://en.wikipedia.org/wiki/RoboCop.

with the HCSO, including gross neglect of an inmate, violent and dangerous driving tactics, failures to file reports, falsifying reports, and being too quick to deploy excessive use of force.

9. Plaintiff was unconstitutionally subjected to unreasonable search and seizure, unreasonable and excessive force, and wrongful arrest by Delgado and Ribbe.

10. Plaintiff was a 65-year-old Black woman at the time of this incident.

11. Plaintiff has no criminal history and has never been arrested before.

12. Plaintiff had a right to sit in her car with her hands on the steering wheel.

13. The officers failed to investigate serious allegations of a breach of the peace by the self-proclaimed repossession individual evidenced by credible eyewitness testimony on scene during an attempted repossession of a vehicle, the purported reason for the interaction between Plaintiff and Defendants.

14. The officers did not have legal authority to be assisting or conducting a repossession of the vehicle and caused a breach of the peace themselves by their actions.

15. The officers did not have reasonable suspicion to approach the Plaintiff when they: a) ran over to her in her vehicle; b) made no verbal warnings or requests of any kind other than "Now, it's your turn" in a threatening manner; c) grabbed both her hands; and, c) illegally tried to pry her fingers from the steering wheel.

16. Delgado used excessive and unreasonable force when he punched her twice in the face, pulled her out of a car by her arms and legs, and grabbed her hair.

17. Ribbe used excessive and unreasonable force when he grabbed her foot with both hands, severely twisted her ankle and knee, and slammed his knees into her legs on the ground.

18. During Delgado's call to the District Attorney intake division, requesting for charges to be accepted, he lied to the prosecutor's office representative, claiming to have given verbal warnings for her to get out of her vehicle before using force, when he nor Ribbe made warnings of any kind.

19. Plaintiff was unconstitutionally subjected to wrongful arrest by Delgado & Ribbe.

20. Delgado and Ribbe also lied in their offense reports about the incident by claiming they

gave verbal warnings and requests *prior to* initiating a use of excessive force, which they did not, and minimizing or leaving out their use of force altogether.

21. Harris County's lack of discipline of officers and failure to train led to the unconstitutional approach with a lack of reasonable suspicion, excessive use of force, and wrongful arrest of Plaintiff.

22. Defendant Harris County is subject to *Monell* liability herein due to its policy, procedure, custom, practice, or protocol of:

    a. inadequately training, supervising, and/or disciplining its officers concerning legality of repossession of vehicles, constitutional reasonable suspicion, de-escalation techniques, reasonable use of force techniques, drafting and preparing use of force and other incident reports, and lawful arrests;

    b. shielding its officers from the consequences of illegal and/or improper conduct;

    c. permitting its officers to perform illegal and/or improper conduct; and

    d. ratifying officers' illegal and/or improper conduct.

23. All the Defendants' actions and inactions caused Plaintiff to suffer serious injuries to her face, arms, legs, knees, wrists, and ankles, as depicted here, requiring serious and ongoing medical care.



4



## II.    <u>NATURE OF THE ACTION</u>

24. This suit arises under the Constitution of the United States (particularly the Fourth and Fourteenth Amendments) and 42 U.S.C. § 1983.

## III.    <u>DEMAND FOR JURY TRIAL</u>

25. Plaintiff respectfully demands a trial by jury.

## IV.    <u>PARTIES</u>

26. Plaintiff Deborah Jones-MacDonald is and was at all time relevant hereto a resident of Harris County, Texas.

27. Defendant Rolando Delgado, an officer with the HCSO, is being sued in his individual capacity and may be served at his place of work at 1200 Baker Street, Houston, Texas 77002 or wherever he may be found.

28. Defendant Charles Ribbe, an officer with the HCSO, is being sued in his individual capacity and may be served at his place of work at 1200 Baker Street, Houston, Texas 77002 or wherever he may be found.

29. Defendant Harris County, is being sued and may be served through County Judge Lina Hidalgo at 1001 Preston, Suite 911, Houston, Texas 77002.

## V.    <u>JURISDICTION AND VENUE</u>

30. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a) (3) and (4) because Plaintiff's suit arises under 42 U.S.C. § 1983.

31. Venue is proper under 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Texas, Houston Division.

32. All conditions precedent have been performed or have occurred.

## VI.    SPECIFIC FACTS

### *HCSO officers enact their culture of violence against Ms. Jones-MacDonald*

33. The officers in this case should never have been at the scene of this incident and should never have joined a private individual who was breaching the peace to induce harm against the Black residents of the apartment complex and the Plaintiff.

34. As shown here, the individual officers in this case and the ***HCSO culture of violence*** displayed by their demeanor, words, decisions, actions, racial bias, failure to investigate, failure to warn, failure to de-escalate, lack of reasonable suspicion, lack of probable cause, excessive use of force, wrongful arrests, and *repeated lies* to cover their harmful actions caused great harm to a Black community's apartment complex peace and injuries to Ms. Jones-MacDonald that she is still suffering from today.

35. On August 12, 2021, the Plaintiff, Ms. Jones-MacDonald, dropped her car off at her ex-husband's apartment.

36. He had offered to do her a favor and look at maintenance issues it was having.

37. Late that night, multiple witnesses at the apartment complex were awoken because someone was trying to steal the car.

38. A private individual with no court order claimed to be attempting to repossess the car and caused a breach of the peace by raising his voice and acting belligerent.

39. On the morning of August 13, 2021, a private individual with no court order claimed to be trying to repossess the car at the apartment again.

40. He provided no documentation to anyone at the apartment of any kind to justify his repossession claim.

41. Plaintiff did not live at that apartment complex, and her car had no registration or other association with this apartment complex address.

42. As far as the Plaintiff and anyone else knew, they were trying to steal her car.

43. He was turned away and asked for verification of a legal right to take the vehicle.

44. The private individual did not obtain a court order, and instead, called the HCSO.

45. Without a court order or other legal repossession authority, HCSO employees Delgado and Ribbe went to the apartment.

46. The very action of requesting police involvement evidences this private individual breached the peace, but Delgado and Ribbe decided to immediately help him repossess the vehicle, anyway.

47. Independently corroborated eyewitnesses attempted to tell Delgado and Ribbe of the breach of peace.[3]

48. Delgado and Ribbe failed to investigate whether a breach of peace had occurred.

49. Had Delgado and Ribbe been properly trained and supervised, they would have known they needed to investigate eyewitness claims of a breach of peace.

50. A reasonable officer in their shoes would have known that it is required by law in repossession assertions to investigate and ensure a breach of peace had not occurred.

51. The independent testimony about a breach of peace came from eyewitnesses who are Black.

52. Delgado and Ribbe chose to ignore the eyewitnesses claiming a breach of peace, and instead took the word of the non-Black private individual claiming a repossession right without question or hesitation.

53. No one else involved – the private individual claiming to be a repossession man, the Defendant officers, the supervisory officer who came on scene, or any other involved officers or emergency medical personnel who were on scene or involved – is Black.

54. Delgado and Ribbe repeatedly stated on scene to multiple people captured by bodycam video that they had "no evidence of a breach of peace."

55. Delgado and Ribbe either do not know that eyewitness testimony is evidence, or they

---

[3] Signed affidavits from two independent witnesses show that the police officers who arrived on scene were made aware of the man claiming to repossess a vehicle had breached the peace by acting belligerent, raising his voice, and causing a disturbance as he attempted to repossess the vehicles. They both told the officers, named Delgado and Ribbe, about the breach of peace, their supervisor came on scene and was made aware of these accounts, and that the officers failed to investigate the breach of peace, and instead, acted in a forceful and violent manner to everyone besides the non-Black repossession man on scene.

chose to disregard multiple independently corroborated accounts by Black witnesses.

56. If Delgado and Ribbe were properly trained and supervised, they would have known that they had evidence, namely, eyewitness testimony, of a breach of peace.

57. This lack of training and culture of violent disregard for Black citizens' input, experiences, and lives, ultimately led to Delgado and Ribbe disregarding the rights of an elderly Black woman and violating Ms. Jones-MacDonald's rights that led to her injuries.

58. At the apartment complex, Delgado and Ribbe found the Plaintiff's ex-husband sitting on her vehicle.

59. He asked Delgado and Ribbe to interview two witnesses about the repossession man breaching the peace.

60. A reasonably trained and supervised police officer in their shoes would have known that they had a duty to do both – see if the repossession man had a right to tow the vehicle AND ensure that the repo man had not breached the peace in attempting to do so.

61. In response to this lawful request, Delgado and Ribbe physically approached and grabbed Plaintiff's ex-husband without any reasonable suspicion of a crime.

62. Delgado and Ribbe later verbally admit that they had no reasonable suspicion of a crime that he committed.

63. Had Delgado and Ribbe been properly trained and supervised, they would have known that without reasonable suspicion, they should not have approached or grabbed Plaintiff's ex-husband.

64. A reasonable officer in their shoes would have known they had no right to approach and grab Plaintiff's ex-husband.

65. Had Delgado and Ribbe merely left or properly investigated the breach of peace, this incident would not have escalated leading to Plaintiff's injuries.

66. After pulling Plaintiff's ex-husband off her vehicle, Delgado and Ribbe put him into custody in handcuffs and placed him in the back of a police car.

67. Again, they verbally admit on bodycam video that they had no crime they could legally be detaining him or hold him in custody for.

68. Later, after the altercation with Plaintiff, Delgado approaches his patrol vehicle, and the ex-husband asks him again, "what's my charge, Delgado?" and Delgado responds, "You? You're not…I…I don't think he's charged with anything."

69. Had Delgado and Ribbe been properly trained and supervised, they would have known that without reasonable suspicion or probable cause, they should not have detained Plaintiff's ex-husband or put him into custody by holding him, putting handcuffs on him, and placing him in the back of a locked police car.

70. A reasonable officer in their shoes would have known they had no right to arrest or detain Plaintiff's ex-husband.

71. With Plaintiff's ex-husband in handcuffs, Delgado's bravado continued and he stated, "You're detained."

72. Plaintiff's ex-husband responded, "Now, I'm detained?"

73. Delgado said, "You've got handcuffs on you."

74. Plaintiff's ex-husband asked, "Based on what crime?"

75. Delgado refused to answer him and later admitted to Ribbe and his supervisor that he had no right to put Plaintiff's ex-husband in custody.

76. Plaintiff's ex-husband was never accused of or charged with any crime.

77. Delgado then spoke to another independent Black eyewitness who tried to tell him that the repossession company had sent people who caused a breach of the peace then and during a prior incident the night before.

78. Delgado rejected this witness's lawful attempt to give him information relevant to his conduct.

79. Plaintiff arrived at the apartment complex and saw her vehicle and a tow truck.

80. Believing any potential tow to be illegal, Plaintiff got into the driver's seat of her car.

81. Delgado ran over to the car without giving any verbal warnings or requests of any kind.

82. Ribbe saw her get in her car, and threateningly stated, "Now it's your turn."

83. Ribbe tried to pull the Plaintiff out of her car.

84. Before turning to violence, neither Delgado or Ribbe gave any warning that they would get physical with her or made any verbal requests for her to get out of the vehicle.

85. Normally, before the use of force, an officer should make a verbal request of a suspect, give a suspect an opportunity to comply, and verbally warn a suspect that they will use force if the suspect does not comply.

86. However, Plaintiff was not a suspect because she was not committing any criminal actions.

87. Still, Delgado and Ribbe treated her lower than a criminal suspect immediately without provocation, disregarded an elderly Black woman's humanity completely, and jumped to the use of force skipping all other reasonable steps they could have taken – in line with HCSO's ***culture of violence***.

88. If Delgado and Ribbe had been properly trained and supervised, they would have known that they needed to give her verbal warnings and requests before any use of force, and they should have deployed de-escalation techniques.

89. A reasonable police officer in their shoes would have given verbal warnings or requests for her to get out of the vehicle, and de-escalated the situation, rather than illegally jumping to an immediate use of excessive force, escalating the scene to a violent one themselves.

90. Alarmingly, they actually created the violence in this incident, utterly failing any resemblance of proper de-escalation.

91. Later, when speaking to the District Attorney intake representative, Delgado lied and said that they gave her verbal warnings, when in fact, they had not.

