Exhibit A



**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

## REPORT TO COMMISSIONERS COURT

FROM:      Harris County Justice Administration Department
DATE:       June 8, 2021
TITLE:       An Evaluation of Harris County Traffic Stop Data in Compliance with
the Sandra Bland Act

**Abstract:** On June 9th, 2020, Commissioners Court passed a motion, made by Commissioner Garcia, for JAD to "analyze existing racial profiling data produced by law enforcement" (Supplemental Item 18, June 9th, 2020). JAD collected public data from the Texas Commission on Law Enforcement (TCOLE) on traffic stops in 2020 as the only available source of existing public traffic stop data in Harris County. JAD examined the gender, and racial demographics of traffic stops in Harris County, including disaggregated statistics on search rates, contraband discovery, stop results including arrest, citations, and warnings, and the use of force resulting in bodily injury rates for each Constable Precinct and the Harris County Sheriff's Office (HCSO). The data supports two preliminary conclusions. First, existing data show some racial/ethnic disparities in rates of arrests, citations, and use of force. Second, additional data is needed to identify if the proportions are the result of racial profiling or extraneous factors. JAD makes several suggestions to increase public education on complaint and commendation procedures, improve data sharing and collection among Harris County Law Enforcement Agencies, and further examine citations, warnings, and use-of-force incidents.

## Table of Contents

Executive Summary..................................................................................... 5

Methodology:............................................................................................. 5

Key Findings:............................................................................................. 7

   1)   Disparate Results ............................................................................ 7

   2)   Data Gaps .......................................................................................... 7

     •   JAD is Unable to Use Population Demographics as a Comparison ............. 7

     •   The Available Data Does Not Provide Sufficient Information to Determine the Scope of Traffic Stop Characteristics ................................................... 7

     •   Additional Data Gaps ....................................................................... 7

   3)   Additional Limitations to the Analysis ........................................ 8

     •   Only Yearly Summary Data, not Incident-Level Data ................................. 8

     •   Lack of Disaggregated Information on Traffic Stop Demographics until 2021 ................................................................................................. 8

     •   Inability to use Population Demographics as a Comparison ........................ 8

     •   The Rarity of Certain Traffic Stop Characteristics.................................... 8

     •   Results Only Show Differences Between Law Enforcement Agencies or Counties ........................................................................................... 8

Recommendations:..................................................................................... 8

  Public Education ..................................................................................... 9

  Improved Data Sharing and Collection ................................................. 9

  Further Examination: ............................................................................. 10

Full Report ................................................................................................ 11

Background of the Sandra Bland Act: ...................................................... 11

Limitations to the Analysis: ..................................................................... 11

     •   The Rarity of Certain Traffic Stop Characteristics .................................. 12

     •   Results Only Show Differences Between Law Enforcement Agencies or Counties ........................................................................................... 12

Constable Precincts and Sheriff's Office Jurisdiction: ........................... 13

A Comparison of Gender Demographics in Traffic Stops: ...................... 15

A Comparison of Racial Demographics in Traffic Stops: ........................ 15

  Harris County Law Enforcement Agencies ........................................... 15

  County-Level Comparison ...................................................................... 16

A Comparison of Racial and Gender Demographics in Traffic Stops:..... 16

  Harris County Law Enforcement Agencies ........................................... 16

County-Level Comparison ..................................................................... 16

A Comparison of Searches by Racial Demographics in Traffic Stops: ..................... 17

    Harris County Law Enforcement Agencies .............................................. 18

    County-Level Comparison ..................................................................... 18

A Comparison of Contraband Discovery in Searches by Racial Demographics in Traffic Stops: ............................................................................................ 18

    County-Level Comparison ..................................................................... 19

A Comparison of Traffic Stops to Arrests by Racial Demographics in Traffic Stops: ............................................................................................................ 19

    Harris County Law Enforcement Agencies .............................................. 20

    County-Level Comparison ..................................................................... 20

A Comparison of the Results of Traffic Stops (Verbal Warning, Written Warning, or Citation) by Racial Demographics: ......................................................... 20

    Harris County Law Enforcement Agencies .............................................. 21

    County-Level Comparison ..................................................................... 22

A Comparison of the Use of Force during Traffic Stops by Racial Demographics in Traffic Stops: ...................................................................................... 22

    Harris County Law Enforcement Agencies .............................................. 22

    County-Level Comparison ..................................................................... 24

Conclusion: ........................................................................................... 25

    • Public Education ............................................................................... 25

        o Harris County Should Research the Positives and Negatives of On-Demand Translation Services for County Departments ............................... 27

        o JAD Recommends Researching System Improvements and Associated Funding ........................................................................................... 27

    • Improved Data Sharing and Collection ................................................. 27

        o JAD Needs Additional Data to Perform More Refined Analyses ............... 28

        o JAD Needs Incident-Level Data to Isolate Extraneous Factors ................ 29

        o The County Has Missing Data in TCOLE Reports .................................... 29

        o A County-Wide Submission System Could Significantly Improve Data Collection and Analysis ....................................................................... 29

        o JAD Recommends Researching System Improvements and Associated Funding ........................................................................................... 29

    • Further Examination ......................................................................... 30

        o Law Enforcement Agencies Issue More Citations to Certain Racial and Ethnic Groups .................................................................................. 30

o   Law Enforcement Agencies Use More Force Against Certain Racial and Ethnic Groups ......................................................................................... 31

Next Steps: ......................................................................................................... 31

- Development of Public Dashboard on Traffic Stop Demographics ................. 31

- Assist in Developing Online Submission Forms for Complaints and Commendations .................................................................................................. 32

- Help Develop Online Submission Platform for Racial Profiling Data Analysis 32

- Supplement Analysis with Future JAD Reports ............................................ 33

Acknowledgments: ............................................................................................. 33

Report Contributors: .......................................................................................... 33

Appendix 1: Tables ............................................................................................ 34

Appendix 2: Code of Criminal Procedure Articles 2.131 to 2.138 ........................ 57

Appendix 3: Texas Occupations Code, Chapter 1701, Section 164 ....................... 64

Appendix 4: The HCSO's Model Business Card for Commendations and Complaints .............................................................................................................................. 65

References .......................................................................................................... 66



**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

### Executive Summary

On June 9, 2020, Commissioners Court unanimously approved a motion from Commissioner Garcia for the Justice Administration Department (JAD) to "analyze existing racial profiling data produced by law enforcement" (Supplemental Item 18). The Texas Occupations Code 1701.164 requires the Texas Commission on Law Enforcement (TCOLE)[A] to collect incident-based data under the Texas Code of Criminal Procedure Articles 2.131 – 2.138.[B] Chief Administrators of Law Enforcement Agencies that meet the criteria must submit racial profiling reports and analyses to their governing body and TCOLE. Each agency submitting data to TCOLE "shall review the data collected under Subsection (b) (6) to identify any improvements the agency could make in its practices and policies regarding motor vehicle stops."[1] To fulfill the Commissioners Courts' request, JAD analyzed the public TCOLE data to include each Constable Precinct and the Harris County Sheriff's Office (HCSO). Additionally, JAD compared Harris County to Bexar County, Dallas County, Tarrant County, and Travis County. JAD further used an equality of proportions test to determine if any disparities were statistically significant to a 99% confidence level. In this report, JAD examined:

- Gender demographics;
- Racial demographics;
- Racial and gender demographics;
- Consent search by racial demographics;
- Contraband discovery by racial demographics;
- Traffic stops to arrests by racial demographics;
- Type of citation or warning by racial demographics; and,
- Use-of-Force by racial demographics.

**Methodology**: JAD acquired the data used for this analysis from the "racial profiling reports" TCOLE makes publicly available each year (Last updated on May 26, 2021). To identify disparate rates at which racial or ethnic groups are overrepresented or underrepresented in traffic stop outcomes, JAD created a proportion for each race and ethnic group based on the total number of occurrences divided by the total

---

[A] The full Texas Occupations Code, Chapter 1701, Section 164 is available in **Appendix 3**.
[B] The full Code of Criminal Procedure 2.131-2.138 is available in **Appendix 2**.

number of possible events. For total traffic stop demographics, it is the rate at which deputies stop one group relative to all traffic stops. For more specific variables, such as the rate of consent searches, JAD divided the proportion of a racial or ethnic group that experienced a consent search by the total number of consent searches in that precinct or county. The disparities JAD identified in this analysis are statistically significant. This result represents that one department or county is statistically significantly different from another department[C] or county. The result does not indicate a racial bias, prejudice, or indication of racial profiling. To determine this finding, JAD used an equality of proportions test, which identifies if the rate of each racial or ethnic group's traffic stop outcome is equivalent across each precinct or county. In this report, any identified disparity is statistically significant with a statistical certainty of 99%.

The report's findings include tests for difference-in-proportions, which provide an estimate of the probability that the difference in rates (the occurrence of an event from the possible number of events) are due to random chance, or due to an underlying, significant difference. In applied statistics, it is traditional to report estimates of difference-in-proportions tests as "statistically significant" if the test yields a "p-value" or less than 0.05. Substantively, this means that only a 5% probability exists that the difference observed between the proportions examined is the product of random chance. JAD took a more restrictive statistically significant standard, only reporting results when a "p-value" was below 0.01. This means that there is only a 1% chance that differences in the proportion of one department more often or less often stops, searches, or uses force against members of a demographic group than other Law Enforcement Agencies is due to random chance. Still, any identified disparity cannot be attributed to racial profiling by Deputies[D] or Law Enforcement Agencies due to data limitations; see the section on **"Limitations to the Analysis"** below. This test only indicates that at least one department is statistically significantly more or less likely to perform an action on a specific demographic group, regardless of that group's representation in the local population compared to other parts of Harris County or from other counties. For example, Constable Precincts or Counties may have a higher proportion of one demographic group or another due to local-level and regional-level demographics, and therefore would engage in more traffic stops with that demographic group.

---

[C] In this report, "department" or "law enforcement agency" are used interchangeably referring to a Constable Precinct or Sheriff's Office in Harris County, Bexar County, Travis County, Dallas County, and Tarrant County.

[D] In this report, the terms Deputy, Deputies, Officer, or Officers refers to commissioned Peace Officers in the State of Texas. Throughout the report, we use these terms interchangeably, but they all refer to "Commissioner Peace Officers" from the Agencies or Departments in this study.

**Key Findings**: Overall, the analysis reveals that many comparisons do not show significant racial inequality in rates of traffic stops, consent searches, and contraband discovery. However, JAD has several key findings regarding disparate results and gaps in data.

1) *Disparate Results:* TCOLE data shows Harris County has some disparate rates against certain racial, ethnic, and gender groups.
   - All Harris County Law Enforcement Agencies are twice as likely to perform a traffic stop when the driver is male compared to female.
   - Harris County Law Enforcement Agencies issue more citations than written warnings and verbal warnings to specific racial and ethnic groups.
   - Harris County Law Enforcement Agencies use force that results in bodily injury against Black and Hispanic drivers more frequently than against other racial and ethnic groups.

2) *Data Gaps*
   - *JAD is Unable to Use Population Demographics as a Comparison:* In Harris County, Constable Precincts are not within defined, measurable areas, making it challenging to include census data to compare the population to traffic stops. Additionally, population demographics may not represent the demographics of drivers in the geographic area.[E]
   - *The Available Data Does Not Provide Sufficient Information to Determine the Scope of Traffic Stop Characteristics:* For example, the data does not represent when deputies request consent and do not receive consent to search a vehicle. Therefore, groups may experience an overrepresentation in consent searches because they allow deputies to search more often. Additionally, the data does not provide sufficient detail to control for extraneous factors.
   - *Additional Data Gaps:*
     - In Harris County, Law Enforcement Agencies did not report arrest by racial demographic information, on average, in 32.55 % of traffic stops (see **Table 13**).
     - In Harris County, Law Enforcement Agencies did not report citations, verbal warnings, and written warnings by racial demographics, on average, in 36.64%, 23.94%, and 27.82% of traffic stops (see **Table 15**, **Table 17** and **Table 19**).
     - In Harris County, three Law Enforcement Agencies are missing racial demographic information in the use of force resulting in

---

[E] For example, Constable Precinct Eight contains a large industrial area. Workers in this area may not live within the Precinct and commute from a different Precinct to work.

physical injury in 63.46%, 31.26%, and 25.56% of all traffic stops in Harris County.

3) *Additional Limitations to the Analysis:*

- *Only Yearly Summary Data, not Incident-Level Data*: Law Enforcement Agencies provide yearly totals of traffic stop incidents. As a result, JAD cannot perform more acute statistical procedures to identify disparate practices. JAD staff cannot specifically identify a single incident across race, gender, searches, arrests, and citations to test for the influence of race or other extraneous factors comparing traffic stop to traffic stop.

- *Lack of Disaggregated Information on Traffic Stop Demographics until 2021*: Law Enforcement Agencies did not provide disaggregated information on traffic stop demographics until submitting 2020 data. Therefore, this report can only rely on the data for 2020 that Law Enforcement Agencies submitted in 2021. We cannot compare to previous years. Similarly, the 2020 data was the first year TCOLE mandated disaggregated information. As a result, we believe some Law Enforcement Agencies may have missing data because the Law Enforcement Agencies did not routinely collect it, and the systems may not require the data's collection in reporting software.

- *Inability to use Population Demographics as a Comparison*: Due to the geographic distribution of precincts and the ability of persons to travel freely, using population demographics as the basis of comparison is infeasible. The traditional methods of comparing traffic stop demographics to population demographics are not feasible because the distribution of the Constable Precincts does not properly align with standard demographic measurement tools.

- *The Rarity of Certain Traffic Stop Characteristics*: Some variables have a small number of occurrences (such as the use of force incidents). Therefore, the proportions of demographic groups may overinflate the percentage. For example, if ten use of force incidents occurred and eight occurred to Black drivers out of 6,000 traffic stops, this would yield a proportion of 80%, which would make the percentage appear much more significant than the raw values. JAD will present the numbers for each disparity, when applicable, to contextualize the information.

