# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| DEBORAH JONES-MACDONALD, § | |
| § | |
| Plaintiff. § | |
| § | |
| V. § | CIVIL ACTION NO. 4:23-cv-02871 |
| § | |
| HARRIS COUNTY, *et al.*, § | |
| § | |
| Defendants. § | |

## OPINION AND ORDER

Pending before me are two motions to dismiss, one filed by Defendant Harris County (the "County"), and one filed by Defendants Charles Ribbe ("Ribbe") and Ronaldo Delgado, Jr. ("Delgado").[1] *See* Dkts. 22, 24. For the reasons discussed below, I **GRANT** the County's Motion to Dismiss (Dkt. 22) and **DENY** the Deputies' Motion to Dismiss (Dkt. 24) as to all claims against them.

## BACKGROUND

Plaintiff Deborah Jones-MacDonald, a 65-year-old Black woman with no criminal history, brings this lawsuit asserting claims against Defendants under 42 U.S.C. § 1983 for alleged violations of her constitutional rights to be free from unreasonable seizure, excessive force, and wrongful arrest. Plaintiff's claims arise from her interactions with Ribbe and Delgado—both deputies with the Harris County Sheriff's Office ("HCSO")—on the morning of August 13, 2021. Most of the relevant events were captured on the Deputies' bodycams. I recount any events not captured on video from Plaintiff's First Amended Complaint. *See* Dkt. 21.

On the morning of August 13, 2021, a private individual (the "Repo Man") attempted to repossess Plaintiff's vehicle while it was parked at her ex-husband's apartment complex. The Repo Man did not have a court order authorizing the repossession of Plaintiff's vehicle. Rather, the Repo Man was undertaking what is

---

[1] I will refer to Ribbe and Delgado collectively as the "Deputies."

colloquially known as a "self-help" repossession. Texas law permits private, self-help repossessions "without judicial process" only "if it proceeds without breach of the peace." TEX. BUS. & COM. CODE ANN. § 9.609(b)(2). When the Repo Man encountered resistance during his repossession of Plaintiff's vehicle, rather than cease the repossession, he called the HCSO. Ribbe and Delgado responded.

According to Plaintiff, when the Deputies arrived on the scene, multiple eyewitnesses told them that the Repo Man was "acting belligerent, raising his voice, and causing a disturbance as he attempted to repossess the vehicle[]." Dkt. 21 at 7 n.3. If these interactions took place, they were not captured on either bodycam. Both Deputies' bodycams begin recording as they approach the tow truck, Plaintiff's vehicle, and Plaintiff's ex-husband (a Black man), who is standing barefoot on the tow truck's lift. *See* Dkt. 25, Ex. 1 (Delgado Video) & Ex. 2 (Ribbe Video). As the Deputies approach, the rear end of Plaintiff's vehicle is lifted at nearly a 45-degree angle, and the front bumper of Plaintiff's vehicle is touching the ground. The tow truck is facing a fixed gate, in the opposite direction of Plaintiff's vehicle, not ready to tow or able to drive away. The audio begins a few seconds into the recording.

One of the first things heard on the video is Ribbe telling the ex-husband that Ribbe is not concerned with who owns the vehicle, but with who is making the payments. Ribbe then states that he will verify the Repo Man's paperwork, but if the Repo Man has the proper paperwork the officers "cannot deny him." Ribbe Video at 0:35–0:42. The ex-husband complains that the Repo Man is the one who is breaching the peace. Ribbe counters that he does not see how the Repo Man is breaching the peace. Ribbe then states: "We can't help you and we're not helping him, we're just stopping you from preventing him from doing his job." *Id.* at 2:39–2:41. The ex-husband asks at what point someone breaches the peace, and Ribbe responds: "causing a disturbance." *Id.* at 3:26–3:34. Delgado then states that he's getting pretty close to detaining the ex-husband if the ex-husband doesn't get off the tow truck. As the ex-husband asks the Deputies if they would like to speak to

the witnesses who saw the Repo Man breach the peace, Delgado grabs the ex-husband's leg, and the ex-husband falls to the ground. Ribbe handcuffs the ex-husband and places him in the back of Delgado's SUV.