92. Their failure to give verbal warnings is captured by their bodycam videos.

93. Delgado's specific account to the District Attorney intake representative about what happened and his lies are as follows:

   a. "At that point, when I was detaining him, the guy's wife ran into the vehicle." THIS IS A LIE. She got into the vehicle long after they had detained her ex-husband and put him in the back of their patrol car.

10

b. "She hopped in the vehicle, so we told her, 'Hey, you just can't jump in the vehicle when the wrecker driver's about to leave.'" THIS IS A LIE. They never said this to her.

c. "She was being very belligerent that 'she wasn't gonna get out, she wasn't gonna get out.'" – THIS IS A LIE. Her only words to them were "get off me" _after_ they had initiated the use of physical force, and any heightened anxiety emotions from her that could be construed as belligerent came _after_ they initiated the use of physical force against her.

d. "So, me and my partner told her, 'Hey you gotta get out of the car because it's being…it's already hooked up.'" – THIS IS A LIE. They did not say this to her before initiating the use of physical force.

e. "So I reached in and I grabbed her hand." His explanation states that he did this AFTER verbal warnings and requests, but he reached in before any words were spoken to her other than a threatening "Now, it's your turn."

f. "We spoke to her a little bit and told her, 'Hey, we're going to remove you out of the vehicle." THIS IS A LIE. They did not speak to her or give her this warning before initiating a use of force.

g. He then states that she bit him on the wrist while his hand was on her wrist, it caused him pain and discomfort, and they had to put her on the ground -  the conversation was over after the charges were accepted and he gave her some identifying information.

h. Importantly, he never mentioned that he punched her in the face twice. This is a LIE BY OMMISSION.

i. He never mentioned that his partner twisted her knee and ankle and slammed his knees into her legs. This is a LIE BY OMMISSION.

94. The fact that Delgado first lies about this incident while he was still on scene during a call to the District Attorney's Office is further evidence that a reasonable police officer in their shoes would have given verbal warnings.

95. Delgado and Ribbe also lied about this incident in their written offense report as follows:

a. After describing observing Plaintiff enter the driver's seat, Delgado writes, "Deputy Ribbie repeatedly told Mrs. Macdonald to get out of the vehicle and she refused." THIS IS A LIE. The video shows that she was not requested to exit the vehicle before they initiated a use of physical force.

b. In a supplement report[4], Ribbe writes, "so I approached the Defendant while giving verbal commands to exit the vehicle. The Defendant refused…" THIS IS A LIE. Video shows he did not give verbal commands nor afford her an opportunity to comply or refuse before he deployed physical use of force.

c. Ribbe failed to include any details about him twisting Plaintiff's knee and ankle or slamming his knees into her legs in his written report, despite knowing that they caused Plaintiff injury. This is a LIE BY OMMISSION.

96. Delgado and Ribbe knew they should have given verbal warnings and requests *first* and instead chose to lie to cover their mistakes and harmful reliance on an immediate use of excessive force that caused Plaintiff's injuries.

97. The pattern, custom, practice, and procedure of HCSO employees lying to cover mistakes like this, as shown below in a long list of prior incidents and independent reviews by the DOJ, Harris County JAD, and the state jail commission, is repeated by Delgado and Ribbe in this case.

98. If Delgado and Ribbe were properly trained and supervised in any attempt to fix the long-standing culture of lies and violence at HCSO as evidenced throughout this complaint, they would not have lied about their illegal actions in this case.

99. When Delgado and Ribbe approached her without warning, Plaintiff was not committing a crime, was not suspected of a crime, had no reasonable suspicion of committing a crime, yet was being illegally detained.[5]

100. At no time did Delgado and Ribbe have a warrant to search or seize Plaintiff.

---

[4] Notably, this supplement is not a formal use of force report, as required by HCSO policy. No use of force report was completed in this case, further evincing the officers and HCSO's attempts to hide instances when illegal excessive use of force occurs.

[5] In reviewing the totality of the circumstances when considering the reasonableness of Delgado and Ribbe's actions, it is noteworthy that this is the second illegal detention at this scene – the first being self-admittedly of the Plaintiff's ex-husband. They knew they already illegally detained someone, and chose to yet again illegally detain someone, the Plaintiff, mere minutes later.

101. At no time did Delgado and Ribbe have consent to search or seize Plaintiff.

102. Delgado and Ribbe did not have probable cause to search or seize Plaintiff.

103. No legal exigent circumstances existed for Delgado and Ribbe to search or seize Plaintiff.

104. After Ribbe angrily threatened the Plaintiff with, "Now it's your turn," he applied force and tried to grab her.

105. She immediately yelled "get off" at least three times before Ribbe stated to get out of the vehicle.

106. Delgado approached Plaintiff and Ribbe started pulling Plaintiff's other arm.

107. Delgado also started to forcibly pry Plaintiff's hands from the steering wheel.

108. Plaintiff screamed for Delgado and Ribbe to "GET OFF!" of her at least 15 times before Delgado yells accusing her of biting him.

109. Instead of de-escalating, Delgado and Ribbe ignored her requests to get off her and continued to actively assault her.

110. HCSO written policy SOP# 501 states that HCSO "[e]mployees are expected to de-escalate a situation whenever reasonably possible at all points before, during, and after an encounter."

111. Delgado and Ribbe disregarded any semblance of de-escalation as written in the policy or in line with national best practices, going the other direction to escalate the violence immediately.

112. Delgado or Ribbe have not been disciplined or had their failure to follow SOP# 501 corrected in any way, proving that this policy is nothing more than marks on a paper and are not representative of the patterns, practices, customs, or procedures of HCSO, which are more clearly shown by the actions in this case, statistics, and other incidents included in this complaint and to be found after proper discovery.

113. The factors showing how unreasonable Delgado and Ribbe's actions were can be outlined by HCSO's own written policy factors, despite a complete failure for HCSO to ensure these policies are actually enforced. Those factors from SOP# 501, evaluated here, are:

| Reasonableness Factor | Reasonable? |
|---|---|
| Seriousness of the crime or suspected offense | Unreasonable - Plaintiff was not suspected of any crime |
| Institutional security risk posed by the subject | Unreasonable - no risk existed |
| Reason for contact with the subject | Unreasonable - an illegal tow |
| Whether the subject is experiencing a medical emergency that rendered him or her incapable of making a rational decision | Unreasonable - no medical emergency until Delgado and Ribbe got involved |
| The level of threat or resistance presented by the subject | Unreasonable - no threat until Delgado and Ribbe began using force |
| The relationship between the need for the use of force and the amount of any force used | Unreasonable - an elderly Black woman does not need to be punched in face twice or have her ankles and knees twisted or officer knees slammed into her legs by two larger male officers in full police equipment to subdue her before force was used |
| Potential for injury to the subject, employee, or others | Unreasonable - Delgado and Ribbe knew there was a high likelihood she could be injured |
| An attempt by the subject to escape | Unreasonable - she was in her car unable to move or flee the entire time |
| Time available to the employee to make a decision and his or her reasonable access to de-escalation options | Unreasonable - they had plenty of time to give her warnings, requests, or other de-escalation tactics before running over to her and using force immediately |
| Proximity or access of weapons to the subject if any | Unreasonable - she had no access or closeness to any weapons |
| Whether the conduct of the subject no longer reasonably appears to pose an imminent threat to the employee or others | Unreasonable - her conduct was never an imminent threat to anyone |
| Relative factors of age, size, strength, skill level, injury, exhaustion, and the number of employees versus the number of subjects | Unreasonable - two large males in full police equipment compared to an elderly Black woman in nothing but a flimsy dress |
| Environmental factors and exigent circumstances | Unreasonable - it was a clear day with another suspect already in a police car and no other exigent circumstances |

114. By review of their own written factors, Delgado and Ribbe's use of force was obviously unreasonable.

115. That policy also states, "[u]sing unreasonable force will subject the employee applying such force to disciplinary action, loss of employment, and referral for possible prosecution." HCSO SOP# 501, pg. 4.

116. Despite this written policy, Delgado and Ribbe have not been disciplined, lost employment, or referred for prosecution.

117. This inaction shows that this written policy of HCSO means nothing.

118. What's the point of written policies if they are not actually followed?

119. Delgado and Ribbe used unreasonable force and were deliberately indifferent to the potential for harm and injury to Plaintiff.

120. An eyewitness can be heard on video pleading with Delgado and Ribbe to stop, stating, "Come on, she's an elderly woman!"

121. At this point, after the officers showed no signs of stopping their illegal behavior (despite being pleaded with repeatedly), Plaintiff felt threatened and defended herself by biting Delgado's hand that he had illegally placed on her elderly Black woman's body.

122. The bite did not break skin.

123. Rather than de-escalating the situation, Delgado decided to punch Plaintiff in the face twice, causing serious damage and injury to her face.



124. The bite mark on Delgado's hand did not need medical attention and did not break the skin, as he told medical officials on scene.



125. Later, Delgado yelled at her that there was a "bite mark on my hand."

126. Plaintiff, after being physically abused, was still able to explain herself by stating, "That's because you were pulling me."

127. Delgado had Ribbe take the above picture of his hand long before anyone checked on Ms. Jones-MacDonald's medical condition or attending to her much more serious injuries from being punched in the face and assaulted by both Delgado and Ribbe.

128. He was so quick to have Ribbe take a picture of his hand because he knew he did something wrong and he was trying to cover only his side of the story and silence her harm and experience.

129. Ribbe joined and supported Delgado in this cover-up attempt.

130. A reasonable police officer in their shoes would have known that they needed to check on Ms. Jones-MacDonald's medical safety after being assaulted.

131. If Delgado and Ribbe had been properly trained and supervised, they would have immediately checked on the well-being of Ms. Jones-MacDonald after assaulting her, rather than focusing on taking pictures of a minor abrasion on his hand.

132. Delgado and Ribbe's actions here are in line with the culture of violence, lies, cover-up, and code of silence prevalent throughout HCSO as shown by statistics, other incidents, and independent evaluation and oversight reports included in this complaint.

133. After using excessive force by punching her in the face, Delgado and Ribbe grabbed her by her hair and pulled her out of the car.

134. While she is on the ground with Delgado on top of her upper body, Ribbe can be seen on video forcibly and intentionally twisting her ankle and knee.

135. Ribbe's twisting of her ankle and knee was excessive use of force and caused serious injuries.



136. Ribbe's use of excessive force by twisting Plaintiff's knee and ankle was not necessary to restrain Plaintiff, as she already had a much larger police officer on top of her.

137. When Ribbe twists Plaintiff's knee and ankle, you can hear the witness again plead with the officers to stop, "Come on, man!"

138. Ribbe then drops his body weight behind slamming his knees into Plaintiff's legs.

139. If Ribbe had been properly trained and supervised, he would have known that twisting her ankle and knee, and slamming his knees into her legs in this manner was an excessive use of force.

140. A reasonable police officer in Ribbe's shoes would not have unnecessarily twisted her knee and ankle or slammed their knees into her legs.

141. A bystander witness was recording the incident, and Delgado threateningly approached him by stating, "you want to record something, take a picture of her biting me. She was trying to steal the car."

142. The witness calmly explains to Delgado that she was not stealing the car, she was actually trying to prevent someone from stealing her car.

143. Delgado unreasonably dismisses this witness's reality check and observation of his ongoing illegal and harmful actions to a community and Plaintiff who was being victimized by an illegal tow.

144. As Delgado and Ribbe handcuff and place the Plaintiff in the back of a police car, she

repeatedly asks to speak with her attorney.

145. Delgado and Ribbe refuse to listen to her assertion of her sixth amendment rights, and instead continue to interrogate her, asking her more questions, long after she has invoked her right to an attorney.

146. Walking away from the car, Ribbe states, "she making me sweat and shit."

147. Then, away from Plaintiff, Ribbe says to Delgado, "I didn't see her biting you, where'd she bite you?"

148. Ribbe's use of force was not in response to Plaintiff's bite, meaning his excessive use of force was done without any knowledge of probable cause of any accusation.

149. Then, Ribbe sees witnesses on a porch recording him, and shouts to them, "you get it for youtube?" obviously feeling very proud of their initiated violent use of excessive force against an elderly Black woman.