- *Results Only Show Differences Between Law Enforcement Agencies or Counties*: This report uses comparisons between variables to ascertain if a specific Department or County diverges from the overall County or multi-County average. This comparison only indicates a disparity relative to the county or multi-county average.

**Recommendations**: JAD provides several recommendations to increase public awareness, improve data collection, and further analyze data to provide a better understanding of current practices:

- *Public Education*
  - o Harris County Law Enforcement should submit the required documentation to TCOLE and Commissioners Court by March 1ˢᵗ each year per the Texas Code of Criminal Procedure Article 2.134.
  - o Harris County Law Enforcement should establish easy-access online methods to submit complaints or commendations about law enforcement interactions with the public. Moreover, the information should be made available in multiple languages, especially languages relevant to resident populations.
  - o Harris County Law Enforcement should provide Deputies business cards with information on filing complaints or commendations, including contact information for a specific person or office and the web address to submit a complaint or commendation. (See **Appendix 4** to see sample card provided by the HCSO).
  - o Harris County should research and evaluate the feasibility and ease of using translation services for county websites, print materials, and personal communications to alleviate language barriers.
  - o With Commissioner Court approval, JAD would like to coordinate with the appropriate Law Enforcement Agencies and Budget Management to assist Harris County Law Enforcement Agencies in covering all additional costs derived from our recommendation, including printing costs for cards, any other public education material that would facilitate the complaint or commendation process submission, translation costs and any other effort related to public education efforts related to this topic.

- *Improved Data Sharing and Collection*
  - o JAD would need additional data on traffic stop characteristics at the incident level to perform more acute statistical analyses. Incident-level data will allow JAD to compare one traffic stop directly statistically to another to identify traffic stop characteristics and outcomes that are not accessible with yearly TCOLE summary data submitted by law enforcement.
  - o Make additional variables on traffic stop characteristics and outcomes available to JAD to perform more acute statistical analyses. These variables include:
    - ▪ The approximate location of the traffic stop;
    - ▪ The infraction that resulted in the Peace Officer stopping a Driver;
    - ▪ The infraction that resulted in the citation or warning;
    - ▪ Use of force information regardless of whether the Peace Officer or subject sustained an injury;

- ▪ The level of resistance (i.e., passive or active resistance) from the Driver during use of force incidents and the type of force a Peace Officer used during use of force incidents;
- ▪ Data on when a Peace Officer requests a driver's consent to search a vehicle, but the Driver denies the Peace Officer's request;
- ▪ The arresting charge, indicating if it is a felony or misdemeanor, and the level of the felony or misdemeanor; and,
- ▪ The amount of contraband discovered during the search.
- o Harris County should establish a centralized submission platform for all County Law Enforcement Agencies to submit racial profiling reports. This system should perform the necessary analyses and issue the Departments reports it can submit to TCOLE and Commissioners Court. A more sophisticated system could pull the data required from Superion, the County-wide law enforcement system, to generate the reports automatically for Harris County Law Enforcement Agencies.
- o Harris County should update Superion—the County-wide law enforcement system—to require Deputies to collect traffic stop information before completing traffic stop reports to limit the possibility of missing data.
- o With Commissioners Court approval, JAD would like to coordinate with the appropriate Law Enforcement Agencies and Budget Management to assist Harris County Law Enforcement Agencies in covering all costs derived from improved data collection and analysis, the development and maintenance of a centralized submission platform, and updates to Superion to limit the possibility of missing data.

- *Further Examination:*
- o Law Enforcement Agencies need to examine areas where there are disparities, work to understand those disparities, and develop solutions.
  - ▪ Further, the overreliance on force against specific communities elevates the necessity for greater data and incident transparency amongst Harris County Law Enforcement Agencies, especially the eight Constable Precincts and the Harris County Sheriff's Office.
- o Law Enforcement Agencies should provide additional information on the infractions drivers commit to receive citations and warnings, to give more context to the reasoning for citations. This can shed light on if the citation was due to a safety violation or for minor quality-of-life type offenses.



## JUSTICE ADMINISTRATION DEPARTMENT

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

## Full Report

**Background of the Sandra Bland Act**: Governor Greg Abbott signed Senate Bill 1849 by Senator John Whitmire, often referred to as the Sandra Bland Act, on June 15, 2017. The Sandra Bland Act aims to improve and correct Texas' criminal justice system and prevent future tragedies like Sandra Bland's death. Among other things, the Act requires reporting on racial profiling during traffic stops (see SECTION 5 Article 2.134, Code of Criminal Procedure). Additionally, when fully reporting, Article 2.134 requires agencies to provide the report to TCOLE and the County or City Governing bodies for the jurisdiction(s) in which the agency operates.[2] Agencies must submit:

- The stop location;
- If an officer knew the race of the driver before the stop;
- The race and ethnicity of the driver;
- The gender of the driver;
- The reason for the stop;
- Whether the officer conducted a vehicle search disaggregated by the driver's race;
- The reason for the search disaggregated by the driver's race;
- The discovery of contraband disaggregated by the driver's race and if it resulted in an arrest;
- The type of contraband the officer discovers;
- Whether the stop resulted in a warning, citation, or arrest,
- The justification of an arrest on a traffic stop,
- If an officer uses force or does not use force on a traffic stop by race; and,
- Optional questions regarding an injury to an officer, a suspect, or both.

**Limitations to the Analysis**: There are several limitations to JAD's analysis of the data.

- *Only Yearly Summary Data, not Incident-Level Data:* Law Enforcement Agencies provide yearly totals of traffic stop incidents. As a result, JAD cannot perform more acute statistical procedures to identify disparate practices. JAD staff cannot specifically identify a single incident across race, gender, searches,

arrests, and citations to test for the influence of race or other extraneous factors comparing traffic stop to traffic stop.

- *Lack of Disaggregated Information on Traffic Stop Demographics Until 2021:* Law Enforcement Agencies did not provide disaggregated information on traffic stop demographics. Therefore, this report can only rely on the data for 2020 that Law Enforcement Agencies submitted in 2021. We cannot compare to previous years. Similarly, the 2020 data was the first year TCOLE mandated disaggregated information. As a result, we believe some Law Enforcement Agencies may have missing data because the Law Enforcement Agencies did not routinely collect it, and the systems may not require the data's collection in reporting software. Therefore, JAD includes additional information on whether Law Enforcement Agencies overrepresented variables (likely due to data entry errors) or have missing data for specific variables (if Deputies did not log the information).

- *Inability to Use Population Demographics as a Comparison:* Due to the geographic distribution of precincts and the ability of persons to travel freely, using population demographics as the basis of comparison is infeasible. The traditional methods of comparing traffic stop demographics to population demographics are not feasible because the distribution of the Constable Precincts does not properly align with geographic areas for which demographic information is available. JAD received a suggestion to use voter registrations to identify the demographic distribution of each Precinct. However, this would not account for individuals who are not eligible to vote or choose not to register to vote for any reason. Lastly, traffic stops can impact persons who do not live within the Precinct or the county, and population demographics could skew the results.

- *The Rarity of Certain Traffic Stop Characteristics:* Some variables have a small number of occurrences (such as the use of force incidents). Therefore, the proportions of demographic groups may overinflate the percentage. For example, if ten use of force incidents occurred and eight occurred to Blacks out of 6,000 traffic stops, this would yield a proportion of 80%, which would make the percentage appear much more significant than the raw values. JAD will present the numbers for each disparity, when applicable, to contextualize the information.

- *Results Only Show Differences Between Law Enforcement Agencies or Counties:* This report uses comparisons between variables to ascertain if a specific Department or County diverges from the overall County or multi-County average. This comparison only indicates a disparity relative to the county or multi-county average. It provides limited statistical certainty if the department engages in any form of bias or prejudicial policing or does not engage in any form of bias or prejudicial policing. These comparisons only indicate a percentage disparity. JAD needs more sophisticated statistical tests with more detailed data to provide more specific results.

**Constable Precincts and Sheriff's Office Jurisdiction**: To provide a broader overview of demographic distributions, JAD included a map of the County and the distribution of Constable Precincts.[3] In the United States, members of racial groups often live in neighborhoods with a high proportion of one racial group, isolated from other racial groups.[4] These residential patterns are typically shaped by inequality in housing markets, which interacts with prevailing trends in economic inequality between racial groups to produce residential segregation.[5] These patterns persist in Harris County: Houston is cited in prominent studies as a typical example of a racially and economically segregated city.[6] Therefore, JAD may identify a disparity in one Precinct purely because one demographic group is consolidated to that jurisdiction. Any results should be understood in the context of the demographic characteristics of areas of Harris County. **Figure 1**, below, displays a map of the Constable Precincts in Harris County in 2021.[F] Sheriff Ed Gonzalez, HCSO, has jurisdiction over the entire county. At the same time, the Constable Precincts are divided into eight jurisdictions that span various areas in Harris County, incorporated and unincorporated. In 2020, Harris County Law Enforcement Agencies in this report performed 295,494 traffic stops.

- Sheriff Gonzalez's primary responsibility is the unincorporated areas of Harris County. However, they provide law enforcement support to smaller incorporated areas of Harris County and offer a specialized response to locations with patrol contracts with Constable Precincts. In 2020, HCSO performed 108,714 traffic stops.
- Constable Alan Rosen, Precinct One, patrols West University Place and northwestern sections of Houston. In 2020, Constable Precinct One performed 15,835 traffic stops.
- Constable Jerry Garcia, Precinct Two, patrols east of Houston and portions of Southeast Harris County.[G] In 2020, Constable Precinct Two performed 3,068 traffic stops.
- Constable Sherman Eagleton, Precinct Three, patrols East Harris County from Baytown to Kingwood. In 2020, Constable Precinct Three performed 15,036 traffic stops.

---

[F] This map reflects the elected Constables in Harris County in 2021. This map would not reflect the any change in Constables resulting from the election in November 2020.

[G] Constable Garcia informed JAD that after taking office in January 2020, he identified data discrepancies in Precinct Two's files, resulting in missing data. He informed TCOLE and based on TCOLE's guidance, submitted the filing based on what he had available for 2020. Constable Garcia further stated that he has made improvements to the Precinct's policies to ensure that the data for 2021 is complete and accurate.

- Constable Mark Herman, Precinct Four, patrols the majority of North Harris County from Waller to Tomball, Spring, Humble, and Kingwood. In 2020, Constable Precinct Four performed 77,096 traffic stops.
- Constable Ted Heap, Precinct Five, patrols West Harris County including Bunker Hill Village, Spring Valley, and Sugarland. In 2020, Constable Precinct Five performed 49,704 traffic stops.
- Constable Silvia Trevino, Precinct Six, patrols central Harris County, and East and South East Houston. In 2020, Constable Precinct Six performed 2,234 traffic stops.
- Constable May Walker, Precinct Seven, patrols south Harris County, Sugar Land, Missouri City, and South Houston. In 2020 Constable Precinct Seven performed 7,141 traffic stops.
- Constable Phil Sandlin, Precinct Eight, patrols Southeast Harris County, including Pasadena, Seabrook, and La Porte.[H] In 2020, Constable Precinct Eight performed 16,666 traffic stops.



Figure 1: Map of Harris County Constable Precincts[7]

---

[H] Constable Sandlin, Precinct Eight, informed JAD of some data issues the Precinct identified in TCOLE's data. While TCOLE has not updated the data to reflect the changes to some variables, JAD made manual modifications to the data to accurately display Precinct Eight's data. Therefore, if a person were to replicate JAD's analysis, some data from Precinct 8 (based on the May 26, 2021 update of TCOLE's data) may yield different results that are inaccurate.

**A Comparison of Gender Demographics in Traffic Stops**: All Harris County Law Enforcement Agencies are twice as likely to perform a traffic stop when the driver is male compared to female. On average, Harris County law enforcement stops 66.35% males and 33.65% females. The demographic distribution is the same for the top five most populous counties, including Harris County. Only Constable Precinct Eight is more than twice as likely to stop males (71.02%) as females (28.98%).[I] **Table 1** and **Table 2** display the gender demographics of Harris County traffic stops and the demographic of traffic stops in the five most populous Texas counties.[J] The same disparity JAD identified in Harris County occurs in the other four counties JAD studied.

**A Comparison of Racial Demographics in Traffic Stops**:[K] The racial profiling reports from TCOLE identify racial and ethnic inequalities in traffic stops. However, a difference does not solely indicate racial profiling because racial demographics across agencies' beats may differ. In Harris County, Constable Precincts are not within defined, measurable areas, making it challenging to include census data to compare the population to traffic stops. Additionally, population demographics may not represent the demographics of drivers in the geographic area. Therefore, in this report, we identify discrepancies well beyond the county averages and employ equality of proportions tests to show that the disproportions between Law Enforcement Agencies are statistically significant at the 99% level, without considering population demographics. **Table 3** displays the racial demographics of drivers in traffic stops in Harris County. **Table 4** shows drivers' racial demographics in traffic stops in Texas's top five most populous counties.[L]

- *Harris County Law Enforcement Agencies*
    - Constable Precincts Two and Five conduct traffic stops with Asian and Pacific Islander drivers in 8.77% and 8.67% of all traffic stops, approximately twice the county-wide average of 4.48%.

---

[I] Precinct Eight contains a large industrial area with a significant number of commuting workers. The overrepresentation of males could be due to the presence of this industrial area.

[J] JAD included all the tables in **Appendix 1** and not in the body of the report because some tables were too wide to fit within the document without sacrificing readability.

[K] Some Law Enforcement Agencies reported that some missing racial data could be due to the Texas Department of Public Safety allowed individuals to report race on a driver's license as "Other," which TCOLE does not accept as a racial demographic. Therefore, some data may be missing due to Deputies being unable to determine racial identification for drivers. Departments could collect and report this data to ensure that while TCOLE data may show missing data, they report the "Other" category to Commissioners Court.

[L] Throughout this report, JAD used the race and ethnic group identifiers "Native American," "Asian and Pacific Islander," "Black," "White," and "Hispanic," because TCOLE reports these terms in official statistics.