As the Deputies place the ex-husband into the back of Delgado's SUV, the Repo Man lowers Plaintiff's vehicle to the ground, disconnects the vehicle, drives around to the front of Plaintiff's vehicle, and places the tow truck's wheel lift under Plaintiff's vehicle.[2] Plaintiff then "arrive[s] at the apartment complex and s[ees] her vehicle and a tow truck. Believing any potential tow to be illegal, Plaintiff g[ets] into the driver's seat of her [vehicle]." Dkt. 21 at 9. Ribbe notices that Plaintiff is in her vehicle as the tow truck begins lifting it. Ribbe walks up to the vehicle, opens the driver's side door, says to Plaintiff, "Now it's your turn," and reaches towards Plaintiff's body to remove her from her vehicle. Ribbe Video at 7:51–8:04.

Plaintiff repeatedly yells at Ribbe—"Stop!" and "Get off me!"—leaning away from Ribbe as he reaches his hands into the vehicle to grab Plaintiff, telling her to "get out of the vehicle." *Id.* at 8:04–8:12. Plaintiff then grasps the steering wheel with both hands. Ribbe grabs Plaintiff's wrist and tries to pry her hand off the steering wheel. Plaintiff screams at Ribbe, "Get off! You better let me go." *Id.* 8:20–8:22. Plaintiff threatens to call the police and file a report against Ribbe for harassment as he continues to grab her hand and wrist. After Plaintiff tells Ribbe to go and call the police, Ribbe yanks Plaintiff part of the way out of her vehicle. Delgado arrives and begins to assist Ribbe in removing Plaintiff from her vehicle, at which point Plaintiff bites Delgado's hand. Delgado then punches Plaintiff in the face as Ribbe drags Plaintiff by her ankle, pulling her to the ground. The Deputies work together to force Plaintiff to turn over, each placing their knees on her legs or back, pushing her body to the ground and handcuffing her.

---

[2] Although neither video captures the tow truck actually moving in reverse and deploying the tow arm to the front of Plaintiff's vehicle, this obviously occurred. Both videos show that immediately after the ex-husband's arrest, the tow truck reversed its position relative to Plaintiff's vehicle, and the direction it was facing.

An unidentified Black male in Ribbe's field of view observes Plaintiff being pulled from her vehicle. This unidentified Black male "tried to tell [Delgado] that the repossession company had sent people who caused a breach of the peace then and during a prior incident the night before." Dkt. 21 at 9. Neither Deputy is responsive to these complaints. Instead, the Deputies load Plaintiff into the back of Ribbe's car. Once Plaintiff and her ex-husband are each in the back of the Deputies' vehicles, the Repo Man drives off with Plaintiff's vehicle.

Plaintiff was ultimately taken to jail and charged with assaulting a police officer. That charge was dismissed on April 21, 2023. On August 4, 2023, Plaintiff filed this lawsuit against the County, Ribbe, and Delgado. Plaintiff brings § 1983 claims of excessive force, unreasonable search and seizure, and wrongful arrest against both Deputies. Plaintiff claims the County is also liable because it has a policy, procedure, custom, practice or protocol of (1) inadequately training, supervising, and/or disciplining its officers; (2) shielding its officers from the consequences of illegal and/or improper conduct; (3) permitting its officers to perform illegal and/or improper conduct; and (4) ratifying officers' illegal and/or improper conduct. The County has moved to dismiss for failure to state a claim. The Deputies move to dismiss arguing that (1) they are entitled to qualified immunity, and (2) Plaintiff fails to state a claim against them.

LEGAL STANDARD

**A. MOTION TO DISMISS**

Defendants are entitled to dismissal if Plaintiff's complaint "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although a complaint need not

contain detailed factual allegations, it "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Nor will legal conclusions couched as factual allegations satisfy this standard. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

I must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotation omitted). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). Here, Plaintiff references both Deputies' bodycam videos throughout her pleading, even attaching images from both bodycams. *See* Dkt. 21-4. Accordingly, I consider the bodycam videos in ruling on the motions to dismiss. *See Robles v. Ciarletta*, 797 F. App'x 821, 831–32 (5th Cir. 2019) (holding that "the district court properly considered [bodycam video] evidence" where the plaintiffs' "complaint referred to . . . video" and the video was "central to [plaintiffs'] claims").