150. A supervisor was then called, Sergeant Willis.

151. This supervisor was aware of Delgado and Ribbe's actions in this case and instead of correcting them, he helped them to further conceal the truth and joined them in comments supporting a culture of violence at HCSO.

152. A supervisor should have known that it was illegal for Delgado and Ribbe to initiate the excessive use of physical force.

153. A supervisor should have known that they had illegally detained two people.

154. A supervisor should have known that they had no legal right to approach the Plaintiff.

155. A supervisor should have known that they should have investigated claims of a breach of peace.

156. A supervisor should have known that they needed to gather all eyewitness testimony as evidence, not disregard statements of the only Black witnesses on scene.

157. A supervisor should have known that a use of force report needed to be written.

158. A supervisor should have known that Delgado should not have lied to the District Attorney intake representative about the incident.

159. A supervisor should have known that they failed to use de-escalation techniques.

160. Delgado, speaking to his supervisor on the phone, stated, "so I punched her – I've got a good bite mark on my wrist…we gotta call EMS because I did punch her…no, she didn't break the skin."[6]

161. Plaintiff tried to receive medical treatment from paramedics, but Delgado and Ribbe turned the paramedics away, refusing them access to Plaintiff.

162. Once their supervisor, Sgt. Willis, arrived on scene, he approached Plaintiff in the vehicle to try to interrogate her again, even though he knew she had requested an attorney multiple times.

163. Sgt. Willis talked to Delagdo and Ribbe about what specific reports were needed from them for this incident.

164. When the supervisor tells Ribbe to write a supplement, Ribbe says it will be exactly what Delgado writes and acts like he doesn't understand the importance of writing a supplemental report.

165. Sgt. Willis does not instruct them to write a use of force report in the list, even after they had discussed that physical assaults had taken place.

166. When medical personnel arrived on scene, they looked at Delgado's wrist before Plaintiff's injuries or her ex-husband's head injury.

167. While prioritizing Delgado's wrist, they stated, "yea, it didn't break the skin – you sure you don't want us to do any kind of report on it?"

168. Later, the medical personnel joked with Delgado stating, "maybe let them look at your wrist while you're down [at the jail], too…haha…just saying, it'll make your case better."

169. HCSO employees thought it was first priority and commonplace to exaggerate injuries to themselves in order to justify and hide their illegal actions against Plaintiff in this case.

---

[6] We have good reason to believe that this phone call, when provided through discovery, will include further evidence that the supervisor was trying to help Delgado cover his mistakes in furtherance of HCSO's culture of violence, rather than properly supervising him, correcting mistakes, ensuring the safety of citizens, and ensuring proper use of force reports would be filed with integrity without lies.

170. Ribbe's bravado continues while on scene when he approached a witness who had remained calm and peaceful through the entire ordeal and asked him, "can you stop agitating everybody?"

171. Later, as he joked with the other officers on scene he said, "man, I wasn't supposed to be sweating today," making light of their physical assault and injury inducing actions against an elderly Black woman.

172. He then sits in the patrol vehicle with Plaintiff and continues his demeanor of abuse by purposefully agitating her with sarcastic comments like, "whatever you say ma'am," while smoking a vape in the car, putting her health at risk.

173. While conversing with other officers on scene seemingly when he is discussing charges, Ribbe purposefully turns his bodycam microphone off, at times heard laughing in menace when the mic comes back on.

174. He purposefully shuts off his bodycam microphone for a total of at least twenty-five minutes.

175. Later, while discussing the incident, Delgado says to Ribbe, "yea, I can't punch worth anything."

176. Ribbe responds, "haha, Lieutenant actually called it pathetic."

177. Ribbe then stated to his supervisor, "sir, I have a boo boo too, does that count?... I'm just kidding."

178. Delgado and Ribbe were making jokes about their illegal and excessive initiation of physical force, and these comments can only be interpreted to mean they thought Delgado should have punched Plaintiff HARDER and used MORE force than they did, further evincing a scary ***culture of violence*** permeating through HCSO.

179. Delgado and Ribbe illegally arrested Plaintiff for assaulting a peace officer by lying about meeting the elements to the District Attorney intake representative.

180. Plaintiff was not charged with any other underlying accusation or crime.

181. Plaintiff has no criminal history.

182. For the first time in her 65 years, she was taken to jail – bruised, embarrassed, and beaten.

183. Delgado and Ribbe's excessive use of force was recorded on body camera video and a regular HCSO offense report.

184. Delgado and Ribbe failed to follow a written HCSO policy on reports, SOP# 207 & 601, by not gathering and writing the required identification information, shortchanging the required synopsis, not writing a scene summary, not including all relevant property, not writing a detailed narrative, not including all witnesses, not including their field notes, not properly including their use of force, and the supervisor did not review it.

185. Delgado and Ribbe's excessive use of force was not reported through a use of force report.

186. HCSO SOP# 207 written policy states, "It is the duty of all employees who have engaged in the use of force, whether the employee is on or off duty at the time, to report the use of force. The supervisor of the employee who was involved in the use of force event shall complete a Use of Force form in the Blue Team system, in addition to the employee completing an MFR report, promptly, completely, and accurately prior to the end of the deputy's tour of duty. Once the Use of Force form is completed in Blue Team, the supervisor shall forward the form electronically (via Blue Team) as outlined in HCSO Department Policy #501 - Use of Force." Pg. 6.

187. HCSO SOP# 501 written policy states, "1. Failure to report the use of force may lead to disciplinary action, loss of employment, and referral for possible prosecution. 2. Incident reports regarding use of force must include a description of: a. Circumstances leading to the incident; b. De-escalation techniques attempted by the employee; c. The threat perceived by the employee; d. The level of resistance faced; e. Any force used in response to resistance faced; f. Any injuries, possible injuries, and treatment administered; g. Medical provider who responded, including names, agency, job titles, and unit number if any; h. Whether any photos or videos are available from before, during, or after the incident; and i. Any other pertinent information, to include other requirements of the Department Manual and applicable standard operating procedures." Pg. 13-14.

188. Delgado and Ribbe did not follow HCSO written policies SOP# 207, 501, or 601.

189. HCSO SOP# 501 written policy also states, "[e]mployees who have observed the use of

force by another employee must promptly report the observed use of force to an on-duty supervisor, and complete a supplement report to the involved employee's report of what was observed. Failure to report an observed use of force may lead to disciplinary action, loss of employment, and referral for possible prosecution."

190. Other officers were on scene besides Delgado and Ribbe and observed this use of force, however, no other officer on scene of this incident completed a supplemental report.

191. No supervisor followed these policies or reviewed their offense report, or ensured a use of force report was properly filed, failing to ensure accuracy, thoroughness, and completeness, as required by the written policy.

192. Delgado, Ribbe, or their on-duty supervisor have not been disciplined or had their failure to follow SOP# 207 & 601 corrected in any way, proving that these policies are nothing more than marks on a paper and are not representative of the patterns, practices, customs, or procedures of HCSO, which are more clearly shown by the actions in this case, statistics, and other incidents included here and to be found after proper discovery.

193. Defendants arrested Plaintiff without probable cause and with disproportionate force.

194. The charge of assaulting a peace officer was dismissed on April 21, 2023.

195. Delgado has a history of documented abusive and dishonest behavior with the HCSO, including but not limited to:

    a. A 2-Day suspension without pay on May 2-3, 2015 and six-month disciplinary probation period for an incident in 2013. As a jailer, Delgado egregiously neglected an MHMRA inmate. Delgado's supervisors found 60 food trays left in the inmate's cell (30 days of neglect) with decaying food and feces, a strong odor of urine from the cell, "horrendous" smell in an around the cell, "gnats upon gnats throughout the cell," mattress batting and feces clogging the toilet, shower drain clogged with feces and orange rinds, and feces and batting in other areas of the cell, too. Three days after supervisors ordered the inmate to be moved and the cell to be cleaned, Delgado put him back in the cell and "just disregarded the situation." When his supervisors again found the inmate there, they ordered him to a clean cell and were "overcome by an incredible cloud of gnats" in the cell where Delgado left the inmate. 50-60 more food tray with feces were in the cell

again and the deplorable conditions persisted. Delgado's testimony about his neglect caused an Internal Affairs conclusion that "[y]our conduct in this matter discredits you, the Sheriff's Office, and its employees."[7]

b. His 2015 annual review stated that his supervisor had "great difficulty in getting him to sign payroll, turn paperwork in, or make corrections on a report, despite repeated emails, phone calls, and messages."

c. A May 6, 2016 "at fault" fleet accident for making an "unsafe U-turn, and struck a park vehicle. Damage was estimated at $1,106.40."

d. In 2016, Delgado used a disabled veteran's apartment as an interrogation room, pulled him out of his home, and hit him in the face with his service firearm, leaving the man bloodied and in need of medical care, and later lied about the incident to cover himself to the District Attorney's Office and in written reports.[8]

e. A 1-Day Suspension without pay on June 29, 2018 for an incident on April 25, 2018 where he "backed without safety while on the scene of a major accident and struck another vehicle in the intersection," causing damage of $712.50.

f. A Letter of Reprimand issued on September 17, 2018 for an incident on May 1, 2018 involving violations of multiple policies where he committed dangerous and violent driving tactics by trying to swerve in front of a car to stop it.[9]

g. A March 8, 2019 "at fault" fleet accident.[10]

h. A 1-Day Suspension without pay on May 16, 2019 for an incident on March 8, 2019 for striking an unoccupied parked vehicle causing damage estimated at $404.60.

---

[7] This disciplinary action is being included as Exhibit E.
[8] While a jury found Delgado did not commit excessive force, it is relevant here because it put the policymaker on notice that Delgado has a history of physically assaulting people more vulnerable than him and lying about it in reports – here, an elderly Black woman; in case 4:16-cv-3568, a disabled veteran – and Delgado's need for more training, supervision, and corrective action to prevent harmful actions like the ones here leading to Plaintiff's injuries. The policymaker did not take necessary corrective action that could have prevented Ms. Jones-MacDonald's injuries.
[9] Violent driving tactics like this have been found to be an exceptional problem in Houston worse than in other Texas cities, and policies have changed to address dangerous actions like the ones Delgado took.
https://www.houstonchronicle.com/news/investigations/article/houston-police-chase-deaths-18329110.php;
https://www.chron.com/news/houston-texas/article/houston-police-car-chase-policy-18369150.php.
[10] No further details were in the public personnel file and more are expected through proper discovery.

i.   A 1-Day Suspension without pay on September 16, 2020 for an incident on May 18, 2020 for another "at-fault" fleet accident striking another vehicle causing $352.70 in damage.

j.   A 1-Day Suspension without pay on May 8, 2021 for an incident on June 6, 2020 for failing to properly document a use of force incident by not activating his body worn camera in a case where he ran after a suspect, unsuccessfully deployed a taser, and struck him "to gain compliance" after handcuffing only one wrist.[11]

196. Ribbe has a history of documented abusive and dishonest behavior with the HCSO, including but not limited to:

a.   An "at-fault" fleet accident on August 15, 2016.

b.   A 3-day suspension without pay on December 16-18, 2017 for an "at-fault" fleet accident on September 25, 2017 for failing to control his speed, striking the vehicle in front of him, and not wearing a seat belt as required by law, causing damage estimated at $5,967.07.

c.   A 3-day suspension without pay on May 4-6, 2018 for an "at-fault" fleet accident on January 13, 2018 for driving at violent speeds: "moving 90 mph in a 40 mph speed limit zone, you struck a large piece of debris on your way. Damage to the county vehicle was estimated at $2,047.42."

d.   A 2021 performance review indicated that Ribbe "has been listed on several missing report statuses and/or has failed to enter reports prior to the end of his shift."[12]

e.   A 16-hour Suspension without pay on July 19-20, 2022 and 60-day probation when he "failed to complete and enter nine (9) crash reports into the Crash Records Information System (CRIS) between May-October 2020 and Internal Affairs found him to have lied about the reasons for not completing the reports.