- o Constable Precinct Six stops Hispanic drivers in 58.42% of all traffic stops, 23.84% higher than the county-wide average of 34.58%.
- o Finally, Constable Precinct Seven Deputies conduct traffic stops with Black drivers 59.71% of the time, almost twice the county-wide average of 31.04%.
- o Constable Precincts One, Three, Four, Eight, and the HCSO did not have disparities greater than 10% of the County-wide average.
- *County-Level Comparison*
  - o In Dallas County, 0.74% of traffic stops involve Native American drivers. However, on average, the top-five counties stop Native American motorists in 0.44% of stops.
  - o In Dallas County and Harris County, law enforcement stops involve 33.30% and 30.05% Black drivers. However, on average, the five counties stopped Black drivers at a rate of 20.78%.
  - o In Travis County and Tarrant County, 58.42% and 58.47% of law enforcement stops involve White motorists. The top-five counties stop White motorists at a rate of 43.20%.
  - o In Bexar County, 50.72% of law enforcement stops involve Hispanic drivers. However, on average, the top-five counties stop Hispanic drivers at a rate of 32.57%.

**A Comparison of Racial and Gender Demographics in Traffic Stops**: The Racial Profiling data from TCOLE also examines the gender of motorists stopped within racial groups. **Table 5** displays the gender and racial demographics of traffic stops in Harris County. Additionally, **Table 6** shows the gender and racial demographics of traffic stops in Texas's top five most populous counties.

- *Harris County Law Enforcement Agencies*
  - o In Constable Precinct Seven, Black drivers account for 59.71% of traffic stops. However, among all females stopped in Constable Precinct Seven, 65% are Black.
  - o Constable Precincts One, Two, Three, Four, Five, Six, Eight, and HCSO did not have disparities greater than 10% of the County-wide average.
- *County-Level Comparison*
  - o Harris County traffic stops involve 4.75% Asian and Pacific Islander Females and 5.13% males, twice the average of all other counties. Additionally, Harris County stops Black Females in 36.29% of all traffic stops involving females, 13% higher than the average in the counties studied here.
  - o Dallas County traffic stops investigate Black Females in 32.89% of all cases involving females, greater than the 23.03% county-level average. Similarly, Dallas County traffic stops target Black Males in 29.92% of cases, more than 10% than the county-level average.

- Tarrant County traffic stops involve White females in 60.84% of stops involving females. Additionally, in Tarrant County, White males are the drivers in 57.16% of traffic stops involving males.
- Finally, in Bexar County, female Hispanics are the subject of 49.17% of traffic stop recipients involving females. Additionally, male Hispanic drivers are the subject of 51.67% of traffic stop recipients involving males. These rates are higher than the county-level average of 28.63% and 34.48%.
- Travis County White female and White male drivers account for 80.91% and 56.57% of traffic stops, compared to a five-county average of only 28.63% and 42.48%.

**A Comparison of Searches by Racial Demographics in Traffic Stops**: Law enforcement officers have justifications for engaging in a vehicle search during a traffic stop. Under the Fourth Amendment of the United States Constitution and its exceptions, officers can search a vehicle under five situations.

1) Officers can search a car when they observe contraband in plain view, where contraband is visible to the officer.
2) Officers may search a vehicle after the issuance of a warrant from a Judge. For example, officers may identify contraband when taking an inventory of a car (an exception to the Constitution when an Officer can review the contents of a vehicle).[M] A vehicle inventory occurs when law enforcement impounds the vehicle because either the car is not legal to drive or the driver is otherwise incapable of driving the car, and no other person is capable. During an inventory, if an officer identifies contraband, they have probable cause to apply for a search warrant from a judge to seize the property.
3) Officers may search a car when an officer has probable cause to search the vehicle, such as an odor of narcotics.
4) Officers may search a vehicle after an officer places the driver under arrest for a criminal violation. The search occurs incident to an arrest.
5) Lastly, officers can search a vehicle when a driver gives the officer the consent to search the car. Under all but the last situation, a driver does not have the legal ability to prevent a search. However, in consent searches, the officer cannot perform the search unless given the driver's permission.

Since the other options provide an officer the legal authority to search, JAD focuses its analysis on the racial demographics during a consent search of the vehicle.[N] **Table**

---

[M] JAD included this example because TCOLE requires Law Enforcement Agencies to identify inventory searches of vehicles as a justification for a search.

[N] The TCOLE data does not provide rates at which traffic stop drivers decline to give the Peace Officer consent to search the vehicle. Therefore, we do not have the rates at which racial and ethnic groups decline to allow Deputies to search vehicles. This

7 and **Table 9** display the search rates per racial group and consent searches per racial group in Harris County traffic stops. **Table 8** and **Table 10** display the search rates per racial demographic and consent searches per racial demographic for Texas's five most populous counties. These values and percentages only represent the proportion of consent searches deputies performed on specific demographic groups. This value does not represent when deputies request consent and do not receive consent to search a vehicle. Therefore, groups may experience an overrepresentation in consent searches because they allow deputies to search more often.

- *Harris County Law Enforcement Agencies*
    - o In Constable Precinct Two, 38.71% of traffic stop searches involve White drivers. However, White drivers experience 50% of all consent searches. The disproportionate rate at which Law Enforcement Agencies consent to search White drivers is statistically significant. The raw values represent that 15 white drivers experienced consent searches out of a total number of 30 consent searches from Precinct Two.
    - o In Constable Precinct Three, White drivers comprise 29.72% of all traffic stop searches. However, 41.54% of consent searches involve White drivers in Precinct Three. The raw values represent that 81 white drivers experienced consent searches out of a total number of 195 consent searches from Precinct Three.
    - o In Constable Precinct Eight, White drivers comprise 34.48% of all searches, but White drivers provide 50% of all consent searches. This represents that 105 white drivers experienced consent searches out of a total number of 213 consent searches from Precinct Eight.
    - o Constable Precincts One, Four, Five, Six, Seven, and the HCSO did not have disparities greater than 10% of the County-wide average.
- *County-Level Comparison*
    - o In Dallas County, Asian and Pacific Islander Drivers account for 100% of all consent searches.[O]
    - o In Tarrant County, White drivers experienced 57.29% of all searches but represented 71.66% of all consent searches.
    - o In Bexar County, Hispanic drivers were the subject of 59.91% of consent searches but represented only 24.55% of all searches.

**A Comparison of Contraband Discovery in Searches by Racial Demographics in Traffic Stops**: Identifying illegal or unlawful items, such as weapons or narcotics (termed contraband), is likely to result in a citation or an arrest depending on the amount and type. Due to the variety, JAD restricts its analysis to examine contraband identification by racial group searched to assess racial disparities in

---

limited JAD's conclusion on consent search disparities because a disparity is likely due to the Driver allowing the search relative to the total number of search requests.
[O] Prior to the May 26, 2021 update of TCOLE's data, Dallas County had variability in consent search rates. This could be a data irregularity issue.

searches to identify contraband. **Table 11** identifies the rate of contraband discovery by racial group searched in Harris County traffic stops. The only disparate finding occurred in Constable Precinct Two, where Asian and Pacific Islanders accounted for 6.45% of all searches. However, deputies discovered contraband in only 2.08% of cases. This accounts for two out of six searches of Asian and Pacific Islanders. Only one search resulted in deputies finding contraband in Precinct Two. Additionally, **Table 12** displays the rate of contraband discovery by racial group searched at the county level. In the county-level comparison, Bexar County was missing racial demographic identification for 37.50% of all contraband discovery.

- *County-Level Comparison*
  - In Bexar County, Black drivers experience 22.99% of searches during traffic stops. However, among all traffic stop searches, Bexar County only identifies contraband in 13.49% of searches. Additionally, Bexar County searches comprise 51.79% White drivers, but in only 17.98% of traffic stops searches of White drivers result in the discovery of Contraband.
  - In Dallas County, Hispanic Drivers experience 49.51% of traffic stop searches, but Deputies only identify contraband in 36.07% of searches of Hispanic Drivers.
  - In Tarrant County, White drivers experience 57.29% of all traffic stop searches but Deputies only identify contraband on White drivers in 44.02% of traffic stop searches.
  - In Travis County, Black Drivers experience 15.18% of all searches, but Deputies only identify contraband in 2.39% of traffic stop searches of Black Drivers. Additionally, in Travis County, 49.59% of traffic stops involve White drivers, but Deputies only identify contraband in 7.87% of traffic stop searches of White drivers. Finally, in Travis County, Hispanic drivers experience 32.79% of all traffic stop searches, but Deputies only identify contraband on Hispanic drivers in 4.38% of all searches.

**A Comparison of Traffic Stops to Arrests by Racial Demographics in Traffic Stops**: The overwhelming majority of all traffic stops do not result in an arrest. However, when arrests do occur, it is essential to evaluate the arrest rates by racial groups. JAD examined the rate of arrests by racial demographics in traffic stops compared to the overall rate of racial demographics in traffic stops. **Table 3** displays the racial demographics of drivers in Harris County traffic stops. However, in Harris County, the Law Enforcement Agencies did not report arrest by racial demographic information in 32.55 % of traffic stops. **Table 13** displays the racial demographics of arrests during Harris County traffic stops. **Table 4** displays the racial demographics of drivers in traffic stops in Texas's five most populous counties. Additionally, **Table 14** displays the racial demographics of traffic stop arrests in Texas's five most populous counties. There is significant missing data for arrests at the county-level. On average, the counties are missing 32.37% of arrest racial demographics.

- *Harris County Law Enforcement Agencies*
  - In Constable Precinct One, Black drivers represent 31.28% of all traffic stops. However, in Precinct One, Black drivers experience 42.77% of all arrests. This accounts for 337 arrests of Black drivers out of 4,953 traffic stops in Precinct One.
  - In Constable Precinct Two, Black motorists experience 20.73% of traffic stops. However, among traffic stops that result in an arrest, 32.97% of drivers are Black. This accounts for 30 arrests of Black drivers out of 636 traffic stops of Black drivers in Precinct Two Additionally, White persons experience 27.74% of traffic stops in Precinct Two. However, among traffic stops that result in an arrest, White drivers experience 35.16% of arrests. This accounts for 32 arrests of White drivers out of 851 traffic stops of White drivers in Precinct Two.
  - In Constable Precinct Four, 30.7% of traffic stops involve a Black driver. However, in traffic stops that result in an arrest, the vehicle's driver is Black 38.38% of the time. This accounts for 819 arrests of Black drivers out of 23,671 traffic stops of Black Drivers in Precinct Four.
  - In Constable Precinct Five, Black drivers experience 28.79% of traffic stops. However, of stops that result in arrests, Black motorists are the subject of an arrest 40.21% of the time. This accounts for 815 arrests of Black drivers out of 14,308 traffic stops of Black drivers in Precinct Five.
  - In Constable Precinct Six, Black individuals are the subjects of only 25.65% of all stops in the Precinct. Nevertheless, in traffic stops resulting in an arrest, 35.87% of arrests are of Black drivers. This accounts for 165 arrests of Black Drivers out of 573 traffic stops of Black drivers. Additionally, a White subject is a driver in 14.73% of traffic stops yet, experience 21.52% of all arrests resulting from traffic stops. This accounts for 99 arrests of White drivers out of 329 traffic stops involving White drivers in Precinct Six.
  - Constable Precinct Three, Eight, and HCSO did not have disparities greater than 10% of the County-wide average.
- *County-Level Comparison*
  - Bexar County reported no arrests by County-level Departments.
  - In Dallas County, Black drivers are the subject in 30.05% of traffic stops, but Dallas County arrests involve 46.43% during traffic stops.
  - In Travis County, Hispanic drivers are the subject of 27.46% of traffic stops, but Hispanic drivers experience 50% of all traffic stop arrests.

**A Comparison of the Results of Traffic Stops (Verbal Warning, Written Warning, or Citation) by Racial Demographics**: An arrest is the most significant action an officer can take during a traffic stop, absent the physical use of force. However, officers have the discretion to use methods to address infractions during traffic stops, including verbal warnings, written warnings, or citations for various violations. This section overviews the issuance of warnings and citations related to the driver's racial and

ethnic demographic. **Table 3** displays the racial demographic of drivers in Harris County traffic stops. **Table 15**, **Table 17**, and **Table 19** display the rate at which law enforcement issues racial and ethnic groups traffic citations, written warnings, and verbal warnings. However, in Harris County, the Law Enforcement Agencies did not report citations, verbal warnings, and written warnings by racial demographics in 36.64%, 23.94%, and 27.82% of traffic stops. **Table 4** displays the racial demographics of drivers in traffic stops in Texas's five most populous counties. **Table 16**, **Table 18**, and **Table 20** display the rate at which racial and ethnic groups receive traffic citations, written warnings, and verbal warnings in Texas's five most populous counties. On average, the county-level comparison for citations, verbal warnings, and written warnings are missing 37.92%, 24.46%, and 28.42% of traffic stop demographics.