## B.   42 U.S.C. § 1983

Section 1983 provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted).

To establish § 1983 liability against the Deputies, Plaintiff must "(1) allege a violation of a right secured by the Constitution or laws of the United States" and (2) demonstrate that the Deputies were "acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

Local government bodies like the County are not liable under § 1983 based solely on their employees' actions. *See Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). Plaintiff may prevail against the County only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the County]'s officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Establishing the County's liability under § 1983 requires Plaintiff to identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle*, 613 F.3d at 541–42 (quotation omitted).

## ANALYSIS

### A.   QUALIFIED IMMUNITY

Law enforcement officers sued in their individual capacity under § 1983 are entitled to assert the defense of qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). It is a judicially created doctrine designed to avoid "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The doctrine arises from "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (cleaned up).

The Deputies contend that they are each entitled to qualified immunity.[3] To overcome their qualified immunity defenses, Plaintiff must allege "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). "These steps may be considered in either order." *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018).

The first step asks whether the alleged facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If Plaintiff's allegations, viewed favorably, do not establish a constitutional violation, no further inquiry is necessary. *See id.* The second step "asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation omitted). The Deputies are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). "A right is clearly established only if the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Mote v. Walthall*, 902 F.3d 500, 505 (5th Cir. 2018) (quotation omitted). "[T]he salient

---

[3] Plaintiff supplemented her response to the motions to dismiss with a recently written opinion by United States District Judge Carlton W. Reeves. *See Green v. Thomas*, No. 3:23-cv-126, 2024 WL 2269133 (S.D. Miss. May 20, 2024). In that opinion, Judge Reeves revisits the history of the Ku Klux Klan Act—the formal name of § 1983—and the judicial invention of qualified immunity. Judge Reeves makes a powerful argument for why qualified immunity is, if not unconstitutional, at the very least, undemocratic. Plaintiff here "requests that the underlying legality of defendants' qualified immunity arguments be incorporated into the ruling on [the] current pending motions." Dkt. 41 at 2. I appreciate Plaintiff's request, but as Judge Reeves himself observes, "[t]his Judge has no say in the adjustment or abolition of qualified immunity." *Green*, 2024 WL 2269133, at *23. I am "'bound by the precedential decisions of both [the Fifth Circuit] and the Supreme Court.'" *Winder v. Gallardo*, ---F.4th---, No. 24-10017, 2024 WL 4313652, at *3 (5th Cir. Sep. 27, 2024) (quoting *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020)). I therefore decline to opine of the legality of qualified immunity, which, as shown below, neither Deputy is entitled to at the motion to dismiss stage of this case anyway.

question . . . is whether the state of the law" at the time of the incident provided the Deputies with "fair warning that their alleged [conduct] was unconstitutional." *Hope*, 536 U.S. at 741. Plaintiff bears a heavy burden on this prong because a right is clearly established only if relevant precedent "ha[s] placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

"[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quotation omitted).

**B.     THE DEPUTIES VIOLATED MULTIPLE CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.**

### *1.     The Fourth and Fourteenth Amendments' Prohibition Against Seizure of Property Without Due Process*

It "is no new principle of constitutional law" that the Fourteenth Amendment protects against a state depriving a person of their property without notice and the opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972); *see also* U.S. CONST. amend. XIV, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law."). "At the heart of *Fuentes* is the principle that it is not for law enforcement officers to decide who is entitled to possession of property." *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir. 1998). Similarly, the Fourth Amendment prohibits the unreasonable "'seizure' of property, . . . [which] occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 446 U.S. 109, 113 (1984)).

In recognition of this fundamental constitutional principle, the Texas Court of Appeals has observed:

> It is well settled that police officers who perform civil standbys to keep the peace during a private party's repossession of property when right to possession of that property is disputed are not state

actors if they act only to keep the peace, "but they cross the line if they affirmatively intervene to aid the repossessor."

*Poteet v. Sullivan*, 218 S.W.3d 780, 788 (Tex. App.—Fort Worth 2007, pet. denied) (quoting *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004)). "[T]he overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." *Marcus*, 394 F.3d at 819.