197. As exemplified in Plaintiff's claims and in the various reports and incidents noted in this

---

[11] The disciplinary action noted his use of force was found to be reasonable, but again, this incident gives the policymaker notice that Delgado is susceptible to using unnecessary force and failing to document it properly that conveniently hides a proper opportunity for review and accountability, as found throughout the culture of HCSO.
[12] This consistent attitude against proper reporting leaves open his ability to lie and shield himself from accountability for harmful actions.

complaint, Harris County has a history encouraging officers to use excessive force, not supervising them in the use of force, not training them on proper de-escalation techniques, encouraging them to use techniques that result in unnecessary harm, encouraging and ratifying false reports, encouraging and ratifying summary investigations, and ultimately charging victims of physical force with false charges to cover up the use of force.

198. Given HCSO's long history of shielding its officers and hiding misconduct, it is likely that discovery will reveal more behavior by Delgado and Ribbe that should have made the policymaker even more aware of a high likelihood they would commit unlawful and harmful actions like they did in this case that would lead to someone's injuries, and then lie about it to try to cover their wrongful actions.

199. The policymaker, Sheriff Ed Gonzalez, likely or should have known about this incident from Delgado and Ribbe's supervisor.

200. Even if he was not personally made aware then of the incident, Sheriff Ed Gonzalez knew about this incident from a demand letter sent to him, the County Attorney Office, and the Commissioners Court before the filing of this suit in June 2023.

201. The policymakers of Harris County knew or should have known of all facts and circumstances giving rise to these claims, at the very least through that demand letter sent on behalf of Plaintiff.

202. The policymaker, Sheriff Ed Gonzalez, chose not to respond to the demand letter and has failed to discipline or take any corrective actions whatsoever against Delgado, Ribbe, or Willis, their supervisor.

203. The policymaker's inaction is evidence of ratifying these actions in furtherance of HCSO's culture of violence and his failure to do anything to correct this culture that shows a policy, practice, custom, and procedure that led to Plaintiff's injuries.

204. Plaintiff's injuries from this incident include but are not limited to: damage requiring wrist and knee surgery; torn ligaments and tendons; permanent physical appearance alteration from irreparable facial trauma and nerve damage; limb numbness; lower back disc damage; loss of employment opportunities; psychological damage requiring therapy; post-traumatic stress disorder; mental anguish; emotional distress; fear; embarrassment;

humiliation; and, reputational damage.

205. Through their actions, Defendants deeply traumatized Plaintiff that affects every aspect of her life now and ongoing.

206. As of the date of this filing, Plaintiff has received no response to her demand letter.

***Evidence of HCSO's culture of violence***

207. Harris County Sheriff Office's ***culture of violence*** creates a pattern, practice, custom, or procedure of conduct that led to Plaintiff's serious injuries.

208. As described above, you see actions and decisions allowed by HCSO officers that violated Plaintiff's constitutional rights, failed to de-escalate, used excessive and unreasonable force with actions like slamming her to ground, punching her in the face, and slamming their knees into her, and then lied about the incident repeatedly (here, at the scene on the phone to the District Attorney and in the offense report, and a failure to complete a use of force report.)

209. The following incidents and statistics will evince that these actions are not isolated, and there is a long-standing history and culture across HCSO that violates people's constitutional rights, failures to de-escalate, using excessive and unreasonable force with actions like slamming people to the ground, punching them in the face, and slamming knees into people, and the lying about incidents in testimony, on reports, and by failing to file reports.

210. This long-standing history and culture subjects Harris County to liability in this case because of the evidence explained here and the further evidence that is expected to be found during discovery (of considerable and specific note, the details of the 1,480 incidents of use of force mentioned below in the same year as this incident – 2021 – will likely provide many more similar instances of conduct that will prove these actions are a part of the patterns, practices, customs, procedures, and policies promulgated by the HCSO and its policymaker, Sheriff Ed Gonzalez).

211. Both Delgado and Ribbe previously worked in the Harris County Jail and have been trained and promoted within the jail culture. As shown here, that culture is violent and without severe corrective measures that have not been taken by the policymaker, Sheriff

Ed Gonzalez, people coming from this culture (like Delgado and Ribbe) will perpetuate it into our streets when they become patrolmen, resulting in abuse and injuries like the ones Plaintiff fell victim to in this case.

212. The HCSO culture of violence is evidenced by the following statistics and prior incidents:

   a. A report to the Harris County Commissioners Court from the Harris County Justice Administrative Department, dated June 8, 2021[13] (2 months prior to the use of force in this case), found that racial & ethnic disparities exist in rates of arrest, citations, and use of force.

   b. Disparate findings in that report specifically states, "Harris County Law Enforcement Agencies use force that results in bodily injury against Black and Hispanic drivers more frequently than against other racial and ethnic groups." Exhibit A, pg. 7.

   c. This report found that Harris County Law Enforcement Agencies "overreliance on force against specific communities" requires reforms. Exhibit A, pg. 10.

   d. This report found that when a HCSO uses force that results in injury, Black drivers are the subject in 47% of these incidents – a higher-than-normal disparity as compared to other Harris County agencies.[14] Exhibit A, pg. 24.

   e. This report concluded, "Harris County Law Enforcement Agencies use force against Black and Hispanic drivers in Harris County significantly more frequently than against other racial and ethnic groups. Law Enforcement Agencies must critically examine these incidents and work to understand the origin of these disparities. Further, the disparate tendency to use force against specific communities elevates the necessity for greater data and incident transparency amongst Harris County Law Enforcement Agencies, especially the eight Constable Precincts and the Harris County Sheriff's Office." Exhibit A, pg. 25.

   f. During 2021, the HCSO had 1,480 patrol incidents of use of force reported and

---

[13] Exhibit A.
[14] The disparity is even worse when compared to other Texas counties: HCSO: 47%; Bexar County: 15%; Dallas County: 38%; Tarrant County: 37%.

investigated by their Internal Affairs Division.[15]

g.   The HCSO has one of the highest numbers of use of force incidents in the country.

h.   The HCSO also controls the Harris County Jail, with a long and excessive culture of violence that spills into the streets in cases like this.

i.   The HCSO's culture of violence in the jail is evidence of their organizational culture of violence that is realized through the practices, customs, procedures, and policies that led to Plaintiff's injuries.

j.   Defendant Officer Delgado and Ribbe were detention officers in the violent jail system, and are now taking this Robocop mentality into the HCSO patrol and wreaking violent havoc to our Black communities and against the Plaintiff that caused the injuries in this case.

k.   The HCSO allowed 21 people to die in the jail in 2021; 27 people died in 2022; and according to current reporting, 18 people died in 2023 – one of the highest death rates in the country.

l.   Some other prior incidents and statistics evidencing this culture of violence that permeates HCSO are included here.

   1.   A HCSO employee was allowed to beat a special needs inmate nearly to death in the face, leaving him with a brain aneurysm and infections in both lungs, without any corrective action taken against the employee by HCSO.[16]

   2.   Sixty-two people died of ***unnatural causes*** in the custody of the HCSO between 2012 and 2022. Nearly 60% of them had been identified as mentally ill.[17]

---

[15] Exhibit B – PIA response from Harris County Sheriff. Further discovery will reveal whether this incident is included in this list or not and more particular similarities between these incidents and the one resulting in this complaint. However, given the Defendant Officers' failure to write a use of force report, it is reliably assumed that this incident is not included in this list, meaning HCSO's incident list should likely be much longer, evidencing their culture of violence and code of silence even further.

[16] Taylor v. Hartley, 4:18-cv-4811 (S.D. Tex. 2020), news coverage: https://abc13.com/eddie-taylor-harris-county-jail/1789641/.

[17] https://houstonlanding.org/her-sons-killer-was-found-guilty-now-she-wants-the-harris-county-jail-held-

3. On February 8, 2023, two former Harris County jail employees described the current condition in the jail as "unsafe…toxic…[d]rugs are rampant…[you] would see gang initiations. [You] would see people being rolled out, they call it beaten to a bloody pulp…there's an expectation that you will be welcomed through violence…[y]ou've got some suicides. You've got some homicides. You've got neglect."[18] Even pregnant women are being abused in this facility.[19] The Harris County Sheriff's Office itself called the current situation a "crisis" that "requires significant action on the part of all participants in the Harris County criminal justice system."[20]

4. In February 2023, a Harris County jail guard was charged with murder due to a February 2022 vicious assault upon an inmate in which 11 officers were fired and 6 officers suspended as being complicit and accepting of the use of excessive force.[21]

5. In 2016, Brandon Campbell was sprayed in the face with gas by a HCSO employee during count, thrown on the ground and kicked, punched and kneed in the head and back, and had his head ran into a door, causing cuts to his face, a blood clot, and constant pain to his head, back, and eyes.

6. In 2010, Herman Young, an elderly man, was thrown on the floor by a HCSO employee detention officer and punched in the stomach while in the jail clinic trying to receive treatment.

7. In 2018, Joseph Bailey was choked, lifted off the ground by his neck and carried 30 to 40 paces while still handcuffed at the jail and then assaulted by another jail staffer once he was put in a cell.

8. In 2015, Vincent Henderson was hit in the back of the head by two

accountable/#:~:text=The%20Houston%20Landing%20has%20found,lawsuits%20was%20filed%20by%20Dallas.
[18] https://www.fox26houston.com/news/two-former-harris-co-jail-employees-say-inmates-are-running-the-show.
[19] https://theappeal.org/pregnant-people-shackled-abused-crisis-harris-county-jail/.
[20] https://www.fox26houston.com/news/two-former-harris-co-jail-employees-say-inmates-are-running-the-show.
[21] https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/02/06/443102/former-detention-officer-charged-with-manslaughter-in-death-at-harris-county-jail/.

HCSO deputies and knocked unconscious.

9. On February 12, 2018, on his way to his cell, Arthur Johnson was called a "stupid" N-word and shoved down the stairs by a HCSO employee, breaking a bone in his hand. Supervisors were told and did nothing.

10. On February 4, 2018, Ashley LeFave, a small woman, was continuously punched in the face by a Harris County Sheriff's deputy while she was handcuffed upon arriving at the jail, causing a broken orbital socket that required surgery.

11. In 2015, Darrell Mark had a "brutal attack" orchestrated against him by detention officers in retaliation to filing a grievance against officers, and the HCSO employees failed to follow the correct protocol for grievances after he filed it.

m. The HCSO's culture of violence in the jail is well-documented in another federal case complaint, which is included here and incorporated as if set forth fully herein as a part of this complaint as evidence to support our claims.[22]

n. Of important note, some evidence from that case shows the culture of violence and policymaker's knowledge most relevant to Plaintiff's claims here[23]:

1. "The seriousness of the [2009] DOJ Report should have wrought drastic change within the Jail; yet, less than seven years later, Sheriff Ron Hickman admitted that the Jail had a ***culture of violence*** and a ***culture of using excessive force*** which led to detainee injuries. When Sheriff Gonzalez ran against Sheriff Hickman in 2016, Sheriff Gonzalez attacked Sheriff Hickman's handling of the Jail and stated in a debate that 'We've got to end this culture that quickly leads to physical altercation.'... Both Sheriffs expressly understood what was going on in the Jail, yet nothing ultimately changed within the Jail." Exhibit C, pg. 8

---

[22] Exhibit C.

[23] While this list is extensive, we have limited it to the instances, facts, and circumstances that are directly comparable and applicable to the facts, claims, and circumstances in this case. As shown below, the actions included here show a similar pattern of violent and dishonest conduct that was on display when Ms. Jones-MacDonald was abused by two HCSO employees who both previously worked inside the jail, adopting its culture of violence and taking it to our community's streets.

(emphasis added).

2.  The jail under HCSO control "has had more assaults within the Jail than all 251 other Texas county jails combined." Exhibit C, pg. 8.

3.  "In [one] altercation, multiple officers beat Mr. Pillow to the point where he had significant blunt force trauma to his head, back, and extremities. The officers placed their weight onto Mr. Pillow's chest and back preventing him from breathing until they stopped beating him." Exhibit C, pg. 16.

4.  "As he was walking out of his cell, an officer pushed Mr. Johnson in the back causing him to stumble. Several officers then tackled Mr. Johnson, placed him on the ground, and began beating him outside of his cell and placed him in restraints. This beating lasted several minutes." Exhibit C, pg. 17.

5.  "While in the Jail, Mr. Barrett was assaulted resulting in significant trauma to his head. The injuries to his head were noticeable… Mr. Barrett was [later] declared deceased due to blunt force trauma to his head." Exhibit C, pg. 20-21.