- *Harris County Law Enforcement Agencies*
  - In Constable Precinct One, Hispanic drivers experience 34.32% of all traffic stops. However, they receive 45.96% of traffic citations and only 23.34% of verbal warnings. Out of 5,434 traffic stops of Hispanic drivers, 2,722 received citations, and 1,100 received verbal warnings in Precinct One. White drivers are the subjects of 30.91% of traffic stops but receive 39.77% of verbal warnings. In Precinct One, 4,894 White drivers experienced traffic stops, with 1,874 receiving verbal warnings.
  - In Constable Precinct Two, Hispanic drivers experience 41.85% of all traffic stops. However, they receive 55.30% of all citations and only 35.67% of verbal warnings. Out of 1,284 traffic stops of Hispanic drivers, 490 received citations and 657 received verbal warnings.
  - In Constable Precinct Three, Hispanic drivers encompass 32.79% of traffic stops but receive 39.11% of traffic citations. Out of 4,931 Hispanic drivers stopped in Precinct Three, 2,189 received traffic citations
  - In Constable Precinct Four, White drivers experience 37.10% of traffic stops but receive 45.35% of verbal warnings. In Precinct Four, 28,599 white drivers experience traffic stops, resulting in 581 verbal warnings. Alternatively, Hispanic drivers are the subject of 27.71% of traffic stops but only receive 19.72% of verbal warnings. Out of 21,363 Hispanic drivers stopped in Precinct Four, 13,940 received citations, and 280 received verbal warnings.
  - In Constable Precinct Five, White drivers are the subject of 34.27% of traffic stops but receive 44.45% of verbal warnings. In Precinct Five, 17,032 White drivers experienced traffic stops resulting in 2,864 verbal warnings.
  - In Constable Precinct Six, Hispanic drivers are the subject of 58.42% of traffic stops but receive 65.73% of all traffic citations. In Precinct Six, 1,305 Hispanic drivers experienced traffic stops, with 631 Hispanic drivers receiving traffic citations.
  - In Constable Precinct Seven, Black drivers are the subject of 59.71% of traffic stops. However, Black drivers receive 69.31% of traffic citations.

In Precinct Seven, 4,264 Black drivers experienced traffic stops, resulting in 1,084 citations.

- o In Constable Precinct Eight, Hispanic drivers experience 33.43% of traffic stops but receive 44.71% of traffic citations. Alternatively, White drivers are the subject of 42.19% of traffic stops and receive 53.18% of verbal warnings. In Precinct Eight, 7,032 White drivers experienced traffic stops, with 3,307 receiving verbal warnings.
- o The Harris County Sheriff's Office stops Hispanic drivers in 34.46% of traffic stops. However, Hispanic motorists receive 42.1% of all traffic citations when the stop originates from the Sheriff's Office. County-wide, the Sheriff's Office stopped 37,458 Hispanic drivers, issuing 15,401 citations.

- *County-Level Comparison*
  - o In Bexar County, White drivers experience 35.59% of traffic stops, but receive 40.70% of all verbal warnings.
  - o In Tarrant County, Asian and Pacific Islander drivers experience 2.79% of traffic stops, but receive 19.05% of verbal warnings and 22.22% of written warnings. Additionally, Black drivers experience 18.83% of traffic stops, but Black drivers receive 29.08% of all traffic citations.

**A Comparison of the Use of Force during Traffic Stops by Racial Demographics in Traffic Stops**: A traffic stop that results in an officer using force that results in bodily injury is a severe matter for all Law Enforcement Agencies in Harris County because it puts the safety and security of the Peace Officer and the Subject at risk. The TCOLE reports contained a comparison of the racial demographic of the subject and the use or non-use of force resulting in bodily injury by deputies during a traffic stop. **Table 22** displays the use or non-use of force resulting in bodily injury by a Peace Officer during a traffic stop in Harris County.[P] In Harris County, three Law Enforcement Agencies did not have any unaccounted for stops related to the racial demographics of physical force resulting in injury in Harris County. Three Law Enforcement Agencies were only missing less than 0.03% of demographic information on physical force resulting in a bodily jury in Harris County. However, three Law Enforcement Agencies are missing racial demographic information in the use of force resulting in physical injury in 31.26%, 28.77%, and 59.6% of all traffic stops in Harris County. **Table 23** shows the use of force resulting in bodily injury, and the non-use of force, during a traffic stop in Texas's five most populous counties.

- *Harris County Law Enforcement Agencies*
  - o In Constable Precinct One, there are two disparities related to a Peace Officer using force that results in physical injury.

---

[P] Constable Precinct Two did not submit the rates at which deputies used force during traffic stops, only the rates at which force was not used against racial demographics. According to Constable Garcia, Precinct Two, this was due to missing data from the previous administration. Constable Garcia assumed this post in January 2021.

- Black drivers are the subject of only 3.29% of traffic stops where a Peace Officer did not use force resulting in bodily injury. However, Black drivers account for 25% of all cases where a Peace Officer did use force that resulted in severe bodily injury. This accounts for a total of 4 use of force incidents that resulted in bodily injury to Black drivers out of a total of 16 traffic stops that where a Peace Officer used force that resulted in physical injury.
- Hispanic drivers are the subject of only 0.20% of traffic stops where a Peace Officer did not use force resulting in bodily injury. However, Hispanic drivers account for 25% of all cases where a Peace Officer did use force that resulted in severe bodily injury. This accounts for a total of 4 use of force incidents that resulted in bodily injury to Hispanic drivers out of a total of 16 traffic stops that where a Peace Officer used force that resulted in physical injury.
- Constable Precinct Three had one disparity in physical force that resulted in bodily injury. Black drivers account for 33.06% of traffic stops where a Peace Officer did not use physical force. However, Black drivers represent 62.50% of all use of force incidents where bodily injury occurred. This accounts for 10 incidents of physical force that resulted in bodily injury out of a total of 16 incidents of physical force that resulted in bodily injury.
- Constable Precinct Four had one disparity in physical force that resulted in bodily injury. White Drivers experience 37.09% of all traffic stops where a Peace Officer does not use force that results in bodily injury. However, White drivers represent 47.17% of physical force incidents that result in bodily injury. This accounts for 25 cases of physical force that resulted in bodily injury out of a total of 53 traffic stop use of force that resulted in bodily injury.
- Constable Precinct Five had two disparities in physical force that resulted in bodily injury.
  - Black drivers experience 8.67% of all traffic stops where a Peace Officer did not use physical force that resulted in bodily injury. However, Black drivers represent 33.33% of traffic stops where a Peace Officer did use physical force that resulted in bodily injury. This accounts for three instances of physical force that resulted in bodily injury out of a total of 9 traffic stops where a Peace Officer used physical force that resulted in bodily injury.
  - Additionally, White drivers represent 37.09% of traffic stops where a Peace Officer did not use physical force that resulted in bodily injury. However, White drivers represent 55.56% of traffic stops where a Peace Officer used force that resulted in bodily injury. This amounts to five cases of physical force resulting in

bodily injury against White drivers out of a total of nine cases of physical force that resulted in bodily injury.

o Constable Precinct Six had one disparity in physical force that resulted in bodily injury. Black drivers represent only 1.17% of traffic stops that did not result in physical force, but represent 40% of all cases of physical force that resulted in bodily injury. This accounts to two instances of physical force that resulted in bodily injury out of a total of 5 instances of physical force that resulted in bodily injury.

o Constable Precinct Seven had one disparate result. Black drivers represent 16.14% of traffic stops where a Peace Officer did not use force. However, when a Peace Officer uses force that results in bodily injury, Black drivers are the subject in 87.50% of traffic stops. This accounts for seven instances of force that resulted in bodily injury out of a total of eight incidents in Constable Precinct 7.

o Constable Precinct Eight had no disparate results.

o HCSO had one disparity related to use of force that resulted in bodily injury. Black drivers experience 29.50% of traffic stops where a Peace Officer did not use force. However, when a Peace Officer uses force that results in bodily injury, Black drivers are the subject in 46.91% of traffic stops. This accounts for 38 cases of physical force that resulted in bodily injury out of 81 cases of physical force that resulted in bodily injury.

- *County-Level Comparison*
  o In Bexar County, the use of force impacted three distinct racial and ethnic groups. Bexar County is missing use of force information in 25.75% of traffic stops.
    ▪ Black drivers experience 14.73% of force incidents during traffic stops and only 1.3% of non-use of force cases.
    ▪ Additionally, Hispanic drivers experience 50.39% of force incidents and only 0.35% of non-force cases.
    ▪ Alternatively, White drivers in Bexar County experienced 34.11% of force incidents on traffic stops, compared to 42.51% of non-use of force cases.
  o In Dallas county, the use of force on traffic stops impacted three distinct racial and ethnic groups. Dallas County is missing use of force information in 43.12% of traffic stops.
    ▪ Black drivers experience 37.5% of force incidents on traffic stops, and only 5.7% of non-use of force traffic stops.
    ▪ Finally, Hispanic drivers in Dallas County experience 32.03% of force incidents during traffic stops than only 0.41% of no use of force traffic stops.
  o In Harris County, the only disparity concerns Black drivers who experience 54.89% of all traffic stop cases in which force is used. However, when a Peace Officer does not use force on a traffic stop,

30.76% of cases involve Black drivers. Harris County is missing use of force information in only 3.73% of traffic stops.

o Finally, in Tarrant County, there are two disparities. Tarrant County is missing use of force information in 5.12% of traffic stops.

▪ Black drivers experience 36.67% of force incidents in traffic stops than only 20.67% of non-use of force traffic stops.

▪ White drivers in Tarrant County experience 50% of all use of force on traffic stops and only experience 31.73% of traffic stops without force incidents.

o Travis County is missing use of force information in 73.48% of traffic stops.

**Conclusion**: Overall, the analysis reveals many comparisons that do not show racial inequality in Harris County. Further, while Harris County agencies have some missing data, when JAD compared these values to other counties, Harris County had significantly less missing information than other counties. While JAD did not find significant inequalities in many comparisons, there were disparities in the issuance of citations, written warnings, and verbal warnings between certain racial and ethnic groups. The issuance of more citations to some racial and ethnic groups than others is relevant because Black and Hispanic Harris County residents are two to three times more likely than White residents of Harris County to live in poverty. Another disparity centers on the use of force resulting in bodily injury during traffic stops. Harris County Law Enforcement Agencies use force against Black and Hispanic drivers in Harris County significantly more frequently than against other racial and ethnic groups. Law Enforcement Agencies must critically examine these incidents and work to understand the origin of these disparities. Further, the disparate tendency to use force against specific communities elevates the necessity for greater data and incident transparency amongst Harris County Law Enforcement Agencies, especially the eight Constable Precincts and the Harris County Sheriff's Office. JAD separated the conclusion and recommendation into three sections, Public Education, Improved Data Collection and Sharing, and Further Examination.

- *Public Education*: The Racial profiling reports Law Enforcement Agencies submit to TCOLE are a method to achieve greater transparency on traffic stop demographics and outcomes. To achieve this, JAD has outlined four recommendations for public education and delivery. The first is improving the ability of persons to submit complaints and commendations to Law Enforcement Agencies. The second is for Law Enforcement Agencies to submit the necessary documentation to TCOLE and Commissioners Court. The third provides a method JAD for to assist the Law Enforcement Agencies to identify and secure funding to make system-level improvements. Last, Harris County should examine and seek information on language translation services for all Harris County Departments, particularly for Law Enforcement Agencies to use in the field that could provide on-demand translation services.

- o *Harris County Law Enforcement Should Increase Accessibility to Commission and Commendation Processes*: TCOLE data includes the number of complaints of racial profiling the department receives and the disposition of those complaints. Overwhelmingly, there are a small number of complaints, and the department finds that most of such complaints are unfounded. JAD reviewed the websites of each Constable Precinct and HCSO to identify the ease of submitting complaints. Constable Precinct Three, Eight, and HCSO have online complaint forms that individuals can fill out and submit. Constable Precinct Four provides a complaint form that a person needs to print and mail into the Precinct at a specific address. Constable Precinct Five has a form that provides an e-mail address and a description of the complaint process. Constable Precinct One provides a phone number and a location for persons to submit complaints. Unfortunately, Constable Precincts Two,[Q] Six, and Seven do not provide information on submitting complaints or a specific contact person.
  - ▪ JAD suggests that Law Enforcement Agencies develop easily accessible bilingual or multilingual online methods of complaint and commendation submission and for Law Enforcement Agencies to issue informational cards with contact information, including web addresses, for complaints and commendations in multiple languages. JAD commends Constable Precinct Three, Eight, and HCSO for providing online submission forms for complaints and suggests other Law Enforcement Agencies implement similar platforms.
- o *Some Departments in Harris County Did Not Satisfy the Reporting Requirements of the Sandra Bland Act*:[R] Constable Precincts Two, Six, Seven, did not submit the summary form or the comparative analytics documentation to Commissioners Court. Constable Precincts One submitted the summary report to Commissioners Court on March 9th, 2021. Constable Precincts Four, Five, and Eight submitted the fill form report and the comparative analytics form to Commissioners Court on March 9th, 2021. Constable Precinct Three submitted the fill form and

---

[Q] Constable Garcia, Precinct Two, is rebuilding the Department's website since taking office in January 2021. After speaking with JAD, Constable Garcia requested JAD's assistance to identify a method to have online complaint and commendation submission. JAD is collaborating with Constable Garcia and his information and technology employees to develop an online submission form for the public to submit complaints and commendations.

[R] JAD is working with the County Attorney's Office to determine the requirements for Constable Precincts and the Sheriff's Office on submitting the reports due to statements from some Law Enforcement Agencies that they are not required to submit them to Commissioners Court.

an analytical report to Commissioners Court on March 30th, 2021. And, HCSO submitted an analytical report to Commissioners Court on April 27th, 2021. However, JAD submitted an open records act request with TCOLE. TCOLE provided JAD with the comparative analytics forms for all eight Constable Precincts and HCSO.

- TCOLE states, "all agencies are REQUIRED to submit both the TCOLE fill form to report and the Comparative Analysis [sic] report" to TCOLE and its local governing body.[8] The Texas Code of Criminal Procedure, Article 2.134, mandates this submission to any local governing body of the county or municipality where a local law enforcement agency has jurisdiction, as provided in **Appendix 2**. JAD suggests that the Constable Precincts and the HCSO submit at least the completed comparative analysis report to Commissioners Court. This report provides the same information as the fill form report, also known as the summary report, but includes comparative statistics. TCOLE provides templates for the summary forms and comparative analysis reports on its website.

o *Harris County Should Research the Positives and Negatives of On-Demand Translation Services for County Departments*: Deputies' work in the field is easier when they are able to communicate effectively with residents who may not speak English. If the County contracted with an organization that could provide on-demand translation services, both for verbal communication with subjects and textual translations, Harris County would be able to easily and quickly translate County websites and print materials to languages best suited for the diversity of our community. Additionally, if such a system could offer virtual translators, Deputies and other employees working in public could quickly and easily communicate with the public reducing the likelihood of a language barrier resulting in an escalating situation.

o *JAD Recommends Researching System Improvements and Associated Funding*: With Commissioners Court approval, JAD would like to coordinate with the appropriate Law Enforcement Agencies and Budget Management to assist Harris County Law Enforcement Agencies in covering all additions costs derived from our recommendation, including printing cost for card, any other public education material that would facilitate the complaint of commendation process submission, translation cost, and any other effort related to public education efforts related to this topic.