Here, the repossession of Plaintiff's vehicle would not have occurred but for the Deputies' actions in "stopping [Plaintiff and her ex-husband] from preventing [the Repo Man] from doing his job." Ribbe Video at 2:39–2:41. Both Deputies put their hands on Plaintiff, physically removing and restraining her from lawfully and peacefully resisting the repossession of her property. "Nothing in the law gives police a . . . right to provide affirmative aid to a [repossessor] who goes onto another's property and removes items to which ownership is disputed." *Poteet*, 218 S.W.3d at 789.

The Deputies contend they removed Plaintiff from her vehicle "to maintain the peace." Dkt. 24 at 15. But the peace had already been breached when the Repo Man persisted with his self-help repossession over objection and confrontation. *See Chapa v. Traciers & Assocs.*, 267 S.W.3d 386, 391–95 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (observing that "the creditor who elects to pursue nonjudicial repossession assumes the risk that a breach of the peace might occur" and concluding that the peace is not breached when the repossession is accomplished "without objection or confrontation"). The Repo Man was not ready to tow Plaintiff's vehicle when the Deputies arrived on the scene. Both videos show that the Repo Man necessarily disconnected Plaintiff's vehicle from the tow truck in order to reposition the tow truck so that Plaintiff's vehicle could be towed from the front. During this repositioning, Plaintiff got into her own vehicle to lawfully and peacefully resist the self-help repossession. Plaintiff "asserted her right to object . . . by physically taking control of the [vehicle]. At that point, [the Repo

Man's] right to pursue his self-help remedy terminated, and he was required to cease the repossession." *Hensley v. Gassman*, 693 F.3d 681, 692 (6th Cir. 2012).

By "proceed[ing] with the attempted repossession over an objection communicated to him at, near, or incident to the seizure of the property," the Repo Man was the one breaching the peace. *Chapa*, 267 S.W.3d at 395. The case law uniformly suggests that any objection or confrontation should cause the end of a self-help repossession. *See Hensley*, 693 F.3d at 689–90 ("As numerous state court cases and secondary authorities have recognized, an objection, particularly when it is accompanied by physical obstruction, is the debtor's most powerful (and lawful) tool in fending off an improper repossession because it constitutes a breach of the peace requiring the creditor to abandon his efforts to repossess."). It is ridiculous for the Deputies to profess concern about the peace when they themselves had already unconstitutionally assisted the Repo Man in breaching it.

Here, the video shows that the Repo Man disconnected the tow truck from Plaintiff's vehicle and then proceeded to reconnect and tow Plaintiff's vehicle, despite the obvious verbal and physical resistance from both Plaintiff and her ex-husband. The Repo Man's reconnection to and ultimate tow of Plaintiff's vehicle would not have been possible but for the aid and intervention of the Deputies, who unilaterally "resolved the stalemate in favor of [the Repo Man]—the party neither factually nor legally entitled to the [vehicle]." *Id.* at 692. For decades now it has been clearly established that the Deputies' actions violated Plaintiff's Fourth and Fourteenth Amendment rights. *See Poteet*, 218 S.W.3d at 793.

The relevant facts of this case are functionally indistinguishable from *Poteet*, in which a Texas appellate court held that Poteet had "provided sufficient evidence of police interference with his possessory interest in the contents of his home to raise a fact issue on whether the officers participated in the unconstitutional seizure of his property." *Id.* at 789. Here, as in *Poteet*, Plaintiff and her ex-husband "had made clear that [the Repo Man] was not allowed on [Plaintiff's] property, but the officers ordered [them to allow the repossession anyway]." *Id.* Similarly, "the

officers' physical restraint . . . precluded [Plaintiff and her ex-husband] from [resisting the repossession] because they confined [Plaintiff and her ex-husband] to [the backs of the deputies' vehicles] while [the Repo Man] took [Plaintiff's] property." *Id.* In *Poteet*, "the officers not only told Poteet that they were present at his home to keep the peace but also asserted that they were there 'to assist Tanya in getting her things.'" *Id.* This is no different from Ribbe telling Plaintiff's ex-husband that the Deputies were there to stop the ex-husband "from preventing [the Repo Man] from doing his job." Ribbe Video at 2:39–2:41.