6.  HCSO employees stood around joking instead of getting a necessary stretcher for Kevin Leon Smith, Jr. and "[i]n the pod, five to six more officers and the sergeant were in the room looking at Mr. Smith in his top bunk. Although the officers knew that Mr. Smith was unresponsive, they were not attempting to get Mr. Smith onto the ground to do CPR or other life saving measures. Instead, the officers were simply stating that Mr. Smith was 'faking' it. Eventually, the trustees got Mr. Smith onto the back board and took him to the elevator. No CPR was being conducted. Medical staff were simply standing by the backboard and not providing any assistance." Exhibit C, pg. 22.

7.  "Mr. Thomas was extremely vulnerable to bullying and abuse within the jail. During his time in the jail, Mr. Thomas was constantly bullied to the point that Mr. Thomas's family were requesting that he be placed in the

mental health section of the jail." Exhibit C, pg. 23.

8. Detention officers lied about when life-saving measures began with two inmates who died. Exhibit C, pg. 23.

9. "Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with 'snitches' and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Griego's injuries and death when the Jail staff either failed to observe or monitor Mr. Griego or the detainee's beating Mr. Griego, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees." Exhibit C, pg. 30.

10. "On or around April 23, 2023, Mr. Garrison was beaten by several detention officers causing him to suffer injuries. The jail alleged that they were investigating this situation, but Mr. Garrison was not provided an update on whether the investigation occurred or not. Mr. Garrison was not aware of any disciplinary action being taken against those guards… an officer [later] stepped toward Mr. Garrison and sprayed him with pepper spray… While Mr. Garrison was walking away, the original officer attacked Mr. Garrison punching him in the face. The other officers then joined the assault and slammed Mr. Garrison against the wall, handcuffed him, and continued to beat him while he was laying on the ground. Eventually, the officers dragged Mr. Garrison out of the dayroom. Instead of the officers taking pictures of the blood on the floors and walls of the dayroom, the officers had workers clean up the blood before any pictures could be taken. Several detainees asked to provide witness statements, but no officer came and took their

statement… Eventually, Mr. Garrison was taken to the hospital. The doctors found that Mr. Garrison was assaulted by the jail guards resulting in a 'Hangman's' fracture of his neck. The doctors found that Mr. Garrison was lucky to be alive and not paralyzed. His injuries required that Mr. Garrison undergo immediate neck surgery. In addition to his broken neck, Mr. Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength and use in his right hand as a direct result of Harris County's actions. Consistent with Harris County's policies, the officers falsified the report of the incident to the medical providers. The medical records show that the officers told the emergency responders that only pepper spray was involved. The doctors knew that this statement was false in light of Mr. Garrison's injuries. The hospital rejected this story and determined that the officers assaulted Mr. Garrison causing the above injuries." Exhibit C, pg. 31-33.

11. "Mr. Johnson was assaulted by numerous officers within the jail. The severity of this assault caused Mr. Johnson to suffer seizures during the assault and go in-and-out of consciousness multiple times. Mr. Johnson did not have any prior history of seizures… The hospital found that due to the assault by the officers, Mr. Johnson suffered a fractured skull, a fractured neck, a fractured spine, and fractured ribs. Additionally, Mr. Johnson's head injuries caused him to have blood on his brain. No reasonable use of force would have caused these severe injuries. Instead, Harris County's policies, practices, and procedures encouraging officers to use excessive force caused these injuries." Exhibit C, pg. 34.

12. "Mr. Richard had complained to his mother about the terrible conditions within the Jail over the phone. While sitting in the clinic, Mr. Richard was waiting to receive care when an officer came in and placed him in handcuffs and leg shackles. Mr. Richard thought this was unusual as they had never shackled him in the clinic previously. Two officers then came into the clinic and escorted Mr. Richard to a holding cell nearby

which was a notorious spot for officer-detainee beatings. The two officers pushed Mr. Richard into the cell telling him not to talk to his mom anymore. The officers then left. A few minutes later, the two officers came back with four additional officers. While Mr. Richard was still restrained, the six officers began punching him to the ground where they proceeded to stomp on him and kick him. This beating lasted for several minutes. Mr. Richard lost consciousness and was eventually sent to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and PTSD. Mr. Richard had lost the skin around his ankles and wrists where the shackles had been when he was beaten up. When Mr. Richard was in the hospital, his injuries required him to be intubated while he was unconscious." Exhibit C, pg. 35-36.

13. "On or about February 1, 2023, Mr. Anglin was placed in handcuffs in the Jail when an officer inexplicably began kicking Mr. Anglin in the face. Due to this inexcusable use of force, Mr. Anglin had six teeth knocked out of his mouth and significant swelling all over his head." Exhibit C, pg. 36-37.

14. "While outside of the elevator and then later inside of the elevator outside of the view of any cameras, the officer lifted Mr. Veal's handcuffed arms high behind his back twisting and hurting Mr. Veal's shoulder and back. Then the officer grabbed the handcuffs and pulled them closer together causing significant pain in Mr. Veal's wrists." Exhibit C, pg. 37.

15. "Once [Mr. Coote] walked through the door, multiple detention officers grabbed him and began to wrestle him to the ground. The Jail records from the officers only indicate that one officer punched Mr. Coote. This officer recorded that he punched Mr. Coote in the head and face six times to get him to 'stop resisting.' Five of these punches came while Mr. Coote was lying on the ground with numerous other officers on top of him shackling his arms and legs. Notably almost all of the other

34

officers did not record anyone punching or hitting Mr. Coote. Almost a dozen officers were involved, which was a clear indicator of an excessive use of force that is pursuant to Harris County's policies and practices. Mr. Coote cooperated to the extent he was trying to protect himself from the kicks and punches of the guards. When Mr. Coote was picked up off the ground, his lips and eyes were swollen with noticeable bruising on his head. Mr. Coote was also sprayed in the face three different times with a type of pepper spray. When Mr. Coote was taken to the clinic, the officer escorting him told the nurse that it was a detainee-on-detainee fight… On February 10, 2023, Mr. Coote was involved in another altercation due to his medications. The officers involved used excessive force and improper force techniques by slamming Mr. Coote against the concrete walls and floor and then punched him several times. Mr. Coote had a split lip, and his previous injuries were aggravated." Exhibit C, pg. 39-40.

16. "Despite the lack of a threat or a serious policy violation, the officer grabbed Mr. Lockhart's arm wrenched it behind his back, slammed his face against a wall and then dragged him to the holding cell which is notorious for officer beatings as seen by several of the Plaintiffs and similar incidents in this Complaint. Additional officers then came into the cell that lacked proper observation measures and began beating Mr. Lockhart without any justification. This resulted in severe injuries including a torn rotator cuff." Exhibit C, pg. 42.

17. "Instead of listening to his concerns, the Harris County Jail guards made good on their threat and ordered the other two detainees to leave the cell. When Mr. Twedt stood and turned his back to the officers, the officers handcuffed him and then without warning slammed his body and face against the wall and then slammed him into the ground. The officers then kneed, punched, and kicked Mr. Twedt numerous times while he was shackled… During this use of excessive force, the officers broke his small finger on his left hand which a doctor has advised would require

surgery to fix. Mr. Twedt also suffered bruised ribs and a lacerated head." Exhibit C, pg. 43-44.

18. "While waiting in line, an officer inexplicably snatched the bag out of Mr. Euell's hand. When Mr. Euell asked for his paperwork back, the officer grabbed Mr. Euell and slammed his face against a wall, injuring his eye. The officer then twisted Mr. Euell's hand causing it to break while placing him in handcuffs. Mr. Euell sought medical treatment for his injuries and was threatened by the officer not to tell anyone about it otherwise he would beat him again… During [a] seizure, the officers that responded claimed that Mr. Euell was faking the seizure, so they stomped on his wrists and his ankles." Exhibit C, pg. 49-50.

19. "It is commonly known in Harris County Jail that detainees will 'fall' either in the shower or off their bunk to cover up the real reason they were injured. Many times, officers will inform the nursing staff of this type of fall shortly after their use of force caused the injuries." Exhibit C, pg. 52.

20. "Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a 'culture that quickly leads to physical altercation,' to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a

36

message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in the injuries and deaths of Jacoby Pillow, Bryan Johnson, Jeremy Garrison, Zachery Johnson, Kenneth Richard, Jeremiah Anglin, Harrell Veal, John Coote, Ryan Twedt, Bernard Lockhart, and Taylor Euell. Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law thereby ratifying these actions." Exhibit C, pg. 54.

21. A Department of Justice investigative report in 2009 found that the HCSO use of force policies causes serious concern. They found a "significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors. The staff would fail to properly investigate the use of force when used with inaccurate documentation and relying exclusively on officer statements. Jail data regarding use of force levels cannot be considered reliable. We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility." Exhibit C, pg. 62-63.[24]

---

[24] This case involves the same types of failures and use of force as found in the report. Notably, the types of force, failure to de-escalate, failure to intervene, and hiding and lying about the use of force, that is obviously a systemic issue across the entire HCSO organization. To quote the report itself, "[The DOJ has] serious concerns about the use of force at the Jail. The Jail's use of force policy is flawed in several regards. First, neither written policy nor training provide staff with clear guidance on prohibited use of force practices. For example, Harris County Jail does not train staff that hogtying and choke holds are dangerous, prohibited practices. Indeed, we found a significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors. Second, use of force policies fail to distinguish between planned use of force (e.g., for extracting a detainee from a cell) and unplanned use of force (e.g., when responding to a fight). In many planned use of force situations, staff should be consulting with supervisors, and possibly medical staff, before using force. Third, Jail policies do not provide for routine videotaping of use of force. Fourth, the Jail does not have an appropriate administrative process for reviewing use of force. Jail policy does not clearly require the individual using force to file a use of force report; nor does Jail policy provide for routine, systematic collection of witness statements. When supervisors review use of force incidents, they do not have ready access to important evidence. Instead, they appear to rely excessively on officer statements to determine what happened during an incident. While Jail staff were helpful and willing to assemble use of force documents requested by our review team, we found it troubling that the Jail did not collect such documents as a matter of course. In other words, use of force occurs at the Jail without adequate review, and Jail data regarding use of force levels cannot be considered reliable. We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility. As a result of systemic deficiencies including a lack of appropriate policies and training, the Jail exposes detainees to harm or risk of harm

37

22. "Each of these constitutional violations noted by the DOJ should have caused immediate and permanent change within the Jail itself. The Sheriff as the policymaker for the Jail was on actual notice of these issues and precludes any excuse for allowing these constitutional violations to occur." Exhibit C, pg. 63-64. Instead, the HCSO has allowed these violations to increase and spill out into the streets of our community through patrol policies like the abuses in this case.

23. Sheriff Gonzalez, the policymaker, knows the HCSO culture of violence needs to change, but has failed to implement different policies. He stated, "[a]nd we also need to improve training as well. Make sure that we are creating opportunities to learn better de-escalation techniques so things don't get out of control, but it starts with leadership. We've got to end this culture that quickly leads to physical altercation…" Exhibit C, pg. 65.

---

from excessive use of force. In a particularly troubling January 2008 case, staff applied a choke hold to a detainee, who subsequently died. The autopsy report identified the manner of death as homicide. Our review of the Jail's records suggests that such improper force technique is being used with troubling frequency. For instance, our consultant found a pattern of such incidents when reviewing use of force reports dated from January through June 2008. These incidents included the following: An officer reported that he 'grabbed inmate RR by the front of his jumpsuit top and the back of his neck and forcibly placed inmate RR on the ground. Once on the ground, I continued to apply pressure to inmate RR's neck and placed my right knee in the small of his back.' An officer used both a headlock and multiple strikes to SS's rib cage. Officers 'grab[bed] the front of [TT's] shirt and place[d] him on the wall to gain control of the incident.' Officers used force on UU that resulted in a laceration requiring eleven staples to the scalp. Yet, the use of force incident was not reported by either of the officers who applied the force. Instead, another officer initiated the 'inmate offense report.' These and other similar incidents suggest that staff use hazardous restraint and force techniques without appropriate guidance or sanction. In some cases, medical records confirm that detainees may have suffered notable injuries, such as lacerations to the scalp or eye. Notably, when force was investigated by supervisors, it appears that the supervisors often determined that staff's use of force was appropriate without obtaining independent medical review or multiple witness statements." DOJ report, pg. 15-17 (June 4, 2009).