- *Improved Data Sharing and Collection*: The racial profiling reports from the Constable Precincts and HCSO examine the characteristics of traffic stops at the summary level. As we stated above, these data are sufficient to identify racial and ethnic inequalities but insufficient to identify racial/ethnic profiling patterns. Additional data can supplement and provide greater clarification on

the results of these stops. JAD identifies specific variables that Law Enforcement Agencies would need to expand on to perform more acute analyses. Further, JAD finds that incident-level information would improve data analysis. JAD identified missing data within the TCOLE variables. Law Enforcement believes that modifying Superion, a county-wide law enforcement system, to mandate data collection could alleviate the issue. Finally, JAD recommends the development of a county-wide submission platform for traffic stop data.

- o *JAD Needs Additional Data to Perform More Refined Analyses*: To perform more acute statistical analyses, JAD would need additional data on traffic stop characteristics and outcomes, including:
  - The infraction that resulted in the Peace Officer stopping a Driver. This information could identify the differences between speeding citations, safety violations, or other forms of traffic and city ordinance infractions. This data would assist JAD in isolating the specific reason for a traffic stop and its outcome.
  - The data provides if a Peace Officer did or did not use force against a Driver resulting in bodily injury. However, the data does not identify the type of resistance a Peace Officer receives during the traffic stop. It does not provide the type of force that results in bodily injury. This could provide significant information on the justification for using force and the outcomes for specific types of Peace Officer force. Additionally, the data excludes use of force incidents unless it results in bodily injury which is likely to undercount the use of force incidents and skew the results toward the most severe cases of use of force.
  - The data only provides if a Driver experienced an arrest due to a warrant, a penal code violation, a traffic violation, or a city ordinance violation. If additional details on the precise charge were included, JAD could isolate the type of charges that result in arrests and compare across race and ethnic groups. This information should include the level of the charge, indicating if it is a felony or misdemeanor, and the level of the felony or misdemeanor; And,
  - The data only provides the type of contraband the Peace Officer discovers, such as money, weapons, narcotics, but does not specify the specific type of contraband or the amount of the contraband. If Law Enforcement Agencies provide the particular type of contraband and the amount, this can lend more information related to the decision to arrest or cite the Driver and enable broader comparisons between race and ethnic groups.
  - The data does provide information on search rates among racial and demographic groups. However, when a Peace Officer requests to search a vehicle ("consent search"), the only documented

information includes that the Peace Officer received consent from the Driver. Therefore, this variable only measures the demographics of Drivers who allow Deputies to search, as opposed to the sum of consent requests in Harris County. Law Enforcement Agencies should expand this data collection to include all times that a Peace Officer requested to search a vehicle. By having this information, JAD can determine the extent of consensual searches of traffic stop recipients and could more accurately display the dispersion of consent requests across all demographic groups.

o  *JAD Needs Incident-Level Data to Isolate Extraneous Factors:* Incident-level data can enable more sophisticated analyses to combine stop justifications with search information and use-of-force statistics. A bivariate analysis can only reveal so much information. In contrast, incident-level documentation can enable a large-scale study to identify if patterns represent racial bias over statistical coincidence due to specific circumstances. These analyses can compare specific incidents with divergent circumstances. Comparable studies that identify racial/ethnic profiling patterns in law enforcement use extensive incident-level data collections. [9]

o  *The County Has Missing Data in TCOLE Reports:* In discussions with Constable Precincts and HCSO, data irregularity issues were an important topic of discussion. JAD identified missing data, and some Law Enforcement Agencies reported that it is likely due to Deputies not providing the information when documenting the traffic stop. Law Enforcement Agencies suggested that if Superion, the law enforcement data system, is modified to mandate the reporting of all relevant variables for TCOLE submission, Law Enforcement Agencies would have significantly less missing data. JAD seeks to work with Law Enforcement Agencies to identify ways to improve the system and limit missing data in future submissions.

o  *A County-Wide Submission System Could Significantly Improve Data Collection and Analysis:* Additionally, some Law Enforcement Agencies suggested that a single reporting platform for Harris County could assist Law Enforcement Agencies in submitting to Commissioners Court and TCOLE. This system could identify missing data, data entry errors, and disparities before the Department submits to TCOLE and Commissioners Court.

o  *JAD Recommends Researching System Improvements and Associated Funding:* With Commissioner Court approval, JAD would like to coordinate with the appropriate Law Enforcement Agencies and Budget Management to assist Harris County Law Enforcement Agencies in covering all costs derived from improved data collection and analysis,

the development and maintenance of a centralized submission platform, and updates to Superion to limit the possibility of missing data.

- *Further Examination*: Overwhelmingly, the most disproportionate rates surround the issuances of citations[S] and the use of force resulting in bodily injury against racial groups, especially Black and Hispanic drivers, in Harris County.

  - *Law Enforcement Agencies Issue More Citations to Certain Racial and Ethnic Groups*: The high rates of citations Law Enforcement Agencies issue to racial and ethnic groups could create a cycle of economic disadvantage and deprivation. Across the County, specific racial and ethnic groups were disproportionately more likely to receive a citation during a traffic stop than a verbal or written warning. Academic research on this occurrence is mixed. Many studies' findings show an overrepresentation of certain racial and ethnic groups receiving citations.[10] Others find no differences between racial demographics.[11] Even in the absence of racial/ethnic inequality, the impact of citations on racial and ethnic groups could be significant due to the overrepresentation of certain racial and ethnic groups living in poverty in Harris County. **Table 21** displays the racial and ethnic composition of Harris County and the percentage of each group living in poverty, according to the United States Census Bureau in 2019.[T]

    - Harris County is 29.6% White, with only 6.8% living in poverty. However, Blacks represent 18.9% of the county, and 19.9% of Blacks live in poverty. Additionally, Native Americans make up 0.4% of the population, and 18% of Native Americans live in poverty. Asian and Pacific Islanders represent 7% and 0.1% of the population, and 11.4% of Asian and 12.4% Pacific Islanders live in poverty.[U] Finally, Hispanic residents comprise 43.1% of the county, and 20.8% of Hispanics live in poverty. The overrepresentation of racial and ethnic groups receiving citations during traffic stops and with these groups having high poverty rates may further hardship impoverished communities. This hardship, likely coupled with increased contact with the criminal

---

[S] One point of reference is that due to the lack of identifying information and incident-level data, JAD cannot control for extraneous factors in the issuance of citations, such as the type of citation and prior traffic history. This could heavily impact the decision to issue citations, beyond racial demographics.

[T] JAD consolidated racial and ethnic groups from the United States Census, to correspond to TCOLE's racial and ethnic demographic descriptors.

[U] The TCOLE data combines these two racial and ethnic groups as a single measure. However, the census delineates between them explaining the two values.

justice system due to a possible inability to pay fines and fees, results in cyclical economic disadvantage by failing to pay a citation resulting in additional penalties and fees. [V]

- These echo similar findings in other jurisdictions concerning inequalities in traffic stops and citations. [12] Some academic work finds that racial and ethnic disparities in stop and search rates are exceptionally high in discretionary stops [13] and tend to be maybe higher in jurisdictions with greater fiscal reliance on fines and fees. [14]
- This is an important area that necessitates transparency because even the perception that traffic enforcement is racially and ethnically unequal reduces trust in government in those subject to them [15] and reduces the individuals' willingness to call 911 for help. [16]

- *Law Enforcement Agencies Use More Force Against Certain Racial and Ethnic Groups:* The high force rates against racial and ethnic groups require additional research. Hispanic and Black drivers experience the most traffic stop use-of-force. Commissioners Court has requested Law Enforcement Agencies provide use of force incidents, not just on traffic stops, to JAD to develop a public dashboard. However, JAD has yet to receive this information, and the current timeline for that information is not yet established. [W] A broader understanding of this information can help determine if the force occurred out of necessity and proportionate the situation, helping to contextualize the results.

**Next Steps:**
- *Development of Public Dashboard on Traffic Stop Demographics:* Since this data is legislatively mandated, JAD developed a public dashboard to provide yearly summaries of traffic stops in Harris County based on the publicly available data from TCOLE. As additional years become available, JAD will add a longitudinal analysis showing how the rates change from year to year. This dashboard contains all agencies that submit to TCOLE, not just the

---

[V] JAD is currently working on a Request for Proposals related to a motion from Commissioners Court (Supplemental Item 17, June 6, 2020) to assess the impact of fines and fees in Harris County, which could provide additional insight into this finding.

[W] JAD received a draft Memorandum of Understanding (MOU) approved by the Constables on January 11, 2021 from the County Attorney's Office. JAD made modifications and submitted the document to the County Attorney's Office on January 21, 2021, with last contact regarding the MOU on February 2, 2021. This MOU was to begin the data sharing process from the eight Constable Precincts and the HCSO.

Constable Precincts and the HCSO, or even Harris County. The estimated release of this dashboard is currently unknown due to issues outside of JAD's control. JAD will release the dashboard at our first availability and provide the dashboard to Commissioners Court. Additionally, JAD will make this dashboard public and inform the public through any available means.

- o In conversations with law enforcement in Harris County, some expressed a desire to host similar dashboards on Departmental websites, particularly those with more frequent updates. JAD will work with Harris County Law Enforcement Agencies interested in data dashboards and Universal Services to make the data available to JAD and the interested Law Enforcement Agencies. JAD will further work with the Law Enforcement Agencies to help develop and publish such dashboards for public view to increase transparency at a greater frequency than TCOLE collects traffic stop data.

- *Assist in Developing Online Submission Forms for Complaints and Commendations*: JAD will assist interested Harris County Law Enforcement Agencies without online submission forms to help the Law Enforcement Agencies update websites to include an online submission form and a contact person for complaints and commendations. Additionally, JAD will work with Harris County Law Enforcement Agencies that do not have business cards that provide information on complaint and commendation submission information to develop such business cards and identify funding to print and distribute the cards. [x]

- *Help Develop Online Submission Platform for Racial Profiling Data Analysis*: JAD will assist Law Enforcement Agencies in identifying the type of system that could satisfy the reporting requirements, perform automated statistical analysis, and generate reports for the Law Enforcement Agencies. Additionally, with support from Universal Services, this system could integrate with Superion and automatically generate the report from available data without Law Enforcement Agencies having to submit the information. This system would have several immense benefits for Harris County.

- o First, Harris County could have the most accurate data and fastest submission of County Law Enforcement Agencies anywhere in Texas due to the system's automation.
- o Second, this would prevent data entry errors by drawing directly from Superion without human intervention.
- o Lastly, this system could enable daily, weekly, monthly, or quarterly reporting to keep the Department abreast on changing information on

---

[x] The HCSO has such business cards available to Deputies and with JAD's immense gratitude provided JAD a copy of the cards for other Law Enforcement Agencies to consider adopting. Constable Garcia, Precinct Two, expressed interest in having these cards for his officers in multiple languages, including languages beyond English and Spanish. The business card is attached as **Appendix 4** in Spanish and English.

traffic stops. Ultimately, this could lead to public dashboards and greater transparency for the Department.

- *Supplement Analysis with Future JAD Reports:* JAD is identifying and hiring consultants to assist in completing Supplemental Item 17, the Impact of Fines and Fees (June 9th, 2020). Due to the expansive nature of racial and ethnic disparity reporting, JAD is further seeking consultants for Commissioner Ellis's item on Racial and Ethnic Disparities Reporting from June 9th, 2020 (Supplemental Item 18). These consultants will develop methods to examine and report racial and ethnic disparities at all county criminal justice system stages. The work currently underway includes JAD is working to finalize a report for a county-level model use of force model to satisfy Supplemental Item 20 (June 9th, 2020). JAD is working with consultants to complete Supplemental Item 15 (June 9th, 2020) on an Independent Law Enforcement Oversight Board.

**Acknowledgments:** JAD would like to thank Assistant Chief Mike Lee, Harris County Sheriff's Office, Constable Jerry Garcia, Constable Precinct Two, Captain Holland Jones, Constable Precinct Seven, Chief Deputy Donald Steward, Constable Precinct Four, Assistant Chief Chris Branson, Constable Precinct Five, Chief Deputy Jason Finnen, Constable Precinct Eight, and Constable Sandlin, Constable Precinct Eight for taking the time to meet with JAD to discuss the report, the methodology, the results, and for offering invaluable suggestions. Additionally, JAD would like to acknowledge Constable Mark Herman, Constable Precinct Four, Constable May Walker, Constable Precinct Seven, and Sheriff Gonzalez, HSCO, for facilitating and allowing us to speak with representatives of their respective agencies. We look forward to meeting with additional Law Enforcement Agencies as their schedules permit and continuing our collaboration as we develop future data analysis and recommendations that impact Harris County residents.

**Report Contributors:** This Justice Administration Department report was written by Dr. Matthew Sweeney, Justice Policy Research Analyst, in collaboration with Brandi Ebanks Copes, Racial Disparity and Fairness Administrator, Perlo Gernale, Jr., Senior Data Warehouse/Business Intelligence Developer, Mike Giordanelli, Budget Analyst and Grants Manager, Dr. Elizabeth Duemig, Front End Law Enforcement Specialist, Dr. Colin Cepuran, Justice Policy Research Analyst, Lindsey Linder, Justice Policy Research Analyst, Dr. Veronyka James, Violence Prevention and Survivor of Crime Specialist, Kelly Venci Gonzalez, Youth Justice Policy Analyst, Dr. Natosha Willis, Justice Policy Research Analyst, and Dr. Ana Yáñez-Correa, Deputy Director.