The result here should be no different from the result in *Poteet*, in which the officers were denied qualified immunity, because "[f]ederal law recognizing that an unlawful taking of property during a civil standby can amount to state action and a § 1983 violation is clearly established." 218 S.W.3d at 793; *see also Marcus*, 394 F.3d at 824 ("State law limiting self-help to those situations where a breach of the peace is avoided, and federal law recognizing that an unlawful repossession can amount to state action and a deprivation of property actionable under § 1983, are both clearly established."); *Abbott*, 164 F.3d at 148 (denying qualified immunity to officers who aided in a private repossession because "the law in this area was clear for at least twenty-four years prior to" their actions); *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981) ("We conclude that there may be a deprivation within the meaning of [§] 1983 . . . when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession."); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 513 (5th Cir. 1980) (observing that "police intervention and aid in [a] repossession by [a private party without a court order] would constitute state action"); *McLinn v. Thomas Cnty. Sheriff's Dep't*, 535 F. Supp. 3d 1087, 1104 (D. Kan. 2021) ("*Marcus* found the law was clearly established and denied qualified immunity under similar circumstances, focusing on the officers' unfounded assumption that the repossessor was entitled to possession of the vehicle and their use of police authority to aid the repossessor."). Thus, at this

initial pleading stage, Plaintiff's allegations and the bodycam videos more than overcome the Deputies' assertion of qualified immunity as to the seizure of Plaintiff's vehicle.

### 2. The Fourth Amendment's Prohibition Against the Unreasonable Seizure of Plaintiff's Person[4]

When the Deputies physically removed Plaintiff from her vehicle, it had been clearly established for more than 50 years that officers cannot seize a person without reasonable suspicion of a crime. *See Terry v. Ohio*, 392 U.S. 1 (1968). The Deputies argue that their seizure of Plaintiff was reasonable because "[a] reasonable officer could have believed that Plaintiff was in violation of failing to follow a deputy's instruction." Dkt. 24 at 18 (quotation omitted). Setting aside that the Deputies had already unconstitutionally and unreasonably aided in a self-help repossession, the problem with this failure-to-follow-instructions argument is that the video shows that Ribbe never gave any instruction to Plaintiff before reaching for her body to remove her from her vehicle. Rather, the video shows that with no investigation whatsoever, Ribbe walked up to Plaintiff's vehicle, opened the driver's side door, said to Plaintiff, "Now it's your turn," and tried to remove Plaintiff from her vehicle. Ribbe Video at 7:51–8:04. Thus, no reasonable officer could have believed that Plaintiff was in violation of failing to follow a deputy's instruction because no instruction was given.

Ribbe and Delgado both eventually shouted at Plaintiff to get out of her vehicle as they struggled with her. But Plaintiff was under no obligation to obey those commands because they were not lawful orders.

> It can be assumed . . . that some police commands will subject a citizen to prosecution for disobeying whether or not the citizen knows why the order is given. Illustrative examples include when the police tell a pedestrian not to enter a building and the reason is to avoid impeding a rescue team, or to protect a crime scene, or to secure an

---

[4] Although Plaintiff uses the words "search and seizure" together throughout her complaint, she never alleges—and more importantly, neither bodycam video shows—that she was ever searched. Accordingly, I construe Plaintiff's unreasonable search and seizure claims to pertain only to the seizure of her vehicle and her person.

area for the protection of a public official. ***It does not follow, however, that any unexplained police order must be obeyed without notice of the lawfulness of the order.***

*City of Chicago v. Morales*, 527 U.S. 41, 69 (1999) (Kennedy, J., concurring) (emphasis added).

An officer may seize a person only "when the officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002). The Deputies have not suggested that they had reasonable suspicion that Plaintiff was committing any crime by sitting in the driver's seat of her own vehicle in a private parking lot. Rather, they argue that "[a] reasonable officer could believe that a person who attempts to drive a vehicle that is hooked up to a tow truck and lifted in the air could potentially cause harm to themself or others." Dkt. 24 at 18.