24. "Thus, for the past four years, Harris County Jail has had hundreds to thousands of more assaults than the 251 other Texas county jails combined." Exhibit C, pg. 69.



25. "Since 2009, over 190 pre-trial detainees have died in Harris County Jail with a record 28 dying in 2022 alone. Only 160 individuals in all of Texas were executed during that same time period. Out of the 252 county jails in Texas, in 2022, Harris County accounted for 18% of all in custody deaths. ***Death row is safer than Harris County Jail.***" Exhibit C, pg. 72 (emphasis added).

26. "Harris County Jail's culture of violence and prevalent policies, practices, and customs encourage officers to resort to violence quickly and to forego reasonable non-violent techniques. This leads to jailers using force to injure detainees for minor offenses and to use more force than necessary to meet penological purposes. This culture also encourages jailers to use force as a means of communication and unnecessarily exert their power and authority over detainees for any act

that the jailer does not like. ***A common example is punching detainees in the face*** even while the detainee is restrained when the detainee talks back to the jailer. This force is unnecessary but encouraged by Harris County because Sheriff Gonzalez is aware of the incessant use of force by his officers and the dangers this imposes on the detainees but fails to make any changes to address these constitutional violations. Essentially, just like the inmates at Shawshank, the detainees of Harris County can just wait to see which detainee will be beaten for crossing the guards." Exhibit C, pg. 107 (emphasis added).

27. Pages 108-112 describe an incident with Jaquaree Smith. For judicial economy, we only refer to those pages here, as the incident in totality show yet another time, like in this case, when HCSO employees used excessive force, failed to de-escalate, escalated themselves, retaliated with disproportionate heightened violence to relatively minor acts of self-defense, and lied about their abuse and actions in reports and testimony. *See* Exhibit C, pg. 108-110.

28. On November 26, 2022, "[a]fter allegedly falling off of his bunk, Mr. [Adael] Garcia was being escorted back from the clinic when one or more detention officers used excessive force against Mr. Garcia to cause severe injuries to his head, neck, eye and other areas of his body. The officers' attack on Mr. Garcia was unwarranted, unprovoked, and was in conjunction with Harris County's pattern, practice, policies, and culture of officers handling matters of disrespect and minor discipline issues with life threatening force. 'Falling off of a bunk' is a common excuse created by guards and detainees for a detainee's injuries to cover up officer use of force and detainee assaults." Exhibit C, pg. 114.

29. On September 4, 2016, "[w]hile Mr. Bartee was being escorted from the clinic to his cell, the detention officer pushed Mr. Bartee out of the door into the hallway. When Mr. Bartee verbally reacted to the unnecessary push, several detention officers began to assault Mr. Bartee by throwing

him against a chair and podium in the hallway and throwing him to the ground. Once on the ground the officers laid on top of him. Although Mr. Bartee was subdued, around ten detention officers punched, kicked, and stomped on Mr. Bartee while he was on the ground. Other officers watched and encouraged the beating. Once the officers stopped beating Mr. Bartee, the officers handcuffed him and pulled him up from a pool of his own blood. Due to this vicious and unnecessary assault, Mr. Bartee suffered bilateral nasal bone fractures, orbital fractures, cuts, bruises, and a closed head injury along with unconsciousness. This beating was one of the few beatings actually recorded by the camera system in the jail because it had just been installed. One jailer even attempted to have the video stop recording once they determined that they were on video. Following the beating, Mr. Bartee was charged with assaulting an officer and was taken for minimal treatment at the local hospital. The Harris County Sheriff as the policymaker for the jail expressly stated to the media that the jailers used 'an unnecessary application of force,' that more jailers than necessary were involved in trying to subdue Mr. Bartee, that jailers failed to de-escalate the situation, and that jailers failed to stop using force when it became unnecessary. Ultimately, Mr. Bartee was released the following day and the charges against him were dismissed for lack of evidence as it was determined he did not initiate the assault." Exhibit C, pg. 118-119.

30. "During the booking process, Mr. Johnson posed to take his booking photo in which he smiled for the camera. The detention officers did not like that Mr. Johnson was smiling for his photo, so they commanded that he not smile or 'We gon' to make you stop smiling.' When Mr. Johnson stated that he was going to smile because he had nothing to worry about, two officers grabbed Mr. Johnson's neck choking him for over 30 seconds while another officer took his picture. Mr. Johnson was handcuffed the entire time. Other [HCSO] employees were standing by and witnessed the assault but refused to intervene and/or encouraged the officers' conduct. This approach is consistent with Harris County's

policies of allowing, encouraging, and not deterring officers using force unnecessarily when detainees refuse to comply with petty and needless commands. Mr. Johnson was refused any medical treatment for his injuries and feared that if he pressed the issue he would be met with a beating from the officers. The officers present falsified reports on what transpired which is consistent with false and incorrect reporting by officers to cover up or mask excessive use of force against detainees and which encourages officers to continue using excessive force." Exhibit C, pg. 124.

31.  "When arriving at the jail, Mr. Alaniz was escorted by two larger detention officers. When they arrived at a window visible to other detainees, Mr. Alaniz was forced to face the wall and be stripped searched. When Mr. Alaniz asked for the officers' names and badge numbers, they refused and took him to a vacant single cell where they slammed him to the ground, sat on top of his back with their knees, and was repeatedly kicked by the officers. Mr. Alaniz lost consciousness, but instead of being taken to medical, he was left alone in the cell for over two hours. When Mr. Alaniz requested medical treatment for his injuries, one officer forcibly grabbed his throat with both hands and cut off his airways. Mr. Alaniz still requested medical despite the officer's response." Exhibit C, pg. 127-128.

32. "On May 29, 2019, Kareem Jefferson was in the process of being released from the Harris County Jail. While waiting in line to leave, detention officer Alexandro Ramos confronted Mr. Jefferson that he was past a 'line' on the ground. When Mr. Jefferson spoke to Officer Ramos, Ramos hit Kareem and then slammed him on the ground, injuring him and placing him back in custody. Ramos then filed a false report that Kareem attacked an officer which resulted in him being in Harris County Jail for almost two more years before the case was dismissed for lack of evidence." Exhibit C, pg. 131.

33. "When a detainee needed to be taught a lesson, the detainee would be taken to a place with closed doors and no cameras and would be beaten

up by several officers. Each floor had four cells where these lessons would be taught. Many cells had blood and feces on the walls and floor." Exhibit C, pg. 145.

34. "On February 17, 2015, Mr. Lucas was upset in his locked single cell unarmed and did not pose a threat to anyone. However, Harris County organized several officers to forcibly enter his cell, knock him to the ground, handcuff his arms behind his back, and drag him from his cell by his face. Once pulled out of the cell, the officers continued to sit on his back and legs while he was restrained. Mr. Lucas was not resisting their efforts. Despite his cries that he was going to pass out and could not breathe, the officers continued their trained tactics of sitting on his back preventing him from breathing and causing him immense trauma and pain." Exhibit C, pg. 146.

35. On May 7, 2016, "[w]hile waiting in line with other detainees, an officer ordered [Ms. Hatton] to go back to her cell. Despite moving in that direction, the officer charged and punched her causing her to lose consciousness and required her to get stiches for her injuries. Ms. Hatton suffered a concussion due to this excessive and unnecessary use of force." Exhibit C, pg. 148.

213. One particular policy cited in that complaint, included here as Exhibit C, is as relevant to this case and the streets patrolled by HCSO employees as to detainees at the jail. That policy is: "***Institutionalized Excessive Force by Jail Employees on Detainees:*** Patterns, practices, policies, and culture of encouraging and failing to deter the use of force by jail employees;

    a. By creating a 'culture that quickly leads to physical altercation';

    b. Insufficient training and enforcement of non-physical de-escalation techniques;

    c. Policy of officers and sergeants utilizing excessive force and inappropriate force techniques that cause unnecessary harm to detainees …;

    d. Inaccurate documentation of the use of force, falsified use of force documentation, and failure to investigate allegations of use of force outside the testimony of interested parties;… and

    e. Charging [violence victims] with offense/use of force charges by reporting false,

misleading, and inaccurate statements and resorting to use of force unnecessarily…" Exhibit C, pg. 156.

214. Further, as shown in Exhibit C extensively, the policymaker, Sheriff Ed Gonzalez has extensively claimed the HCSO's lack of funding has caused understaffing issues preventing his ability to change the culture of violence.

215. Harris County's lack of funding to properly train its employees and change the culture of violence led to Delgado and Ribbe's actions causing Plaintiff's injuries.

### *Timeline for Causes of Action*

216. For clarity purposes, the timeline of violations is important to note here:

| Timeline | Causes of Action |
|---|---|
| 1. Decades before this event | Harris County inadequately trains, supervises, and/or disciplines its officers, creating and failing to change a culture of violence (Count 7) |
| 2. Their approach of Plaintiff, before self-defensive action of biting Delgado | Unlawful search and seizure by Delgado and Ribbe (Counts 3 & 4) |
| 3. Punches to Plaintiff's face, twisting of her knee and ankle, slamming knees into her legs | Unreasonable, excessive, and deliberately indifferent use of force by Delgado and Ribbe (Counts 1 & 2) |
| 4. Arrest of Plaintiff after lying to District Attorney intake representative | Wrongful arrest by Delgado and Ribbe (Counts 5 & 6) |
| 5. Harris County's policymaker and supervisors not correcting officer actions in this case and other incidents | Harris County permitting illegal/improper conduct (Count 9) |
| 6. Failing to respond to demand letter and complaints about officer actions and failing to have a robust and independent grievance and complaint process for this case and other incidents | Harris County shielding illegal/improper conduct (Count 8) |
| 7. Failing to take any corrective action whatsoever and the ongoing defense of officer actions, including but not limited to Qualified Immunity claims, in this case and other incidents | Harris County ratifying illegal/improper conduct (Count 10) |

## VII.    CAUSES OF ACTION

## COUNT 1 – 42 U.S.C. § 1983

### Delgado Violated Plaintiff's Fourth Amendment Rights to be Free from Excessive Force

217. The foregoing paragraphs are incorporated herein as if quoted verbatim.

218. On August 13, 2021, Plaintiff's constitutional right to remain free from the use of unreasonable and/or excessive force against her person by a peace officer acting under color

44

of state law was:

    a.   secured to her by the Fourth Amendment of the United States;

    b.   clearly established within the Southern District of Texas; and

    c.   violated by Delgado.

219. Any and all objectively reasonable peace officer would know:

    a.   punching a 65-year-old woman twice in the face carries the potential for lethal consequences;

    b.   lethal force should only be exercised when objective circumstances surrounding the exercise thereof would lead a reasonable peace officer to believe that such force was warranted; and

    c.   Plaintiff did not present a threat of any kind to anyone.

220. Any reasonable peace officer acting under the clearly established law of the Southern District of Texas and confronting the same or similar facts would know:

    a.   the Fourth Amendment to the United States Constitution prohibits objectively unreasonable uses of force in light of the facts and circumstances;

    b.   said prohibition is clearly established within the Southern District of Texas;

    c.   Plaintiff had not committed an act that would justify Delgado's assault thereon;

    d.   Delgado's punching Plaintiff twice in the face carried with it the great risk of harm or death and was thus objectively unreasonable in light of the facts and circumstances; and,

    e.   Delgado's actions were clearly unreasonable in light of established law.

221. Delgado's use of force against Plaintiff:

    a.   was plainly incompetent;

    b.   knowingly violated the law;

    c.   intentionally violated the law;

    d.   was objectively unreasonable in light of clearly established law;

    e.   evidences an unreasonable misunderstanding of his powers and responsibilities; and,

    f.   was the moving force behind the deprivation of Plaintiff's civil rights and her injuries.