**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

**Appendix 1: Tables**

| Department | Male Driver | Female Driver | Missing Data |
|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 68.23% | 31.77% | 0.01% |
| HARRIS CO. CONST. PCT. 2 | 63.49% | 36.51% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 66.21% | 33.79% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 62.99% | 37.00% | 0.01% |
| HARRIS CO. CONST. PCT. 5 | 65.44% | 34.56% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 68.89% | 31.11% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 63.97% | 36.03% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 71.02% | 28.98% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 66.89% | 33.11% | 0.00% |
| **Average** | **66.35%** | **33.65%** | 0.00% |

Table 1: Gender Demographics of Drivers in Harris County Traffic Stops

| County | Male Driver | Female Driver | Missing Data |
|--------|-------------|---------------|--------------|
| **Bexar** | 62.09% | 37.91% | 0.00% |
| **Dallas** | 70.17% | 29.83% | 0.00% |
| **Harris** | 65.81% | 34.19% | 0.00% |
| **Tarrant** | 66.52% | 33.48% | 0.00% |
| **Travis** | 65.31% | 34.69% | 0.00% |
| **Average** | **65.98%** | **34.69%** | **0.00%** |

Table 2: Comparison of Gender Demographics of Drivers Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.20% | 3.30% | 31.28% | 30.91% | 34.32% | 0.01% |
| HARRIS CO. CONST. PCT. 2 | 0.91% | 8.77% | 20.73% | 27.74% | 41.85% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 0.17% | 1.25% | 33.09% | 32.69% | 32.79% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.10% | 4.38% | 30.70% | 37.10% | 27.71% | 0.01% |
| HARRIS CO. CONST. PCT. 5 | 0.22% | 8.67% | 28.79% | 34.27% | 28.06% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.04% | 1.16% | 25.65% | 14.73% | 58.42% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 0.17% | 3.85% | 59.71% | 16.12% | 20.15% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 0.22% | 4.24% | 19.91% | 42.19% | 33.43% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.12% | 4.74% | 29.53% | 31.15% | 34.46% | 0.00% |
| Average | **0.24%** | **4.48%** | **31.04%** | **29.65%** | **34.58%** | **0.00%** |

Table 3: Racial Demographics of Drivers in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| **Bexar** | 0.57% | 1.24% | 11.87% | 35.59% | 50.72% | 0.00% |
| **Dallas** | 0.74% | 2.30% | 33.30% | 30.14% | 33.52% | 0.00% |
| **Harris** | 0.15% | 5.02% | 30.05% | 33.39% | 31.38% | 0.00% |
| **Tarrant** | 0.14% | 2.79% | 18.83% | 58.47% | 19.76% | 0.00% |
| **Travis** | 0.58% | 3.69% | 9.82% | 58.42% | 27.46% | 0.02% |
| **Average** | **0.44%** | **3.01%** | **20.78%** | **43.20%** | **32.57%** | **0.00%** |

Table 4: Racial Demographics of Drivers in Traffic Stops by County

| Department | Female | | | | | | Male | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
| HARRIS CO. CONST. PCT. 1 | 0.14% | 3.26% | 34.69% | 29.86% | 32.05% | 0.00% | 0.22% | 3.31% | 29.69% | 31.40% | 35.38% | 0.00% |
| HARRIS CO. CONST. PCT. 2 | 0.71% | 9.02% | 20.36% | 27.14% | 42.77% | 0.00% | 1.03% | 8.62% | 20.94% | 28.08% | 41.32% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 0.16% | 1.24% | 36.85% | 30.75% | 31.00% | 0.00% | 0.18% | 1.26% | 31.18% | 33.68% | 33.71% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.07% | 3.96% | 33.73% | 37.84% | 24.39% | 0.00% | 0.12% | 4.62% | 28.93% | 36.66% | 29.66% | 0.01 |
| HARRIS CO. CONST. PCT. 5 | 0.17% | 8.18% | 32.54% | 33.76% | 25.34% | 0.00% | 0.24% | 8.92% | 26.80% | 34.54% | 29.50% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 0.86% | 28.06% | 14.39% | 56.69% | 0.00% | 0.06% | 1.30% | 24.56% | 14.88% | 59.19% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 2.95% | 65.14% | 15.55% | 16.36% | 0.00% | 0.26% | 4.36% | 56.65% | 16.44% | 22.29% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 0.19% | 4.29% | 22.01% | 42.64% | 30.88% | 0.00% | 0.24% | 4.22% | 19.05% | 42.01% | 34.48% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.09% | 4.56% | 31.21% | 31.92% | 32.23% | 0.00% | 0.14% | 4.83% | 28.70% | 30.77% | 35.56% | 0.00% |
| Average | 0.11% | 4.75% | 32.89% | 33.66% | 28.59% | 0.00% | 0.18% | 5.16% | 28.58% | 33.25% | 32.83% | 0.00% |

Table 5: Racial and Gender Demographics of Drivers in Harris County Traffic Stops

| County | Female Driver | | | | | | Male Driver | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
| Bexar | 0.34% | 1.37% | 11.04% | 38.08% | 49.17% | 0.00% | 0.72% | 1.17% | 12.38% | 34.08% | 51.67% | 0.00% |
| Dallas | 0.45% | 2.07% | 41.24% | 31.31% | 24.92% | 0.00% | 0.86% | 2.40% | 29.92% | 29.65% | 37.18% | 0.00% |
| Harris | 0.11% | 4.75% | 32.89% | 33.66% | 28.59% | 0.00% | 0.18% | 5.16% | 28.58% | 33.25% | 32.83% | 0.00% |
| Tarrant | 0.21% | 2.19% | 20.47% | 60.84% | 16.30% | 0.00% | 0.10% | 3.09% | 18.13% | 57.16% | 21.51% | 0.00% |
| Travis | 0.40% | 3.97% | 9.53% | 80.91% | 24.18% | 0.00 | 0.71% | 3.55% | 9.96% | 56.57% | 29.22% | 0.00% |
| **Average** | **0.30%** | **2.87%** | **23.03%** | **45.16%** | **28.63%** | **0.00** | 0.51% | 3.07% | 19.79% | 42.14% | 34.48% | **0.00%** |

Table 6: Racial and Gender Demographics of Drivers in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.07% | 0.91% | 43.89% | 16.98% | 38.16% | 0.00% |
| HARRIS CO. CONST. PCT. 2 | 1.08% | 6.45% | 24.73% | 38.71% | 29.03% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 0.10% | 0.39% | 36.36% | 29.72% | 33.43% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.03% | 1.80% | 41.51% | 28.29% | 28.32% | 0.01% |
| HARRIS CO. CONST. PCT. 5 | 0.04% | 2.88% | 39.85% | 25.73% | 31.51% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.16% | 0.16% | 37.85% | 17.78% | 44.05% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 3.22% | 60.23% | 9.89% | 26.67% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 0.00% | 1.72% | 24.30% | 34.48% | 39.49% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.05% | 1.70% | 40.21% | 23.85% | 34.18% | 0.00% |
| **Average** | **0.05%** | **1.76%** | **39.86%** | **24.85%** | **33.48%** | **0.00%** |

Table 7: Searches by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| **Bexar** | 0.45% | 0.22% | 22.99% | 51.79% | 24.55% | 0.00% |
| **Dallas** | 0.97% | 0.49% | 38.35% | 10.68% | 49.51% | 0.00% |
| **Harris** | 0.05% | 1.76% | 39.86% | 24.85% | 33.48% | 0.00% |
| **Tarrant** | 0.86% | 1.03% | 20.24% | 57.29% | 20.58% | 0.00% |
| **Travis** | 0.27% | 2.17% | 15.18% | 49.59% | 32.79% | 0.00% |
| **Average** | **0.52%** | **1.13%** | **27.32%** | **38.84%** | **32.18%** | **0.00%** |

Table 8: Searches by Racial Demographics in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.00% | 0.76% | 45.80% | 23.66% | 29.77% | 0.00% |
| HARRIS CO. CONST. PCT. 2 | 0.00% | 6.67% | 16.67% | 50.00% | 26.67% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 0.00% | 0.00% | 38.46% | 41.54% | 20.00% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.00% | 2.06% | 36.47% | 35.59% | 25.59% | 0.29% |
| HARRIS CO. CONST. PCT. 5 | 0.00% | 4.03% | 26.51% | 32.21% | 37.25% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 0.00% | 41.89% | 16.22% | 41.89% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 0.00% | 66.67% | 16.67% | 16.67% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 0.00% | 0.94% | 19.72% | 49.30% | 30.05% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.17% | 1.43% | 36.26% | 30.27% | 31.87% | 0.00% |
| Average | 0.10% | 1.61% | 34.85% | 32.59% | 30.82% | 0.03% |

Table 9: Consent Searches by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| **Bexar** | 0.00% | 0.81% | 20.33% | 21.95% | 56.91% | 0.00% |
| **Dallas** | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Harris** | 0.10% | 1.61% | 34.85% | 32.59% | 30.82% | 0.10% |
| **Tarrant** | 1.60% | 0.00% | 12.83% | 71.66% | 15.51% | (2.00%) |
| **Travis** | 0.00% | 3.23% | 19.35% | 54.84% | 22.58% | 0.00% |
| **Average** | **0.34%** | **21.13%** | **17.47%** | **36.21%** | **25.16%** | **0.00%** |

Table 10: Consent Searches by Racial Demographics in Traffic Stops by County [25]

---

[25] The values between parentheses represent that the County overreported consent search demographics for the number of consent searches.

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.00% | 0.49% | 46.98% | 19.74% | 32.79% | 0.00% |
| HARRIS CO. CONST. PCT. 2 | 0.00% | 2.08% | 27.08% | 37.50% | 33.33% | 0.00% |
| HARRIS CO. CONST. PCT. 3 | 0.00% | 0.25% | 40.15% | 27.68% | 31.92% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.06% | 1.67% | 40.55% | 29.39% | 28.21% | 0.00% |
| HARRIS CO. CONST. PCT. 5 | 0.00% | 2.28% | 39.31% | 27.62% | 30.79% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.22% | 0.00% | 39.78% | 18.00% | 42.00% | 0.00% |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 2.15% | 56.45% | 11.83% | 29.57% | 0.00% |
| HARRIS CO. CONST. PCT. 8 | 0.00% | 1.99% | 23.46% | 34.79% | 39.76% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.00% | 1.44% | 42.72% | 24.48% | 31.32% | 0.00% |
| **Average** | **0.02%** | **1.44%** | **41.21%** | **25.51%** | **31.77%** | **0.00%** |

Table 11: Contraband Discovery by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|--------|-----------------|----------------------------|-------|-------|----------|--------------|
| **Bexar** | 0.02% | 0.40% | 13.49% | 17.98% | 65.70% | 37.50% |
| **Dallas** | 0.09% | 0.45% | 53.39% | 10.00% | 36.07% | 0.00% |
| **Harris** | 0.09% | 1.29% | 48.04% | 23.37% | 27.19% | 0.04% |
| **Tarrant** | 0.00% | 0.90% | 27.31% | 44.02% | 27.31% | 0.67% |
| **Travis** | 0.06% | 0.32% | 2.39% | 7.87% | 4.38% | 0.00% |
| **Average** | **0.05%** | **0.67%** | **28.92%** | **20.65%** | **32.13%** | 1.08% |

Table 12: Contraband Discovery by Racial Demographics in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.13% | 1.78% | 42.77% | 23.10% | 32.23% | 32.11% |
| HARRIS CO. CONST. PCT. 2 | 0.00% | 1.10% | 32.97% | 35.16% | 30.77% | 30.77% |
| HARRIS CO. CONST. PCT. 3 | 0.00% | 0.20% | 34.01% | 32.59% | 33.20% | 33.20% |
| HARRIS CO. CONST. PCT. 4 | 0.05% | 1.97% | 38.38% | 32.15% | 27.41% | 27.41% |
| HARRIS CO. CONST. PCT. 5 | 0.05% | 2.76% | 40.21% | 27.38% | 29.60% | 29.55% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 0.22% | 35.87% | 21.52% | 42.39% | 42.39% |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 3.81% | 61.29% | 9.38% | 25.51% | 25.51% |
| HARRIS CO. CONST. PCT. 8 | 0.00% | 1.55% | 23.60% | 33.25% | 41.60% | 41.59% |
| HARRIS CO. SHERIFF'S OFFICE | 0.04% | 1.76% | 39.43% | 25.18% | 33.56% | 33.56% |
| **Average** | **0.03%** | **1.68%** | **38.72%** | **26.63%** | **32.92%** | **32.55%** |

Table 13: Arrests by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|--------|-----------------|----------------------------|-------|-------|----------|--------------|
| **Bexar** | X | X | X | X | X | X |
| **Dallas** | 0.00% | 0.00% | 46.43% | 21.43% | 32.14% | 32.14% |
| **Harris** | 0.04% | 1.86% | 38.83% | 26.67% | 32.57% | 32.55% |
| **Tarrant** | 0.00% | 2.27% | 18.94% | 57.20% | 21.59% | 21.59% |
| **Travis** | 0.00% | 0.00% | 0.00% | 50.00% | 50.00% | 50.00% |
| **Average** | **0.01%** | **1.03%** | **26.05%** | **38.82%** | **34.08%** | 32.37% |