This sounds like an assertion that the Deputies' actions fall within the "community caretaking" exception to the requirement that officers have reasonable suspicion or a warrant before seizing a person. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (observing that police frequently perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"). But Plaintiff disputes—and neither video clearly shows—that she was attempting to drive the vehicle. That disputed fact must be resolved by a jury. *See Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (observing that "disputed questions of fact are anathema to Rule 12(b)(6) jurisprudence"); *Madden v. State*, 242 S.W.3d 504, 511 (Tex. Crim. App. 2007) ("Only if one or more of those necessary facts are disputed does the judge ask the jury to decide whether the officer's belief in those facts was reasonable."). Thus, it would be inappropriate to dismiss Plaintiff's unreasonable seizure claims at this early stage of the case.

### 3.  *The Fourth Amendment's Prohibition of Excessive Force*

Plaintiff claims to have suffered "serious injuries to her face, arms, legs, knees, wrists, and ankles" as a result of the Deputies' alleged excessive force in physically removing her from her vehicle. Dkt. 21 at 4.

"In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass*, 814 F.3d at 731 (quotation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Analyzing reasonableness

> requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*. Here, all three *Graham* factors weigh in Plaintiff's favor.

"First, at the time [Ribbe] and [Delgado] took down [Plaintiff], [she] had not committed a crime; [she] was merely [sitting in her own vehicle in a private parking lot]." *Ramos v. Erwin*, No. 4:23-cv-2517, 2024 WL 1184822, at *8 (S.D. Tex. Mar. 18, 2024). Plaintiff's "physical obstruction" was her "most powerful (and lawful) tool in fending off an improper repossession," and reasonable officers would have known that Plaintiff's physical obstruction should have caused the Repo Man "to abandon his efforts to repossess" Plaintiff's vehicle. *Hensley*, 693 F.3d at 689–90.

Second, as discussed above, whether Plaintiff posed an immediate threat to the safety of the officers or others requires the resolution of a disputed fact. But even if a jury determines that Plaintiff posed a safety risk by trying to drive her vehicle while it was lifted by the tow truck, Plaintiff has still alleged force that was clearly excessive to that need. Once Plaintiff was removed from her vehicle, any

purported safety risk was eliminated. Yet, the Deputies continued to physically restrain Plaintiff once she was out of her vehicle—as she protested that she was only trying to stand up—including forcing her to straighten her bent legs and turn over on her stomach as each placed a knee on her back or legs to hold her down.

Third, although Plaintiff resisted the Deputies, she was not under arrest when they first started to remove her from her vehicle, and she certainly was not attempting to flee by trying to remain in her vehicle. Moreover, her resistance was initially passive—leaning away from Ribbe and grasping her own steering wheel—until *the Deputies* initiated physical contact. "A reasonable jury could infer from [the videos] that [Ribbe and Delgado] engaged in very little, if any, negotiation with [Plaintiff]—and find that [they] instead quickly resorted to . . . dragging her out of the vehicle." *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (denying qualified immunity to officers who removed grandmother from vehicle after she passively resisted an unlawful arrest). On these facts, I cannot say that the Deputies are entitled to qualified immunity from Plaintiff's excessive force claims. Plaintiff "had a clearly established right to be free from excessive force" and "a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances." *Id.* at 169.

### 4.    The Fourth Amendment's Protection Against Unlawful Arrest

"In order to make a lawful arrest, an officer must have probable cause to believe the suspect committed a crime." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000). "The right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994).

The Deputies argue that "[b]ecause Plaintiff bit Deputy Delgado while he was attempting to remove her from the [vehicle], probable cause existed to believe that Plaintiff had committed the crime of assault on a police officer." Dkt. 24 at 19. In other words, the Deputies claim they had probable cause to arrest Plaintiff for aggravated assault. *See* TEX. PENAL CODE § 22.02(b)(2)(A)–(B) (classifying assault against a public servant as a first-degree felony). Plaintiff retorts that no reasonable deputy would believe there was probable cause to arrest her because she "was merely acting in self-defense." Dkt. 30 at 9.

Texas law provides that:

> a person is justified in using force against another when . . . [she] knew or had reason to believe that the person against whom the force was used . . . unlawfully and with force removed, or was attempting to remove unlawfully and with force, [her] from [her] . . . vehicle . . . .