222. Plaintiff seeks punitive damages against Delgado because he:

a.  knew at the time that the force he used to subdue Plaintiff was unreasonably excessive;

b.  acted with conscious and deliberate indifference to the possibility that Plaintiff would sufferegregious harm from his unreasonably excessive use of force;

c.  acted with reckless and/or callous indifference to Plaintiff's federally protected rights;

d.  recklessly trampled on Plaintiff's rights through plainly unlawful conduct;

e.  was grossly negligent through his actions; and,

f.  fabricated evidence concerning this incident.

## COUNT 2 – 42 U.S.C. § 1983

### Ribbe Violated Plaintiff's Fourth Amendment Rights to be Free from Excessive Force

223. The foregoing paragraphs are incorporated herein as if quoted verbatim.

224. On August 13, 2021, Plaintiff's constitutional right to remain free from the use of unreasonable and/or excessive force against her person by a peace officer acting under color of state law was:

a.  secured to her by the Fourth Amendment of the United States;

b.  clearly established within the Southern District of Texas; and

c.  violated by Ribbe.

225. Any and all objectively reasonable peace officer would know:

a.  forcefully and intentionally twisting the knee and ankle, and slamming his body weight and knees into the legs of a 65-year-old woman carries the potential for serious bodily injury consequences;

b.  serious bodily injury force should only be exercised when objective circumstances surrounding the exercise thereof would lead a reasonable peace officer to believe that such force was warranted; and

c.  Plaintiff did not present a threat of any kind to anyone.

226. Any reasonable peace officer acting under the clearly established law of the Southern District of Texas and confronting the same or similar facts would know:

a.  the Fourth Amendment to the United States Constitution prohibits objectively unreasonable uses of force in light of the facts and circumstances;

    b.   said prohibition is clearly established within the Southern District of Texas;

    c.   Plaintiff had not committed an act that would justify Ribbe's assault thereon;

    d.   Ribbe's twisting of her ankle and knee and slamming his knees into her legs carried with it the great risk of harm or serious bodily injury and was thus objectively unreasonable in light of the facts and circumstances; and,

    e.   Ribbe's actions were clearly unreasonable in light of established law.

227. Ribbe's use of force against Plaintiff:

    a.   was plainly incompetent;

    b.   knowingly violated the law;

    c.   intentionally violated the law;

    d.   was objectively unreasonable in light of clearly established law;

    e.   evidences an unreasonable misunderstanding of his powers and responsibilities; and,

    f.   was the moving force behind the deprivation of Plaintiff's civil rights and her injuries.

228. Plaintiff seeks punitive damages against Ribbe because he:

    a.   knew at the time that the force he used to subdue Plaintiff was unreasonably excessive;

    b.   acted with conscious and deliberate indifference to the possibility that Plaintiff would suffer egregious harm from his unreasonably excessive use of force;

    c.   acted with reckless and/or callous indifference to Plaintiff's federally protected rights;

    d.   recklessly trampled on Plaintiff's rights through plainly unlawful conduct;

    e.   was grossly negligent through his actions; and,

    f.   fabricated evidence concerning this incident.

## COUNT 3 – 42 U.S.C. § 1983

### Delgado Violated Plaintiff's Fourth Amendment Rights to be Free from Unreasonable Search and Seizure

229. The foregoing paragraphs are incorporated herein as if quoted verbatim.

230. On August 13, 2021, Plaintiff's constitutional right to remain free from unreasonable search and seizure against her person by a peace officer acting under color of state law was:

    a.  secured to her by the Fourth Amendment of the United States;

    b.  clearly established within the Southern District of Texas; and,

    c.  violated by Delgado.

231. Any and all objectively reasonable peace officer would know:

    a. they need legal authority to repossess vehicles;

    b. they have no right to approach an elderly 65-year-old Black woman without reasonable suspicion of a crime;

    c. they have no right to pull an elderly 65-year-old Black woman's arms;

    d. they have no right to try to pry the fingers of an elderly 65-year-old Black woman off her steering wheel without reasonable suspicion of a crime; and,

    e. Plaintiff did not commit any act giving rise to reasonable suspicion.

232. Any reasonable peace officer acting under the clearly established law of the Southern District of Texas and confronting the same or similar facts would know:

    a. the Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures without consent, probable cause, or exigent circumstances in light of the facts and circumstances;

    b. said prohibition is clearly established within the Southern District of Texas;

    c. Plaintiff had not committed an act that would justify Delgado's warrantless search and seizure thereon;

    d. Delgado's actions against Plaintiff were unreasonable because he did not have consent, probable cause, or exigent circumstances to conduct a warrantless search or seizure in light of the facts and circumstances; and,

    e. Delgado's actions were clearly unreasonable in light of established law.

233. Delgado's illegal approach and search and seizure of Plaintiff:

    a. was plainly incompetent;

    b. knowingly violated the law;

    c. intentionally violated the law;

    d. was objectively unreasonable in light of clearly established law;

    e. evidences an unreasonable misunderstanding of his powers and responsibilities; and,

    f. was the moving force behind the deprivation of Plaintiff's civil rights and her

injuries.

234. Plaintiff seeks punitive damages against Delgado because he:

a. knew at the time that the search and seizure of Plaintiff was unreasonable;

b. acted with conscious, deliberate, reckless, and callous indifference to Plaintiff's federally protected rights;

c. recklessly trampled on Plaintiff's rights through plainly unlawful conduct;

d. was grossly negligent through his actions; and,

e. fabricated evidence concerning this incident.

## COUNT 4 – 42 U.S.C. § 1983

### Ribbe Violated Plaintiff's Fourth Amendment Rights to be Free from Unreasonable Search and Seizure

235. The foregoing paragraphs are incorporated herein as if quoted verbatim.

236. On August 13, 2021, Plaintiff's constitutional right to remain free from unreasonable search and seizure against her person by a peace officer acting under color of state law was:

a. secured to her by the Fourth Amendment of the United States;

b. clearly established within the Southern District of Texas; and,

c. violated by Ribbe.

237. Any and all objectively reasonable peace officer would know:

a. they need legal authority to repossess vehicles;

b. they have no right to approach an elderly 65-year-old Black woman without reasonable suspicion of a crime;

c. they have no right to pull an elderly 65-year-old Black woman's arms;

d. they have no right to try to pry the fingers of an elderly 65-year-old Black woman off her steering wheel without reasonable suspicion of a crime; and,

e. Plaintiff did not commit any act giving rise to reasonable suspicion.

238. Any reasonable peace officer acting under the clearly established law of the Southern District of Texas and confronting the same or similar facts would know:

a. the Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures without consent, probable cause, or exigent circumstances in

light of the facts and circumstances;

    b.  said prohibition is clearly established within the Southern District of Texas;

    c.  Plaintiff had not committed an act that would justify Ribbe's warrantless search and seizure thereon;

    d.  Ribbe's actions against Plaintiff were unreasonable because he did not have consent, probable cause, or exigent circumstances to conduct a warrantless search or seizure in light of the facts and circumstances; and,

    e.  Ribbe's actions were clearly unreasonable in light of established law.

239. Ribbe's illegal approach and search and seizure of Plaintiff:

    a.  was plainly incompetent;

    b.  knowingly violated the law;

    c.  intentionally violated the law;

    d.  was objectively unreasonable in light of clearly established law;

    e.  evidences an unreasonable misunderstanding of his powers and responsibilities; and,

    f.  was the moving force behind the deprivation of Plaintiff's civil rights and her injuries.

240. Plaintiff seeks punitive damages against Ribbe because he:

    a.  knew at the time that the search and seizure of Plaintiff was unreasonable;

    b.  acted with conscious, deliberate, reckless, and callous indifference to Plaintiff's federally protected rights;

    c.  recklessly trampled on Plaintiff's rights through plainly unlawful conduct;

    d.  was grossly negligent through his actions; and,

    e.  fabricated evidence concerning this incident.

## COUNT 5 – 42 U.S.C. § 1983

### Delgado violated Plaintiff's constitutional right to be free from wrongful arrests.

241. The foregoing paragraphs are incorporated herein as if quoted verbatim.

242. On or about August 13, 2021, Plaintiff's constitutional right to be free from wrongful arrests by a peace officer acting under color of state law was:

    a.  secured to her by the Fourth Amendment of the United States Constitution;

    b.  clearly established within the Southern District of Texas; and,

     c.   violated by Delgado.

243. Any and all objectively reasonable peace officer would know that:

     a.   they had no legal authority to repossess the vehicle in this case;

     b.   Plaintiff had done nothing to consist of probable cause of a crime;

     c.   Plaintiff had a legal right in her actions;

     d.   Plaintiff's action of biting Delgado was in legal self-defense in the face of illegal discharge of unofficial duties; and,

     e.   Plaintiff should not have been arrested for Assaulting a Peace Officer.

244. Any reasonable peace officer acting under clearly established law in the Southern District of Texas and confronting the same or similar facts would know:

     a.   the Fourth Amendment to the United States Constitution prohibits the detention of a person in the absence of probable cause;

     b.   said prohibition is clearly established within the Southern District of Texas;

     c.   Plaintiff had not committed any crime to justify Delgado's arrest of Plaintiff;

     d.   there was no probable cause to believe Plaintiff had committed any crime;

     e.   the circumstances herein did not generate any objectively reasonable indicia of criminal activity;

     f.   there was no objective justification behind Delgado's arrest of Plaintiff; and,

     g.   he had to lie to the District Attorney intake representative to secure the arrest.

245. Delgado's arrest of Plaintiff:

     a.   was plainly incompetent;

     b.   knowingly violated the law;

     c.   intentionally violated the law;

     d.   was the product of unreasonably mistaken beliefs;

     e.   was objectively unreasonable in light of clearly established law;

     f.   was deliberately indifferent to Plaintiff and her rights;

     g.   evidences an unreasonable misunderstanding of his powers and responsibilities; and,

     h.   was the moving force behind the deprivation of Plaintiff's civil rights and her injuries.

246. Plaintiff seeks punitive damages against Delgado because he:

     a.   knew at the time that the arrest of Plaintiff was without probable cause;

b.   acted with conscious and deliberate indifference to the possibility that Plaintiff would suffer egregious harm from the wrongful arrest;

c.   acted with reckless and/or callous indifference to Plaintiff's federally protected rights;

d.   recklessly trampled on Plaintiff's rights through plainly unlawful conduct; and,

e.   was grossly negligent in his investigation of or reliance on the facts presented herein.

## COUNT 6 – 42 U.S.C. § 1983

### Ribbe violated Plaintiff's constitutional right to be free from wrongful arrests.

247. The foregoing paragraphs are incorporated herein as if quoted verbatim.

248. On or about August 13, 2021, Plaintiff's constitutional right to be free from wrongful arrests by a peace officer acting under color of state law was:

a.   secured to her by the Fourth Amendment of the United States Constitution;

b.   clearly established within the Southern District of Texas; and,

c.   violated by Ribbe.

249. Any and all objectively reasonable peace officers would know that:

a.   they had no legal authority to repossess the vehicle in this case;

b.   Plaintiff had done nothing to consist of probable cause of a crime;

c.   Plaintiff had a legal right in her actions;

d.   Plaintiff's action of biting Delgado was in legal self-defense in the face of illegal discharge of unofficial duties; and,

e.   Plaintiff should not have been arrested for Assaulting a Peace Officer.

250. Any reasonable peace officer acting under clearly established law in the Southern District of Texas and confronting the same or similar facts would know:

a.   the Fourth Amendment to the United States Constitution prohibits the detention of a person in the absence of probable cause;

b.   said prohibition is clearly established within the Southern District of Texas;

c.   Plaintiff had not committed any crime to justify Ribbe's arrest of Plaintiff;

d.   there was no probable cause to believe Plaintiff had committed any crime;

e.   the circumstances herein did not generate any objectively reasonable indicia of criminal activity;

f.   there was no objective justification behind Ribbe's arrest of Plaintiff; and,

      g.  his partner had to lie to the District Attorney intake representative to secure the arrest.

251. Ribbe's arrest of Plaintiff:

      a.  was plainly incompetent;

      b.  knowingly violated the law;

      c.  intentionally violated the law;

      d.  was the product of unreasonably mistaken beliefs;

      e.  was objectively unreasonable in light of clearly established law;

      f.  was deliberately indifferent to Plaintiff and her rights;

      g.  evidences an unreasonable misunderstanding of his powers and responsibilities; and,

      h.  was the moving force behind the deprivation of Plaintiff's civil rights and her injuries.