Table 14: Arrests by Racial Demographics in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.03% | 2.89% | 29.92% | 21.19% | 45.96% | 45.93% |
| HARRIS CO. CONST. PCT. 2 | 0.11% | 8.35% | 18.96% | 17.27% | 55.30% | 55.19% |
| HARRIS CO. CONST. PCT. 3 | 0.05% | 1.32% | 33.29% | 26.23% | 39.11% | 39.06% |
| HARRIS CO. CONST. PCT. 4 | 0.09% | 4.24% | 32.44% | 31.98% | 31.24% | 31.16% |
| HARRIS CO. CONST. PCT. 5 | 0.20% | 9.20% | 26.51% | 29.88% | 34.22% | 34.01% |
| HARRIS CO. CONST. PCT. 6 | 0.10% | 0.31% | 23.65% | 10.21% | 65.73% | 65.63% |
| HARRIS CO. CONST. PCT. 7 | 0.14% | 4.40% | 55.91% | 16.47% | 23.09% | 22.95% |
| HARRIS CO. CONST. PCT. 8 | 0.03% | 4.64% | 17.42% | 33.19% | 44.71% | 44.68% |
| HARRIS CO. SHERIFF'S OFFICE | 0.11% | 4.99% | 26.23% | 26.51% | 42.10% | 42.06% |
| Average | 0.10% | 5.14% | 29.45% | 28.55% | 36.73% | 36.64% |

Table 15: Traffic Citations by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|--------|-----------------|----------------------------|-------|-------|----------|--------------|
| **Bexar** | 0.61% | 1.14% | 10.21% | 33.22% | 54.83% | 54.22% |
| **Dallas** | 0.60% | 2.21% | 31.71% | 29.84% | 35.64% | 35.04% |
| **Harris** | 0.11% | 5.14% | 29.45% | 28.55% | 36.73% | 36.64% |
| **Tarrant** | 0.20% | 2.58% | 29.08% | 42.92% | 25.22% | 25.02% |
| **Travis** | 0.67% | 3.09% | 6.45% | 59.81% | 29.97% | 29.30% |
| **Average** | **0.44%** | **2.83%** | **21.38%** | **38.87%** | **36.48%** | **37.92%** |

Table 16: Traffic Citations by Racial Demographics in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.07% | 4.98% | 27.99% | 36.46% | 30.48% | 30.43% |
| HARRIS CO. CONST. PCT. 2 | 0.00% | 12.05% | 22.89% | 21.29% | 43.78% | 43.78% |
| HARRIS CO. CONST. PCT. 3 | 0.13% | 1.42% | 31.38% | 32.80% | 34.26% | 34.14% |
| HARRIS CO. CONST. PCT. 4 | 0.13% | 4.80% | 27.02% | 45.35% | 22.69% | 22.57% |
| HARRIS CO. CONST. PCT. 5 | 0.23% | 9.49% | 29.70% | 36.60% | 23.97% | 23.75% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 4.93% | 24.01% | 14.80% | 56.25% | 56.25% |
| HARRIS CO. CONST. PCT. 7 | 0.06% | 3.11% | 69.31% | 13.00% | 14.52% | 14.48% |
| HARRIS CO. CONST. PCT. 8 | 0.28% | 4.41% | 22.09% | 41.73% | 31.49% | 31.20% |
| HARRIS CO. SHERIFF'S OFFICE | 0.09% | 5.96% | 26.86% | 34.95% | 32.13% | 32.06% |
| **Average** | **0.13%** | **6.07%** | **28.01%** | **37.85%** | **27.93%** | **27.82%** |

Table 17: Written Warnings by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| **Bexar** | 0.50% | 1.47% | 14.99% | 40.70% | 43.24% | 41.82% |
| **Dallas** | 1.28% | 1.98% | 41.96% | 34.50% | 20.28% | 19.00% |
| **Harris** | 0.13% | 6.07% | 28.01% | 37.85% | 27.93% | 27.82% |
| **Tarrant** | 0.00% | 22.22% | 27.78% | 38.89% | 11.11% | 11.11% |
| **Travis** | 0.55% | 4.17% | 12.46% | 57.16% | 25.68% | 25.11% |
| **Average** | **0.49%** | **7.18%** | **25.04%** | **41.82%** | **25.65%** | **28.42%** |

Table 18: Written Warnings by Racial Demographics in Traffic Stops by County

| Department | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| HARRIS CO. CONST. PCT. 1 | 0.53% | 2.59% | 33.76% | 39.77% | 23.34% | 22.81% |
| HARRIS CO. CONST. PCT. 2 | 1.47% | 8.90% | 20.68% | 33.28% | 35.67% | 34.20% |
| HARRIS CO. CONST. PCT. 3 | 0.30% | 1.21% | 33.37% | 38.17% | 26.94% | 26.64% |
| HARRIS CO. CONST. PCT. 4 | 0.07% | 4.23% | 35.07% | 40.92% | 19.72% | 19.65% |
| HARRIS CO. CONST. PCT. 5 | 0.31% | 6.30% | 29.61% | 44.45% | 19.28% | 19.01% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 1.41% | 20.88% | 16.87% | 60.84% | 60.84% |
| HARRIS CO. CONST. PCT. 7 | 0.57% | 2.49% | 60.41% | 22.51% | 14.03% | 13.46% |
| HARRIS CO. CONST. PCT. 8 | 0.41% | 4.11% | 20.60% | 53.18% | 21.69% | 21.28% |
| HARRIS CO. SHERIFF'S OFFICE | 0.29% | 2.24% | 39.32% | 33.15% | 25.01% | 24.72% |
| **Average** | **0.38%** | **3.27%** | **33.37%** | **38.66%** | **24.31%** | **23.94%** |

Table 19: Verbal Warnings by Racial Demographics in Harris County Traffic Stops

| County | Native American | Asian and Pacific Islander | Black | White | Hispanic | Missing Data |
|---|---|---|---|---|---|---|
| **Bexar** | 0.44% | 1.32% | 25.00% | 27.19% | 46.05% | 45.61% |
| **Dallas** | 1.06% | 2.57% | 35.34% | 30.05% | 30.98% | 29.91% |
| **Harris** | 0.38% | 3.27% | 33.37% | 38.66% | 24.31% | 23.94% |
| **Tarrant** | 0.00% | 19.05% | 27.21% | 19.05% | 34.69% | 34.69% |
| **Travis** | 0.30% | 4.14% | 8.88% | 67.75% | 18.93% | 18.64% |
| **Average** | **0.44%** | **6.07%** | **25.96%** | **36.54%** | **30.99%** | **24.46%** |

Table 20: Verbal Warnings by Racial Demographics in Traffic Stops by County

| Race and Ethnicity | Percentage of Total Population | Percentage Living in Poverty |
|---|---|---|
| White | 62.6% | 14.1% |
| Black | 18.9% | 19.9% |
| Native American | 0.4% | 18.0% |
| Asian | 7.0% | 11.4% |
| Pacific Islander | 0.1% | 12.4% |
| Hispanic | 43.1% | 20.8% |

Table 21: Racial and Ethnic Demographics by Poverty Status in Harris County [17]

| Department | No Force | | | | | Force | | | | | Missing Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Native American | Asian and Pacific Islander | Black | White | Hispanic | Native American | Asian and Pacific Islander | Black | White | Hispanic | |
| HARRIS CO. CONST. PCT. 1 | 0.00% | 30.90% | 3.29% | 34.33% | 0.20% | 0.00% | 12.50% | 25.00% | 37.50% | 25.00% | 31.26% |
| HARRIS CO. CONST. PCT. 2[26] | 0.91% | 8.77% | 20.73% | 27.74% | 41.85% | X | X | X | X | X | X |
| HARRIS CO. CONST. PCT. 3 | 0.17% | 1.25% | 33.06% | 32.70% | 32.81% | 0.00% | 0.00% | 62.50% | 18.75% | 18.75% | 0.00% |
| HARRIS CO. CONST. PCT. 4 | 0.10% | 4.38% | 30.70% | 37.09% | 27.72% | 0.00% | 3.77% | 33.96% | 47.17% | 15.09% | 0.01% |
| HARRIS CO. CONST. PCT. 5 | 0.22% | 8.67% | 8.67% | 24.27% | 28.07% | 0.00% | 0.00% | 33.33% | 55.56% | 11.11% | 0.00% |
| HARRIS CO. CONST. PCT. 6 | 0.00% | 14.72% | 1.17% | 58.46% | 0.04% | 0.00% | 0.00% | 40.00% | 20.00% | 40.00% | 25.56 |
| HARRIS CO. CONST. PCT. 7 | 0.00% | 20.16% | 16.14% | 0.17% | 0.00% | 0.00% | 0.00% | 87.50% | 0.00% | 12.50% | 63.46 |
| HARRIS CO. CONST. PCT. 8 | 0.22% | 4.25% | 19.90% | 42.19% | 33.44% | 0.00% | 0.00% | 23.81% | 47.62% | 28.57% | 0.00% |
| HARRIS CO. SHERIFF'S OFFICE | 0.12% | 4.74% | 29.50% | 33.52% | 34.45% | 0.00% | 3.70% | 46.91% | 22.22% | 27.16% | 0.03% |
| Average | 0.14% | 6.99% | 27.30% | 33.52% | 28.63% | 0.00% | 2.50% | 44.13% | 31.10% | 22.27% | 3.42% |

Table 22: Use of Force by Racial Demographics in Harris County Traffic Stops

---

[26] Constable Garcia, Precinct Two, reported significant data issues to JAD. After consulting with TCOLE, Constable Garcia may have left some fields blank to indicate inaccessible data rather than report inaccurate data.

| County | No Force | | | | | Force | | | | | Missing Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Native American | Asian and Pacific Islander | Black | White | Hispanic | Native American | Asian and Pacific Islander | Black | White | Hispanic | |
| **Bexar** | 0.01% | 30.07% | 1.30% | 42.51% | 0.35% | 0.00% | 0.78% | 14.73% | 34.11% | 50.39% | 25.75% |
| **Dallas** | 0.01% | 18.13% | 5.70% | 32.59% | 0.41% | 1.56% | 2.34% | 37.50% | 26.56% | 32.03% | 43.12% |
| **Harris** | 0.17% | 7.32% | 30.76% | 29.45% | 28.66% | 0.25% | 1.50% | 54.89% | 23.05% | 20.31% | 3.73% |
| **Tarrant** | 0.13% | 16.50% | 20.67% | 31.73% | 26.37% | 0.00% | 3.33% | 36.67% | 50.00% | 10.00% | 5.12% |
| **Travis** | 0.09% | 3.40% | 7.96% | 9.72% | 5.35% | 0.00% | 2.27% | 0.00% | 6.82% | 2.27% | 73.48% |
| **Average** | **0.08%** | **15.08%** | **13.28%** | **29.20%** | **12.23%** | **0.36%** | **2.04%** | **28.76%** | **28.11%** | **23.00%** | **19.63%** |

Table 23: Use of Force by Racial Demographics in Traffic Stops by County



**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6ᵗʰ floor
Houston, TX 77002
(832) 927-6990

**Appendix 2: Code of Criminal Procedure Articles 2.131 to 2.138**

Art. 2.131. RACIAL PROFILING PROHIBITED. A peace officer may not engage in racial profiling.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.

Art. 2.132. LAW ENFORCEMENT POLICY ON RACIAL PROFILING. (a) In this article:

(1) "Law enforcement agency" means an agency of the state, or of a county, municipality, or other political subdivision of the state, that employs peace officers who make motor vehicle stops in the routine performance of the officers' official duties.

(2) "Motor vehicle stop" means an occasion in which a peace officer stops a motor vehicle for an alleged violation of a law or ordinance.

(3) "Race or ethnicity" means the following categories:

(A) Alaska native or American Indian;

(B) Asian or Pacific Islander;

(C) Black;

(D) White; and

(E) Hispanic or Latino.

(b) Each law enforcement agency in this state shall adopt a detailed written policy on racial profiling. The policy must:

(1) clearly define acts constituting racial profiling;

(2) strictly prohibit peace officers employed by the agency from engaging in racial profiling;

(3) implement a process by which an individual may file a complaint with the agency if the individual believes that a peace officer employed by the agency has engaged in racial profiling with respect to the individual;

(4) provide public education relating to the agency's compliment and complaint process, including providing the telephone number, mailing address, and e-mail address to make a compliment or complaint with respect to each ticket, citation, or warning issued by a peace officer;

(5) require appropriate corrective action to be taken against a peace officer employed by the agency who, after an investigation, is shown to have engaged in racial profiling in violation of the agency's policy adopted under this article;

(6) require collection of information relating to motor vehicle stops in which a ticket, citation, or warning is issued and to arrests made as a result of those stops, including information relating to:

(A) the race or ethnicity of the individual detained;

(B) whether a search was conducted and, if so, whether the individual detained consented to the search;

(C) whether the peace officer knew the race or ethnicity of the individual detained before detaining that individual;

(D) whether the peace officer used physical force that resulted in bodily injury, as that term is defined by Section 1.07, Penal Code, during the stop;

(E) the location of the stop; and

(F) the reason for the stop; and

(7) require the chief administrator of the agency, regardless of whether the administrator is elected, employed, or appointed, to submit an annual report of the information collected under Subdivision (6) to:

(A) the Texas Commission on Law Enforcement; and

(B) the governing body of each county or municipality served by the agency, if the agency is an agency of a county, municipality, or other political subdivision of the state.

(c) The data collected as a result of the reporting requirements of this article shall not constitute prima facie evidence of racial profiling.

(d) On adoption of a policy under Subsection (b), a law enforcement agency shall examine the feasibility of installing video camera and transmitter-activated equipment in each agency law enforcement motor vehicle regularly used to make motor vehicle stops and transmitter-activated equipment in each agency law enforcement motorcycle regularly used to make motor vehicle stops. The agency also shall examine the feasibility of equipping each peace officer who regularly detains or stops motor vehicles with a body worn camera, as that term is defined by Section 1701.651, Occupations Code. If a law enforcement agency installs video or audio

equipment or equips peace officers with body worn cameras as provided by this subsection, the policy adopted by the agency under Subsection (b) must include standards for reviewing video and audio documentation.

(e) A report required under Subsection (b)(7) may not include identifying information about a peace officer who makes a motor vehicle stop or about an individual who is stopped or arrested by a peace officer. This subsection does not affect the collection of information as required by a policy under Subsection (b)(6).

(f) On the commencement of an investigation by a law enforcement agency of a complaint described by Subsection (b)(3) in which a video or audio recording of the occurrence on which the complaint is based was made, the agency shall promptly provide a copy of the recording to the peace officer who is the subject of the complaint on written request by the officer.