TEX. PENAL CODE § 9.31(a)(1)(B). As discussed above, it has long been the law that a debtor may lawfully obstruct a self-help repossession by sitting in her vehicle to prevent it from being towed. *See Hensley*, 693 F.3d at 689–90. Thus, Plaintiff—who sat in the driver's seat of her own vehicle in a private parking lot—reasonably believed that the Deputies were unlawfully removing her from her vehicle. Furthermore, the videos show that the Deputies, not Plaintiff, were the ones that first deployed force in their interaction with Plaintiff. Delgado's video shows that when Delgado arrived to assist Ribbe in removing Plaintiff from her vehicle, Plaintiff grasped her steering wheel with both hands—not posing a threat to anyone—while threatening to file assault charges *against Ribbe*, who was twisting Plaintiff's wrist. *See* Delgado Video at 8:20–8:22. Plaintiff—a female senior citizen resisting the unlawful efforts of two men trying to prevent her from lawfully protecting her property by physically obstructing the Repo Man's self-help repossession—could have reasonably believed that biting Delgado's hand was the degree of force "immediately necessary to protect [herself] against [the Deputies'] use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). In this circumstance, Plaintiff's use of force is justified by Texas law.

16

If the Deputies "were aware of the facts that established this defense, then they lacked probable cause for aggravated assault." *Reyes v. Greer*, 686 F. Supp. 3d 524, 538 (W.D. Tex. 2023). The Fifth Circuit has "repeatedly refused to opine on whether facts supporting the existence of an affirmative defense are relevant to the determination of probable cause." *Espinal v. City of Houston*, 96 F.4th 741, 747 (5th Cir. 2024) (quotation omitted). But "[a]ll other circuits to consider the issue appear to have held that evidence of an affirmative defense is relevant to the probable cause inquiry in some circumstances." *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 835 (S.D. Tex. 2011). "[S]everal of those courts have . . . made clear that officers are *not* required to conduct any investigation of whether affirmative defenses apply," but an officer also "may not ignore conclusively established evidence of the existence of an affirmative defense." *Id.* at 835–36. Thus, when an officer knows facts that conclusively establish the existence of an affirmative defense, he must consider that affirmative defense in making a probable cause determination.

Here, all the facts demonstrating Plaintiff's justified use of force derive from clearly established law and the Deputies' own bodycams. No investigation was required on the Deputies' part. Accordingly, both Deputies should have considered that Plaintiff's use of force to defend herself against their unlawful efforts was justified, meaning there was no probable cause to arrest her for aggravated assault.

Because facts supporting probable cause for *any* crime—not just the crime for which Plaintiff was arrested—would entitle the Deputies to qualified immunity, they go on to argue that "the body cam videos reflect that a reasonable officer would have probable cause to arrest Plaintiff for breach of the peace." Dkt. 24 at 19. The Deputies boldly assert that "Plaintiff engaged in a confrontational tirade with the deputies thereby leading to a breach of the peace, which resulted in a physical confrontation and a loud disturbance." *Id.* As established many times throughout this opinion, reasonable officers should have known that the Repo Man—not Plaintiff, and not Plaintiff's ex-husband—had breached the peace by persisting

with a self-help repossession over objection. *See Hensley*, 693 F.3d at 689–90. The Deputies only exacerbated that breach. There was no probable cause to think that Plaintiff breached the peace by resisting the Deputies' unlawful conduct.

Finally, the Deputies argue that "a reasonable officer could have believed that the Plaintiff resisted arrest and was acting disorderly in violation of Section 42.01(a)(1) of the Texas Penal Code." Dkt. 24 at 20. This argument fails for the same reason the Deputies lacked probable cause to arrest Plaintiff for aggravated assault. Plaintiff was lawfully sitting in her own vehicle when the Deputies dragged her away and prevented her from physically obstructing the Repo Man's self-help repossession. Plaintiff's use of force was justified and the Deputies' bodycam videos supply all the facts necessary to know such force was justified. Therefore, the Deputies should have known they did not have probable cause to arrest Plaintiff for resisting arrest or disorderly conduct. Thus, the Deputies are not entitled to qualified immunity on Plaintiff's claims of unlawful arrest.

*   *   *

Having established that Plaintiff may proceed with her claims against the Deputies, I must now consider whether Plaintiff may also proceed with her claims against the County.