252. Plaintiff seeks punitive damages against Ribbe because he:

      a.  knew at the time that the arrest of Plaintiff was without probable cause;

      b.  acted with conscious and deliberate indifference to the possibility that Plaintiff would suffer egregious harm from the wrongful arrest;

      c.  acted with reckless and/or callous indifference to Plaintiff's federally protected rights;

      d.  recklessly trampled on Plaintiff's rights through plainly unlawful conduct; and,

      e.  was grossly negligent in his investigation of or reliance on the facts presented herein.

### COUNT 7 – 42 U.S.C. § 1983

### Harris County has a policy, procedure, custom, practice, or protocol of inadequately training, supervising, and/or disciplining its officers which was the moving force behind Plaintiff's injuries.

253. The foregoing paragraphs are incorporated herein as if quoted verbatim.

***254. Training regarding de-escalation techniques and reasonable use of force:***

      1.  Despite written policy language, Delgado's behavior exhibits the fact that it is normal practice of the Defendants to not engage in any kind of de-escalation practices in the event of punching an elderly citizen and Black woman who is no threat twice in the face.

      2.  Delgado's actions evidence his inadequate training, supervision, and/or discipline

under Harris County concerning reasonable uses of force and further demonstrates the silent adoption and implementation by its policymakers.

3. Delgado's actions throughout his encounter with Plaintiff unnecessarily and unreasonably escalated the situation into an unreasonable use of excessive and deadly force.

4. Harris County has adopted policies that were not followed bv Delgado here, and yet, no corrective or disciplinary action was taken against him, proving the written policy is not properly implemented at HCSO.

5. Because of the lack of adequate training, Defendant Delgado's actions unreasonably escalated the situation.

6. Other aggressive actions in his history of abusive behavior, as dictated above, show a policy, procedure, custom, practice, or protocol of inadequate training, supervision, and/or discipline that fails to implement de-escalation techniques.

7. Delgado's actions evidence his plainly inadequate training, supervision, and/or discipline by Harris County in the use of de-escalation techniques for officers.

8. The other violent incidents in this complaint and to be found in discovery evince Harris County's ongoing and cultural failure to train regarding de-escalation techniques and reasonable use of force.

### 255. *Training regarding elements of assaulting a peace officer charge:*

1. An assault of a peace officer charge requires that a peace officer was "lawfully discharging an official duty" Tex. Pen. Code § 22.01(b-2).

2. The statute does not allow a charge for actions against peace officers who are acting without legal authority – illegally discharging unofficial duties.

3. It was clear that Plaintiff believed the officers to be acting illegally, and in fact, they were.

4. Delgado and Ribbe's actions indicate Harris County's officer training, supervision, and/or discipline stretches the use of this charge beyond a reasonable meaning under the statute.

5. Given the long history of false reporting and exaggerated charges when force is used by HCSO employees, it is evident that HCSO employees feel free to use this charge

to try to cover their own unreasonable and violent actions against the people in our community.

6. This inadequate training, supervision, and/or discipline results in officers unreasonably deploying deadly and disproportionately injurious force against the People without fear of corrective or disciplinary action.

7. The other violent incidents in this complaint and to be found in discovery evince Harris County's ongoing and cultural failure to train regarding the elements of assault on a peace officer charge.

### 256. *Training regarding preparation, drafting, and/or submission of offense/investigative/use of force reports:*

1. Delgado and Ribbe felt it was acceptable to fill out fictitious and incomplete offense reports and supplements in this case, as detailed above.

2. Additionally, no use of force report was completed for this incident.

3. Defendants use of force policy is inadequate due to the lack of guidance in reporting incidents of force used against an elderly citizen and Black woman who is no threat.

4. The policy states that "[e]mployees who have observed the use of force by another employee must promptly report the observed use of force to an on-duty supervisor, and complete a supplement report to the involved employee's report of what was observed. Failure to report an observed use of force may lead to disciplinary action, loss of employment, and referral for possible prosecution."

    a. Despite this language, the policy fails to ensure the accurate reporting of excessive force, as evidenced by the fact that no Harris County supervisor made any statements that condemned or identified the improper and unreasonable force utilized by Delgado and Ribbe.

    b. This supports the argument that Harris County is deliberately indifferent in to the inadequacies of the policy by actively allowing officers to not make reports or make false reports.

5. The use of force policy fails to outline what a supervisor should do if they believe a use of force was unreasonable.

6. Delgado and Ribbe were unreasonably inadequate and/or failed to properly prepare, draft or submit a use of force report.

7. Delgado and Ribbe's actions evidence an unreasonable lack of training, supervision, and/or discipline by Harris County for its officers concerning the proper preparation, drafting, and/or submission of offense reports.

8. Other aggressive, abusive, and dishonest actions in Delgado and Ribbe's history of abusive behavior, as dictated above, show a policy, procedure, custom, practice, or protocol of inadequate training, supervision, and/or discipline regarding proper preparation, drafting, and/or submission of use of force and offense reports.

9. The other violent incidents and egregiously voluminous failures of reporting in this complaint and to be found in discovery evince Harris County's ongoing and cultural failure to train regarding the preparation, drafting, and/or submission of offense/investigative/use of force reports.

257. Harris County's training, supervision, and/or discipline is inadequate as it allowed and/or facilitated its officer's fabrication of evidence.

258. Harris County's failure to fund proper and adequate training, evinced by the extensive understaffing publicly reported by the policymaker, Sheriff Ed Gonzalez, as shown in this complaint, has caused Plaintiff's injuries outlined in this complaint.

259. Harris County has officially ratified, accepted, and approved Delgado and Ribbe's repeated actions as evidenced by its lack of response to Plaintiff's demand letter, its lack of action regarding this incident, and its lack of action concerning Delgado and Ribbe's aggressive actions in his history of abusive behavior, as dictated above.

260. Harris County's training, supervision, and/or discipline is inadequate as it lacks discipline for officers involved in wrongdoings such as Delgado's and Ribbe's action.

261. Harris County's failures were deliberately indifferent to the People's clearly established rights under the Fourth Amendment to the United States Constitution and were the moving force behind Plaintiff's injuries.

## COUNT 8 – 42 U.S.C. § 1983

### Harris County has a policy, procedure, custom, practice, or protocol of shielding its officers from the consequences of illegal and/or improper conduct.

262. The foregoing paragraphs are incorporated herein as if quoted verbatim.

263. By implementing and enforcing the inadequate practices mentioned above, Harris County

is clearly aware of the improper behavior that is permitted by them.

264. None of the officers on scene attempted to de-escalate the situation or in the alternative call for the assistance of a de-escalation unit.

265. Additionally, such inadequate policies and improper practices that have clearly failed to prepare officers in handling an elderly citizen and Black woman who is no threat are still being used by the Defendants today.

266. At the date of this filing, it is believed that Delgado and Ribbe are still on-duty serving as peace officers in Harris County.

267. Harris County has been made aware of the truth surrounding the actions of Delgado and Ribbe.

268. Harris County knows, should know, or must know that Delgado and Ribbe fabricated evidence and has a pattern of fabricating evidence.

269. Harris County allowed Delgado and Ribbe to fabricate evidence in order to protect themselves and to permit the county to avoid having a record of their unreasonable conduct.

270. Harris County has failed to discipline or even admit the actions of Delgado and Ribbe were unreasonable.

271. Instead, Harris County ratifies, accepts, and approves the actions of Delgado and Ribbe.

272. Specifically, Harris County failed to respond to Plaintiff's demand letter, evidencing Harris County believes the actions of Delgado and Ribbe were reasonable and that they were free from any wrongdoing.

273. The actions of Delgado and Ribbe were ratified, shielded, and not adequately acted upon in other aggressive actions in the history of abusive behavior, as dictated above.

274. These failures to act show a policy, procedure, custom, practice, or protocol of Harris County shielding its officers from consequences for their unreasonable uses of force.

275. The other violent incidents and egregiously voluminous failures of reporting in this complaint and to be found in discovery evince Harris County's policy, procedure, custom, practice, or protocol of shielding its officers from consequences of unconstitutional searches and seizures, unreasonable uses of force, and wrongful arrests.

## **COUNT 9 – 42 U.S.C. § 1983**

### **Harris County has a policy, procedure, custom, practice, or protocol of permitting**

**its officers to perform illegal and/or improper conduct.**

276. The foregoing paragraphs are incorporated herein as if quoted verbatim.

277. Harris County, by enacting and promulgating the above inadequate practices, has implemented a customary practice of allowing unreasonable force to be used against an elderly citizen and Black woman who is no threat, as exhibited by the actions of Delgado and Ribbe.

278. Harris County, by enacting and promulgating the above inadequate practices, has implemented a customary practice of failing to recognize the rights of an elderly citizen and Black woman who is no threat.

279. Harris County, by enacting and promulgating the above inadequate practices, has implemented a customary practice of accepting false reports that contradict real evidence without any proper supervision.

280. Harris County, by enacting and promulgating the above inadequate policies, has implemented a customary practice of allowing officers who use unnecessary, unreasonable, and excessive force to remain on-duty and thus allow for additional people in Harris County to be subject to their abuse.

281. At the date of this filing, it is believed that Delgado and Ribbe are still on-duty serving as peace officers in Harris County.

282. Harris County has been made aware of the truth of the actions of Delgado and Ribbe.

283. The video and other evidence show Delgado's use of deadly and other force was unreasonable, unlawful, wrongful, and grossly inappropriate.

284. Similar and other illegal and improper conduct from other aggressive actions in Delgado and Ribbe's history of abusive, dishonest, and careless behavior, as dictated above, show they have a pattern of engaging in such conduct against the People.

285. Harris County has refused to adequately discipline or even admit Delgado and Ribbe's actions were unreasonable.

286. Instead, Harris County permits its officers to perform illegal and improper conduct such as Delgado's and Ribbe's actions.

287. This failure to act shows a policy, procedure, custom, practice, or protocol of permitting officers to use unjustifiable and unreasonable force without consequence.

288. The other violent incidents and egregiously voluminous failures of reporting in this complaint and to be found in discovery evince Harris County's policy, procedure, custom,

practice, or protocol of permitting officers to use illegal and improper conduct.

## COUNT 10 – 42 U.S.C. § 1983

### Harris County has a policy, procedure, custom, practice, or protocol of ratifying officers' illegal and/or improper conduct.

289. The foregoing paragraphs are incorporated herein as if quoted verbatim.

290. Harris County ratifies, accepts, and approves of its officers' illegal and improper conduct such as the actions of Delgado and Ribbe.

291. Harris County, by enacting and promulgating the above inadequate policies, has implemented a customary practice of ignoring and failing to recognize the rights of elderly citizens and Black women who are no threat.

292. Harris County, by enacting and promulgating the above inadequate policies, has implemented a customary practice of accepting false reports that contradict real evidence without proper supervision.

293. This ratification shows a policy, procedure, custom, practice, or protocol of approving officers to use unjustifiable and unreasonable force, commit illegal searches and seizures, and arrest the People illegally.

294. The other violent incidents and egregiously voluminous failures of reporting in this complaint and to be found in discovery evince HarrisCounty's policy, procedure, custom, practice, or protocol of ratifying officers' illegal and improper conduct.

## VIII.   DAMAGES

295. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injuries and damages.

296. Plaintiff therefore seeks compensatory damages (including legal fees, lost future earnings, lost wages, and mental and emotional distress), presumed damages, nominal damages, and punitive damages.

## IX.   ATTORNEY FEES

297. After prevailing herein, Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b).

## X.    <u>PRAYER</u>

298. For these reasons, Plaintiff asks for judgment against Defendant for the following:

    (a)    compensatory damages;

    (b)    presumed damages;

    (c)    nominal damages;

    (d)    punitive damages;

    (e)    reasonable attorney fees;

    (f)    costs of suit; and

    (g)    all other relief to which Plaintiff shows herself entitled, both at law and in equity.

Respectfully submitted,

By:**_/s/ Drew Willey_**
Drew Willey
SBN: 24093371
P.O. Box 30317
Houston, Texas 77249
713-739-9455 (p)
713-510-1950 (f)
drew@law-dw.com
ATTORNEY FOR PLAINTIFF