(g) On a finding by the Texas Commission on Law Enforcement that the chief administrator of a law enforcement agency intentionally failed to submit a report required under Subsection (b)(7), the commission shall begin disciplinary procedures against the chief administrator.

(h) A law enforcement agency shall review the data collected under Subsection (b)(6) to identify any improvements the agency could make in its practices and policies regarding motor vehicle stops.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.
Amended by:

Acts 2009, 81st Leg., R.S., Ch. 1172 (H.B. 3389), Sec. 25, eff. September 1, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 93 (S.B. 686), Sec. 2.05, eff. May 18, 2013.

Acts 2017, 85th Leg., R.S., Ch. 173 (H.B. 3051), Sec. 1, eff. September 1, 2017.

Acts 2017, 85th Leg., R.S., Ch. 950 (S.B. 1849), Sec. 5.01, eff. September 1, 2017.

Art. 2.133. REPORTS REQUIRED FOR MOTOR VEHICLE STOPS. (a) In this article, "race or ethnicity" has the meaning assigned by Article 2.132(a).

(b) A peace officer who stops a motor vehicle for an alleged violation of a law or ordinance shall report to the law enforcement agency that employs the officer information relating to the stop, including:

(1) a physical description of any person operating the motor vehicle who is detained as a result of the stop, including:

(A) the person's gender; and

(B) the person's race or ethnicity, as stated by the person or, if the person does not state the person's race or ethnicity, as determined by the officer to the best of the officer's ability;

(2) the initial reason for the stop;

(3) whether the officer conducted a search as a result of the stop and, if so, whether the person detained consented to the search;

(4) whether any contraband or other evidence was discovered in the course of the search and a description of the contraband or evidence;

(5) the reason for the search, including whether:

(A) any contraband or other evidence was in plain view;

(B) any probable cause or reasonable suspicion existed to perform the search; or

(C) the search was performed as a result of the towing of the motor vehicle or the arrest of any person in the motor vehicle;

(6) whether the officer made an arrest as a result of the stop or the search, including a statement of whether the arrest was based on a violation of the Penal Code, a violation of a traffic law or ordinance, or an outstanding warrant and a statement of the offense charged;

(7) the street address or approximate location of the stop;

(8) whether the officer issued a verbal or written warning or a ticket or citation as a result of the stop; and

(9) whether the officer used physical force that resulted in bodily injury, as that term is defined by Section 1.07, Penal Code, during the stop.

(c) The chief administrator of a law enforcement agency, regardless of whether the administrator is elected, employed, or appointed, is responsible for auditing reports under Subsection (b) to ensure that the race or ethnicity of the person operating the motor vehicle is being reported.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.
Amended by:

Acts 2009, 81st Leg., R.S., Ch. 1172 (H.B. 3389), Sec. 26, eff. September 1, 2009.

Acts 2017, 85th Leg., R.S., Ch. 950 (S.B. 1849), Sec. 5.02, eff. September 1, 2017.

Art. 2.134. COMPILATION AND ANALYSIS OF INFORMATION COLLECTED. (a) In this article:

(1) "Motor vehicle stop" has the meaning assigned by Article 2.132(a).

(2) "Race or ethnicity" has the meaning assigned by Article 2.132(a).

(b) A law enforcement agency shall compile and analyze the information contained in each report received by the agency under Article 2.133. Not later than March 1 of each year, each law enforcement agency shall submit a report containing the incident-based data compiled during the previous calendar year to the Texas Commission on Law Enforcement and, if the law enforcement agency is a local law enforcement agency, to the governing body of each county or municipality served by the agency.

(c) A report required under Subsection (b) must be submitted by the chief administrator of the law enforcement agency, regardless of whether the administrator is elected, employed, or appointed, and must include:

(1) a comparative analysis of the information compiled under Article 2.133 to:

(A) evaluate and compare the number of motor vehicle stops, within the applicable jurisdiction, of persons who are recognized as racial or ethnic minorities and persons who are not recognized as racial or ethnic minorities;

(B) examine the disposition of motor vehicle stops made by officers employed by the agency, categorized according to the race or ethnicity of the affected persons, as appropriate, including any searches resulting from stops within the applicable jurisdiction; and

(C) evaluate and compare the number of searches resulting from motor vehicle stops within the applicable jurisdiction and whether contraband or other evidence was discovered in the course of those searches; and

(2) information relating to each complaint filed with the agency alleging that a peace officer employed by the agency has engaged in racial profiling.

(d) A report required under Subsection (b) may not include identifying information about a peace officer who makes a motor vehicle stop or about an individual who is stopped or arrested by a peace officer. This subsection does not affect the reporting of information required under Article 2.133(b)(1).

(e) The Texas Commission on Law Enforcement, in accordance with Section 1701.162, Occupations Code, shall develop guidelines for compiling and reporting information as required by this article.

(f) The data collected as a result of the reporting requirements of this article shall not constitute prima facie evidence of racial profiling.

(g) On a finding by the Texas Commission on Law Enforcement that the chief administrator of a law enforcement agency intentionally failed to submit a report required under Subsection (b), the commission shall begin disciplinary procedures against the chief administrator.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.
Amended by:

Acts 2009, 81st Leg., R.S., Ch. 1172 (H.B. 3389), Sec. 27, eff. September 1, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 93 (S.B. 686), Sec. 2.06, eff. May 18, 2013.

Acts 2017, 85th Leg., R.S., Ch. 950 (S.B. 1849), Sec. 5.03, eff. September 1, 2017.

Art. 2.136. LIABILITY. A peace officer is not liable for damages arising from an act relating to the collection or reporting of information as required by Article 2.133 or under a policy adopted under Article 2.132.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.

Art. 2.137. PROVISION OF FUNDING OR EQUIPMENT. (a) The Department of Public Safety shall adopt rules for providing funds or video and audio equipment to Law Enforcement Agencies for the purpose of installing video and audio equipment in law enforcement motor vehicles and motorcycles or equipping peace officers with body worn cameras, including specifying criteria to prioritize funding or equipment provided to Law Enforcement Agencies. The criteria may include consideration of tax effort, financial hardship, available revenue, and budget surpluses. The criteria must give priority to:

(1) Law Enforcement Agencies that employ peace officers whose primary duty is traffic enforcement;

(2) smaller jurisdictions; and

(3) municipal and county Law Enforcement Agencies.

(b) The Department of Public Safety shall collaborate with an institution of higher education to identify Law Enforcement Agencies that need funds or video and audio equipment for the purpose of installing video and audio equipment in law enforcement motor vehicles and motorcycles or equipping peace officers with body

worn cameras. The collaboration may include the use of a survey to assist in developing criteria to prioritize funding or equipment provided to Law Enforcement Agencies.

(c) To receive funds or video and audio equipment from the state for the purpose of installing video and audio equipment in law enforcement motor vehicles and motorcycles or equipping peace officers with body worn cameras, the governing body of a county or municipality, in conjunction with the law enforcement agency serving the county or municipality, shall certify to the Department of Public Safety that the law enforcement agency needs funds or video and audio equipment for that purpose.

(d) On receipt of funds or video and audio equipment from the state for the purpose of installing video and audio equipment in law enforcement motor vehicles and motorcycles or equipping peace officers with body worn cameras, the governing body of a county or municipality, in conjunction with the law enforcement agency serving the county or municipality, shall certify to the Department of Public Safety that the law enforcement agency has taken the necessary actions to use and is using video and audio equipment and body worn cameras for those purposes.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.
Amended by:
 Acts 2017, 85th Leg., R.S., Ch. 950 (S.B. 1849), Sec. 5.04, eff. September 1, 2017.
 Art. 2.138. RULES. The Department of Public Safety may adopt rules to implement Articles 2.131-2.137.

Added by Acts 2001, 77th Leg., ch. 947, Sec. 1, eff. Sept. 1, 2001.



**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

**Appendix 3: Texas Occupations Code, Chapter 1701, Section 164**

Sec. 1701.164. COLLECTION OF CERTAIN INCIDENT-BASED DATA SUBMITTED BY LAW ENFORCEMENT AGENCIES. The commission shall collect and maintain incident-based data submitted to the commission under Article 2.134, Code of Criminal Procedure, including incident-based data compiled by a law enforcement agency from reports received by the law enforcement agency under Article 2.133 of that code. The commission in consultation with the Department of Public Safety, the Bill Blackwood Law Enforcement Management Institute of Texas, the W. W. Caruth, Jr., Police Institute at Dallas, and the Texas Police Chiefs Association shall develop guidelines for submitting in a standard format the report containing incident-based data as required by Article 2.134, Code of Criminal Procedure.

Added by Acts 2009, 81st Leg., R.S., Ch. 1172 (H.B. 3389), Sec. 8, eff. September 1, 2009.



## JUSTICE ADMINISTRATION DEPARTMENT

### HARRIS COUNTY, TEXAS

**Jim Bethke, Director**
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

**Appendix 4: The HCSO's Model Business Card for Commendations and Complaints**







**JUSTICE ADMINISTRATION DEPARTMENT**

**HARRIS COUNTY, TEXAS**

*Jim Bethke, Director*
1115 Congress St., 6th floor
Houston, TX 77002
(832) 927-6990

## References

1 Texas State Legislature, "TITLE 1. CODE OF CRIMINAL PROCEDURE, CHAPTER 2. GENERAL DUTIES OF OFFICERS, Art. 2.132. LAW ENFORCEMENT POLICY ON RACIAL PROFILING," 2017, https://statutes.capitol.texas.gov/Docs/CR/htm/CR.2.htm#2.131.

2 Texas Commission on Law Enforcement, "RACIAL PROFLING: WHAT IS THE COMPARATIVE ANALYSIS?," 2021, https://www.tcole.texas.gov/content/comparative-analysis.

3 Harris County, "Harris County Constable Precincts | Harris County | Texas," 2021, https://www.harriscountytx.gov/Government/Law-Enforcement/Harris-County-Constable-Precincts.

4 R D Enos, *The Space Between Us: Social Geography and Politics* (Cambridge University Press, 2017), https://books.google.com/books?id=2y42DwAAQBAJ.

5 J Trounstine, *Segregation by Design: Local Politics and Inequality in American Cities* (Cambridge University Press, 2018), https://books.google.com/books?id=3ZfjtQEACAAJ.

6 B F Schaffner, J H Rhodes, and R J L Raja, *Hometown Inequality: Race, Class, and Representation in American Local Politics* (Cambridge University Press, 2020), https://books.google.com/books?id=0VDuDwAAQBAJ.

7 Harris County, "Harris County Constable Precincts | Harris County | Texas," 2021, https://www.harriscountytx.gov/Government/Law-Enforcement/Harris-County-Constable-Precincts.

8 Texas Commission on Law Enforcement, "Racial Profiling Reports: Law Enforcement Agency Requirements," 2021, http://www.tcole.texas.gov/content/racial-profiling-reports.

9 See: Notes **Error! Bookmark not defined.**-15.

10 Christopher Barnum and Robert L. Perfetti, "Race-Sensitive Choices by Police Officers in Traffic Stop Encounters," *Police Quarterly* 13, no. 2 (2010): 180–208, https://doi.org/10.1177/1098611110365690; Amy Farrell et al., "Massachusetts Racial and Gender Profiling Study: Final Report.," May 4, 2004, http://hdl.handle.net/2047/D20002338; Wendy C. Regoeczi and Stephanie Kent, "Race, Poverty, and the Traffic Ticket Cycle," *Policing: An International Journal of Police Strategies & Management* 37, no. 1 (March 11, 2014): 190–205,

https://doi.org/10.1108/PIJPSM-06-2013-0060; Rob Tillyer, "Opening the Black Box of Officer Decision-Making: An Examination of Race, Criminal History, and Discretionary Searches," *Justice Quarterly* 31, no. 6 (November 2, 2014): 961–85, https://doi.org/10.1080/07418825.2012.710646.

[11] Greg Ridgeway, *Assessing the Effect of Race Bias in Post-Traffic Stop Outcomes Using Propensity Scores* (Santa Monica: RAND, 2006).

[12] Frank R. Baumgartner et al., "Intersectional Encounters, Representative Bureaucracy, and the Routine Traffic Stop," *Policy Studies Journal* 0, no. 0 (February 12, 2020): psj.12382, https://doi.org/10.1111/psj.12382; Emma Pierson et al., "A Large-Scale Analysis of Racial Disparities in Police Stops across the United States," *Nature Human Behaviour* 4, no. 7 (July 4, 2020): 736–45, https://doi.org/10.1038/s41562-020-0858-1; Frank Baumgartner et al., "Racial Disparities in Traffic Stop Outcomes," *Duke Forum for Law & Social Change* 9, no. 1 (2017): 21.

[13] Kevin Roach et al., "At the Intersection: Race, Gender, and Discretion in Police Traffic Stop Outcomes," *The Journal of Race, Ethnicity, and Politics*, November 11, 2020, 1–23, https://doi.org/10.1017/rep.2020.35.

[14] Charles Epp, Steven Maynard-Moody, and Donald Haider-Markel, *Pulled Over: How Police Stops Define Race and Citizenship* (Chicago: University of Chicago Press, 2014), https://press.uchicago.edu/ucp/books/book/chicago/P/bo17322831.html; Frank R Baumgartner, Derek A Epp, and Kelsey Shoub, *Suspect Citizens: What 20 Million Traffic Stops Tell Us about Policing and Race* (Cambridge: Cambridge University Press, 2018), https://doi.org/10.1017/ 9781108553599.

[15] Epp, Maynard-Moody, and Haider-Markel, *Pulled Over: How Police Stops Define Race and Citizenship*.

[16] Chris L. Gibson et al., "The Impact of Traffic Stops on Calling the Police for Help," *Criminal Justice Policy Review* 21, no. 2 (June 22, 2010): 139–59, https://doi.org/10.1177/0887403409344165.

[17] U.S. Census Bureau, "Explore Census Data," accessed April 3, 2021, https://data.census.gov/cedsci/.