## B.    HARRIS COUNTY

### 1.    Monell *Liability*

"In *Monell . . .* , the Supreme Court held that Congress intended § 1983 to apply to local government entities as well as to persons." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994). The Fifth Circuit has explained:

> Under the decisions of the Supreme Court and this court, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom. *Monell* and later decisions reject municipal liability predicated on *respondeat superior*, because the text of section 1983 will not bear such a reading. Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; **isolated unconstitutional actions by**

> ***municipal employees will almost never trigger liability***. The three attribution principles identified here—a policymaker, an official policy and the "moving force" of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself. Mistakes in analyzing section 1983 municipal liability cases frequently begin with a failure to separate the three attribution principles and to consider each in light of relevant case law.

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (emphasis added) (cleaned up).

Official policy exists in two forms. "First, a plaintiff may point to a policy statement formally announced by an official policymaker." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010). Second, an official policy may "arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579). "A policy or custom is official only 'when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy.'" *Peterson*, 588 F.3d at 847 (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "State law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996).

Proof of a custom or policy can be shown by "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees," or where "a *final policymaker* took a single unconstitutional action." *Zarnow*, 614 F.3d at 169. "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Id.* "Consistent with the commonly understood meaning of custom, proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy." *Paz v. Weir*,

137 F. Supp. 2d 782, 799 (S.D. Tex. 2001). To plausibly "plead a practice so persistent and widespread as to practically have the force of law, [Plaintiff] must do more than describe the incident that gave rise to [her] injury." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 285 (5th Cir. 2020) (quotation omitted).

### 2.   *Plaintiff Has Not Alleged a Pattern of Unconstitutional Conduct*

Although Plaintiff points to several written policies—HCSO Standard Operating Procedures 207, 501, and 601—she does not allege that any of these written policies are the moving force behind the deprivation of her constitutional rights. Rather, Plaintiff complains that the County turned a blind eye to Delgado's and Ribbe's alleged failure to follow the County's written policies. Accordingly, to establish the County's liability as to any of her claims, Plaintiff must allege facts demonstrating a pattern of unconstitutional conduct. This she cannot do.

Plaintiff first points to what she claims is "a history of documented abusive and dishonest behavior with the HCSO" by Delgado. Dkt. 21 at 22. Yet, the events that Plaintiff cites are instances of neglect—failure to care for prisoners, failure to file paperwork, failure to adhere to traffic laws, and failure to turn on his bodycam. *See* Dkt. 21 at 22–24. Only one incident in the five years preceding Plaintiff's interactions with Delgado bears any resemblance to the conduct at issue in this case. In 2016, Delgado "hit [a man] in the face with his service firearm." *Id.* at 23. Two incidents over a decade are not a pattern of anything.

Plaintiff claims that Ribbe also "has a history of documented abusive and dishonest behavior with the HCSO." *Id.* at 24. Yet, as with Delgado, the bulk of Ribbe's discipline pertains to his causing car accidents and failing to complete necessary reports. *See id.* There is simply no relationship between Ribbe's disciplinary file and the conduct at issue in this case.

Plaintiff goes on to describe HCSO's alleged "culture of violence." *Id.* at 26. Plaintiff's allegations regarding this alleged "culture of violence" span a whopping 19 pages. *See id.* at 26–44. Yet, most of the allegations pertain to the Harris County

Jail and a separate federal lawsuit concerning the death or serious injury of 27 detainees at the Harris County Jail. *See* Dkt. 21-3. Even if Harris County has a policy of failing to train, supervise, and/or discipline officers at the Harris County Jail, that cannot be the moving force behind the alleged violations of Plaintiff's constitutional rights on private property. As the Fifth Circuit has explained:

> A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question. While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired.

*Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 810 (5th Cir. 2017) (cleaned up). Here, all Plaintiff offers is an amalgamation of bad and unwise acts totally divorced from the constitutional violations that she alleges the Deputies committed against her. Thus, Plaintiff fails to allege a pattern of constitutional violations that would establish the County's municipal liability. Accordingly, the County is entitled to dismissal of all of Plaintiff's claims against it.

## CONCLUSION

For the reasons discussed above, I **GRANT** the County's Motion to Dismiss (Dkt. 22) and **DENY** the Deputies' Motion to Dismiss (Dkt. 24).

SIGNED this 30th day of September 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE